

### HODGES WALSH & BURKE, LLP

ATTORNEYS AT LAW
55 CHURCH STREET, SUITE 211
WHITE PLAINS, NEW YORK 10601
———
(914) 385-6000
FAX (914) 385-6060
www.hwb-lawfirm.com

Michael K. Burke, Esq.
Direct E-Mail: mburke@hwb-lawfirm.com

February 21, 2020

Honorable Kenneth M. Karas
United States District Court Judge
300 Quarropas Street
White Plains, New York 10601

Re:     *United States v. Brendan Vaughan*
        19 Cr 526 (KMK)

Dear Judge Karas:

I am submitting this letter in connection with Brendan Vaughan's sentencing that is scheduled before your Honor on Thursday, February 27, 2020. We are requesting that Mr. Vaughan be sentenced to a time served sentence and transferred to a long-term inpatient facility for other necessary services and treatment to be provided by the New York State Office for People with Developmental Disabilities ("OPWDD"). On December 3, 2019, Mr. Vaughan pleaded guilty to three counts of transmitting a threat in interstate commerce, in violation of 18 U.S.C. § 875(c). As detailed in the PSR, the combined Guidelines offense level is 20 pursuant to U.S.S.G Section 3D1.4. Mr. Vaughan's adjusted offense level after acceptance of responsibility deductions under U.S.S.G Section 3E1.1(a) and 3E1.1(b) is level 17 with a criminal history category I for a corresponding guideline range of 24 to 30 months.

We disagree with, and object to, the basis for Probation's recommendation of an upward departure and maximum sentence of 60 months' imprisonment. There are numerous statements within the PSR that are incomplete, inaccurate or refer to statements or reports that were not disclosed to defense counsel to properly challenge. We have submitted a separate letter with objections dated February 21, 2020.

Significantly, Probation made only a passing reference to Mr. Vaughan's mental illness and totally disregarded the psychological evaluation of Dr. Kate Termini in which she found that Mr. Vaughan met the criteria for Autism Spectrum Disorder and with the correct intervention [such as can be provided by OPWDD] "Brendan Vaughan is considered low risk of violence and with improvement of his mood symptoms and development of copying resources in treatment he would be considered a low risk to his community."(Ex. A)(Dkt. Entry 31)  Probation also failed to acknowledge that OPWDD examined him and determined Brendan has a developmental disability and  is eligible and approved for their services in their inpatient facility. (Ex. B). Both Dr. Termini's report and findings and OPWDD's acceptance of Brendan for inpatient treatment were discussed with probation during the presentence report yet probation chose not to include any reference to those facts and determinations in its report or justification section. Inpatient treatment with OPWDD would provide Mr. Vaughan with necessary resources for managing his mental condition while a prolonged prison sentence without appropriate mental health will continue exacerbate his issues and negatively impact his ability to be a productive member of society.

I have attached for the court consideration the following records and character letters:

1. Evaluations of Dr. Kate Termini dated  (Ex. A)

2. Evaluation of Dr. Philip Bozmer Office for Persons with Developmental Disabilities (OPWDD) Ex. B.

3. NY State Police Report dated: 9-18-2016. Ex. C

4. Letter from treatment provider Elaine Zimmerman LCSW, dated 1-8-2020. Ex. D

5. Letter from Helen Lynch January 8, 2020. Ex. E

6. Letter from Kenneth Lynch January 8, 2020. Ex. F

7. Letter from Reverend Jeffrey Maurer January 9th 2020, Ex. G

8. Letter from George Frazier basketball coach, January 9, 2020 Ex. H

9. Letter from Kelly Vaughan (sister) Ex. I

10. Letter from Liz Lynch Brendan's Aunt Ex. J

11. Letter from Sean Vaughan Brendan's father Ex. K

12. Letter from Laura Moran Brendan's mother Ex. L

## I.  Background

Here, the first troubling snap chat messaging to a fellow classmate was reported on May 9, 2018 to the Washingtonville Police and Brendan was brought into the station and spoken to about the threat. His phone was searched and he was told in essence, to knock it off.  He was then permitted to return to school.  On May 20, 2018, Brendan's home was searched for the first of seven times. During the seven searches no weapons of any kind, were ever located.  On May 9, 2018, law enforcement searched his phone and saw that he had been searching past school shootings and pipe bombs. Brendan was permitted to return to Washingtonville High School until May 31, 2018 when he sent the second troubling messages over snap chat to a classmate (Victim 1) about a potential school shooting.  This was reported to law enforcement and on June

2, 2018 law enforcement again searched Brendan's home. No weapons were recovered. Brendan was away in Ocean City, Maryland with his mother for a basketball tournament. The next day, when he returned home, he was arrested and charged by the Orange County District Attorney with making terroristic threat. On June 2, 3rd, 7th November 20th, 28th, 29th, January 7th 2019 his home was searched several times the search team included the K-9 unit. No weapons, bombs, or destructive devices or materials were recovered. Initially, Brendan was arrested by the state on Making Terroristic Threats for the May 9th and May 31st, 2018 conduct.[1] He was then arrested by the FBI on November 20th, 2018 for the May threats and subsequent postings in August 2018.

## I.   **PSYCHOLOGICAL EVALUATION AND REFERRAL FOR SERVICES**

Though it was overlooked by Probation, the Court has previously been provided with an evaluation dated May 14, 2019, and an update dated June 19, 2019, from Dr. Kate Termini. (see Docket entry 31 Ex. A).   Dr. Termini comprehensive report and evaluation provides some context to a lot of the questions surrounding Mr. Vaughan's troubling behavior as well as optimism that similar future conduct can be avoided with appropriate treatment.

After he posted bail on the state charges, Brendan was immediately hospitalized inpatient at Four Winds from June 8, 2018 to July 5, 2018. His treatment notes from Four Winds from did not reflect that he made any threats while hospitalized from June 8, 2018 to July 5th, 2018.  Nor did he report that he was going to go to his High School graduation and engage in any violent acts. His discharge summary stated that he was diagnosed by the doctors at Four Winds with the Principal Diagnosis as Bipolar I Disorder, Most Recent Episode Manic, Severe with Psychotic Features Disruptive Mood Dysregulation Disorder and Secondary Diagnoses as Attention

---

[1] Counts one and two of the information are based on the same factual basis that New York State had lodge charges against Brendan. Count three relates to threats made on August 7th, 11th and 13th, 2018.

Deficit/Hyperactivity Disorder Combined Type. Then from July 6, 2018 through July 13, 2018, Brendan participated in an out-patient partial program through Four Winds while treating with his local psychiatrist Dr. Sylvan Nakkab. Brendan was then readmitted inpatient from August 15, 2018 to August 22, 2018 after suffering his first of at least six seizures that he suffered since his initial June 2018 arrest.[2] On November 20, 2018, Brendan was arrested again by the FBI for another series of snap chats that he posted with emojis of guns and bombs and the "845" area code. On November 28th, 2018 after the federal arrest and charges he was readmitted to Four Winds from November 28th, 2018 to December 5th, 2018. On December 5th, 2018 he was released to his parents and to be treated by his local psychiatrist Dr. Sylvan Nakkab. Brendan was readmitted again on January 8th, 2019 to Four Winds after he was to be found in violation of his bail conditions by having an electronic device.

While hospitalized at Four Winds following his January 2019 arrest for violating bail conditions, the investigating Special Agent from the FBI met with staff and doctors and provided information that led to a change in Mr. Vaughan's care. Defense counsel objected because counsel feared that the information would be misleading and sabotage his care. That is exactly what happened. Immediately thereafter, Four Winds reversed course in the treatment program for Mr. Vaughan and placed him under 24-hour supervision. This negatively affected him and not being able to properly cope he soon he began to not be compliant with staff and acting out including tampering with his GPS monitor. Following his hospitalization in January 7, 2019, Mr. Vaughan had been engaged and benefitting from in his treatment but the Special Agent's unnecessary interference negatively affected his outlook. As explained by Dr. Termini, Mr. Vaughan's mental condition and years of bullying makes him especially prone to regression

---

[2] Brendan suffered three seizures while out on bail that resulted in hospitalization. (Dr. Pogge evaluation He suffered from at least three seizures. Some of the seizures were related to his prescribed medications.

when he feels as if he is being attacked unfairly. (Ex. A) After the Special Agent intervened and Mr. Vaughan began responding negatively to treatment, he was diagnosed as have some symptoms of Antisocial Personality Disorder. Dr. Termini concluded that Mr. Vaughan has Autism Spectrum Disorder, the symptoms of which are consistent with the behavior at issue in this case, but finds no psychological basis for Antisocial Personality Disorder. Dr. Bozmer from OPWDD also met with and interviewed Brendan and reviewed his mental health records and agreed that he has a developmental disability of Autism and Brendan is acceptable candidate for a long-term inpatient program with his agency.

Brendan has been incarcerated from March 7th, 2020. He is not receiving any treatment for his Autism and while at MDC was prescribed a generic form of his medication that was causing his seizures so he discontinued taking it. While at MDC he was placed in solitary confinement for 97 days because of a disciplinary issue.  Numerous recent studies have found that solitary confinement has devasting lasting effects on individuals especially juveniles and individuals with mental illness.

See:https://www.americanbar.org/groups/litigation/committees/childrens-rights/practice/2016/ban-on-solitary-confinement-juveniles-federal-prison/ (last visited 2-21-20)

https://solitarywatch.org/2016/09/09/new-report-documents-devastating-effects-of-solitary-confinement-on-mental-illness/ (last visited 2-21-20)

Jails and prisons spend few resources on programming or services, with jails spending even fewer resources than prisons. Human Rights Watch and the American Civil Liberties Union found that it was exceedingly rare that facilities provided programming or services aimed at rehabilitation or social development to young people under age 18 in solitary confinement. While this is a problem for adolescents

in adult facilities generally, the problem is acute for those in solitary confinement. Youth enter jails and prisons—and solitary confinement—in the midst of a transition to adulthood.

As one expert with experience in juvenile and adult facilities expressed:

We are raising these kids. We need to teach them…. What we are doing is putting young men [and women] who are forming their identity in a situation where they are learning to do things—not in a good way…. So, if we are going to send young men [and women] to prison, we need truly specialized units where they can learn and grow. Because I think we all want them to be better off when they come out. The other thing they need is skills that will help them on the outside.

https://www.hrw.org/report/2012/10/10/growing-locked-down/youth-solitary-confinement-jails-and-prisons-across-united

Young people who have not had the same life experience as adults need programming to facilitate their development. Those who have been convicted of a crime *also* require rehabilitative programming. All youth deprived of their liberty need programming aimed at reentry into society. The longer young people are held in solitary confinement, the more egregious the deprivation becomes.

Almost all adolescents charged or convicted in the adult criminal justice system are eventually released into the community. Young people, as well as corrections and psychological experts, expressed concerns about the long-term implications for youth, and public safety, of failing to adequately provide for youth development and rehabilitation. *Id.*

**19-20 year-olds need rehabilitation not prolonged prison sentences like Probation recommends here**

Nancy Gertner a former United States District Judge (ret.) and current Harvard Law professor recently wrote an op ed piece in the Boston Globe about development and effect of incarceration of 18 to 20 year-old defendants such as Brendan.

https://www.bostonglobe.com/opinion/2017/06/19/year-olds-don-belong-adult-prisons/s8QTEcSxvdXNSP6QYPhnBN/story.html (Lasted visited 2-20-20)

"Keeping 18-to-20-year-olds in the juvenile system, where they must attend school and participate in rehabilitative programming, where they are given supervision and intensive services, is the best bet to reduce recidivism."*Id.*

Judges, prosecutors, and defenders in juvenile court are specially trained and have a broader range of options to deal with young people than officials in the adult system. And those youths who are committed to the custody of the Department of Youth Services have access to developmentally appropriate programs. The data speak volumes: Centers for Disease Control research shows 34 percent lower recidivism for young people with similar offenses tried in the juvenile system rather than in the adult system. *Id.*

Neurobiology and developmental psychology show that 18-to-20-year-olds are at a distinct developmental stage, in between children and mature adults. Most will "age out of criminality," especially if they cross the bridges that criminologists believe are essential, like completing their education, getting married, getting a job. Adult prison doesn't just stall that trajectory; it could derail it entirely. *Id.*

It is hard to imagine an environment worse for a youthful offender than an adult prison. Professor Joshua Buckholtz, of the Harvard Department of Psychology, put it this way: If an evil genius scientist were hell-bent on using the most up-to-date neuroscientific insights to make

youthful offenders more impulsive, aggressive, and antisocial, he could do no better than the adult prison: constant uncertain threat, being disconnected from communities, subject to long periods of social isolation, a regimented life that undermines their ability to learn to plan. He would break their ability to associate "good" behavior to future beneficial outcomes — a trait necessary for them to begin to envision a different life for themselves — by limiting access to meaningful occupational training and education while imprisoned, and/or ensuring that their occupational opportunities are impaired once released. *Id.*

Despite numerous efforts to have Brendan transferred to a facility to begin receive appropriate mental health treatment to address his Autism, Bi-Polar, Depression and ADHD counsel's efforts were meet with opposition. In fact, treatment of the mentally ill in the Bureau of Prisons has deteriorated and continues to be denied despite repeated promises of reform.

https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons (last visited 2-20-20)
See also:
https://www.dallasnews.com/opinion/commentary/2017/08/15/the-u-s-justice-system-has-an-autism-problem/
See also:
https://apps.bostonglobe.com/spotlight/the-desperate-and-the-dead/series/prisons/?p1=Spotlight_MI_Story_Explore

Finally, OPWDD evaluated Brendan and said that they could take him but that he could not have charges pending against him or be serving a criminal sentence. Left with little choice Brendan moved forward with a guilty plea in the hope that he can be transferred to an inpatient facility for OPWDD. In speaking with Steven Deaner and Dr. Philip Bozmer from OPWDD he informed me that the either of the 2 facilities are locked secured facilities with security and a

sallyport entry system to assure that the patients do not leave the facility. They will keep Brendan at the facility for a prolonged period of time to address his developmental disability.

**Horrifying Recent Mass Shootings**

Unfortunately, America has recently witnessed years of horrifying mass shootings, some of the worst taking place at schools. In a recent article in the *Atlantic* the author wrote about the growing trend of arrests of young people for threats made at their schools. https://www.theatlantic.com/politics/archive/2019/10/fake-school-shooting-threats-getting-kids-arrested/600238/ ( last visited 2-20-20)

In the article the author notes that "school leaders and law-enforcement officials say that they can't take any chances, and that they won't know what's a genuine threat until they investigate." If someone is going to commit a mass shooting, research has found, there is a good chance that they'll say something about it before carrying out the violence, which is why the Secret Service advised in a July report that people should tell school administrators or police if they're concerned about a student. Still, administrators concede that they, too, are frustrated with the false alarms that always seem to pop up on social media.

"There's an overreporting of these instances at schools because the administrators are afraid of something happening and they didn't report it," says Ken Baker, the head of the Ohio Association of Secondary School Administrators, a trade group for high-school officials.

Of the nearly 20 people the author spoke with for the story—including school officials, campus-safety experts, advocates for students, law-enforcement officials, and public defenders, as well as a suspect and his family—everyone agreed that if someone reports a threat against a

school, it should be taken seriously. However, there is a growing concern that in an effort to show how serious schools and police are, officials are imposing heavy sanctions on too many kids, potentially derailing their education and casting them away from their peers.

Here, the threats were scary and put some in the community on edge. Those fears were compounded by Brendan's interest in researching serial killers and mass shooters. However, Brendan has never displayed any violent tendencies in the past and does not have any weapons or access to weapons. Brendan has pled guilty to the crimes of making the threats as outlined above and needs to begin his mental health treatment as soon as possible with OPWDD to begin to get better.

## Brendan's Young Age, Vulnerability and Immaturity

Brendan's emotional age is relevant because when the offenses were committed Brendan was in his adolescence, the transitional period between childhood and maturity are important factors to consider.

Brendan's youth, immaturity and mental illness are all important considerations because he is more amenable to treatment and rehabilitation than are older offenders whose patterns of preference and behavior are well-settled. Because Brendan is still evolving through the normal process of maturation it will be easier for him to rehabilitate with the appropriate treatment. Brendan's age gives rise to the possibility that, with treatment, he will mature and move away from the troubling behavior which has brought him before the Court.

Related to age and maturity is the issue of vulnerability while in prison. *United States v. Gonzalez*, 945 F2d 525 (2nd Cir. 1991) (upholding 66-month downward departure for a 19 year old defendant who appeared 14 or 15). In our review, Brendan's boyish appearance, coupled

11

with his emotional immaturity would support a finding that older inmates would be especially likely to victimize him, further evidencing that he does not belong in prison. Brendan has reported such instances to me that while at MDC Brooklyn he was subject to sexual advances and potential abuse owing to his age and immaturity.

**Diagnosis of Autism**

In her analysis, Dr. Termini discusses many of the signs Mr. Vaughan has displayed from a young age that are consistent with high functioning Autism Spectrum Disorder. Mr. Vaughan's mother reported that as a child he "exhibited sensory sensitivities, including sensitivity to light, sound, and certain textures of food" as well as a generally "lonely existence, no friends, no birthday parties." (Ex. A 5/14/19 eval, p. 12). These differences made him a target for bullying that was relentless throughout much of his life in both elementary and high school. Some of the bullying included threats of physical harm leading to law enforcement intervention. (See, Ex. C) In fact, he transferred from John S. Burke High School after being threatened by a classmate. *Id.* Up to the current incidents, Mr. Vaughan has never engaged in any violent outbursts or shown a predisposition towards violent behavior.

Dr. Termini stated in her June 19th, 2019 addendum to her original report that:

"The finding of Autism Spectrum Disorder was based on numerous pieces of data, including Mr. Vaughan's presentation, his cognitive profile (as per testing he underwent at Four Winds), review of records, his parents report, and results of objective testing administered to his parents. His history of sensory issues, speech difficulties, difficulties in communicating, his social awkwardness, his difficulties with nonverbal communication, his difficulties making and maintaining friends, his inability to read social cues, his difficulties understanding other people's needs and feelings, as well as the findings of the test results from Four Winds support the diagnosis. Emotionally, he may be impulsive and reckless, and experiences symptoms of depression, and subjective measures administered to his parents indicated significant autism symptoms. These

findings, combined with his history of poor social functioning, poor emotional functioning, and behavioral problems provide clear indication for a diagnosis of Autism Spectrum Disorder." (update p. 1).

Dr. Termini further clarifies her finding by stating that:

"It is important to note that clinicians at Four Winds also believed Mr. Vaughan displayed symptoms of Autism Spectrum Disorder, as well as Antisocial Personality Disorder. They noted the personality disorder because he reportedly exhibited lack of empathy, lack of remorse, and always feeling he is right. All of these symptoms are also associated or can be perceived in individuals with autism. In fact, poor social functioning and poor emotional reciprocity are hallmark symptoms of high functioning Autism Spectrum Disorder. In Mr. Vaughan's case, his lack of social and emotional awareness is not due to a callous and aggressive temperament, but rather a neurocognitive profile that is developmental in nature." (update p. 2).

The symptoms of high functioning autism, specifically the inability to maintain and understand personal relationships and frustration with the lack of meaningful social interactions, are consistent with Mr. Vaughan's behavior as well. Dr. Termini commented on the high arrest rate of individuals suffering from autism for computer-based offenses,

"An article written by The Marshall Project highlights some of the reasons these individuals resort to such behaviors. 'People on the high-functioning end of the autism spectrum can have impressive cognitive abilities that mask areas of extreme deficit. They might be intellectually adult but socially childlike, hobbled by their inability to read emotion or understand non-verbal communication. They long for meaningful relationships but are routinely rejected because they are unable to navigate the intricate, invisible rules of social interaction…And so a great many people with high-functioning autism take refuge in computers, which allow them a way of approaching the world without the discomfort and risk of face-to-face interaction. And they transfer to that computer the same naivete, the same lack of street smarts and common sense, that they have in their everyday life.'" (update p. 2).

This provides an explanation as to why Mr. Vaughan continued acting out, despite being arrested on serious charges, and seemed to not understand why the community and law enforcement were so alarmed. Despite being angry and feeling alienated after years of untreated autism and ceaseless bullying, he is not a violent person and has a positive prognosis assuming he received

the appropriate mental health treatment and supervision.  Specifically, Dr. Termini stated that "with improvement of his mood symptoms and once he has begun to develop more adaptive coping resources in treatment, he would be considered a low risk to his community." (update p. 3).

Following Dr. Termini's evaluation, the OPWDD submitted a "Determination of Developmental Disability" for Mr. Vaughan finding that he has a developmental disability and is eligible for services.  As Dr. Termini stated in her evaluation, OPWDD is the appropriate state agency that is in charge of providing services to individuals afflicted with Autism Spectrum Disorder.  The OPWDD's services are critical to improving Mr. Vaughan's mental condition, addressing the conduct at issue, and ensuring he has a positive prognosis going forward.

## II. APPLICATION OF THE 3553(a) MANDATE AND FACTORS WARRANTS A NON GUIDELINE SENTENCE FOR BRENDAN VAUGHAN

The challenge in this case, like all cases, is to determine a fair sentence that is sufficient but not greater than necessary.  We can start with the general agreement that the conduct in this case is serious.

The overriding principle of 3553(a) requires a District Court to impose a sentence "sufficient, but not greater than necessary," to satisfy the four purposes of sentencing set forth in 3553(a)(2). The four purposes of sentencing set forth in 3553(a)(2) are: (A) to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant and (D) to provide the defendant with the needed educational or vocational training, medical care or other correctional treatment in the most effective manner.

The overriding principle of imposing a sentence that is sufficient *but not greater than necessary* to achieve these ends requires that the Court must also take into account 18 U.S.C. § 3582, especially when considering rehabilitation, the fourth purpose of sentencing under 3553(a)(2)(D). (emphasis supplied) 18 U.S.C. § 3582(a) states that the court, in analyzing the 3553(a), factors must recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation.

In determining whether the sentence is sufficient to comply with the 3553(a)(2) purposes of sentencing, factors to be considered are listed in § 3553(a). These factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the kinds of sentences available;
(3) the now advisory sentencing guidelines and policy statements;
(4) the need to avoid unwarranted sentencing disparity; and
(5) the need to provide restitution where applicable.

None of these factors are to be given greater emphasis than another. However, all of the factors are subservient to the overriding mandate to impose a sentence not greater than necessary.

**a.  The nature and circumstances of the offense and the history and characteristics of the defendant (3553 [a][1])**

As explained above in more detail and in Dr. Termini's evaluation, Mr. Vaughan is a young man with a significant developmental disorder that has been misdiagnosed and treated incorrectly for most of his childhood and young adult life.  Though he was raised in a caring home, it does not appear that he received any treatment for Autism Spectrum Disorder.  The unfortunate result is that he was bullied mercilessly throughout his school years and never formed any personal relationships with peers.  He even had a distant relationship from his own

parents. This disability bears directly on his conduct in this case and is the cause of his alarming behavior and inability to understand why his behavior is so serious.

Without question, Mr. Vaughan's use of snapchat to send messages to others about potential mass shootings is alarming to everyone in his community. As unacceptable as this behavior is, Mr. Vaughan never took any steps, aside from provocative language to the police and others, to actually carry out violence against other people. As reported, Mr. Vaughan does not like hunting and has never even held a gun. There is no indication he ever attempted to procure a firearm or other dangerous materials. Contrary to Probation's portrayal of Mr. Vaughan as a cold and calculating threat to the community, Mr. Vaughan's behavior is symptomatic of his Autism Spectrum Disorder and years of bullying. Though it is a serious disability involving obviously negative behaviors, with appropriate services and aggressive treatment individuals suffering from the same condition have been able to lead productive and positive lives. Mr. Vaughan is willing to enroll in any available services and actively participate in treatment, minimizing the chance of something like this ever happening again.

Probation's request for an upward departure above the guidelines sentence is excessive unduly punitive and fails to balance the factors relevant to sentencing. In support of their recommendation, Probation relies solely on the right of victims to be reasonably protected from the accused. *see* 18 U.S.C. § 3771. This presupposes that Mr. Vaughan is actually violent and that he intends to carry out his threats. There is no evidence he had or has any such intention. Sentencing him to 60 months in prison, rather than specialized treatment of the root cause, will only worsen Mr. Vaughan's mental condition and set the stage for possibly more inappropriate and alarming conduct down the line. As the Court is aware, an unnecessarily lengthy term of imprisonment is not an appropriate means of promoting correction and rehabilitation. *see* 18

U.S.C. § 3582.  Mr. Vaughan will ultimately be released at some point for these crimes and it is in his best interest, as well as the community's best interest, that he receives the treatment and services he desperately needs.

### Conclusion

Brendan Vaughan is a non-violent young man who has unfortunately struggled for years with unaddressed autism spectrum disorder, resulting in relentless bullying and an inability to engage in productive social interactions.  His mental condition and alienation from social circles in elementary school and high school has led to irrational and inappropriate attention seeking behavior.  While his actions are undoubtedly shocking and alarming to the community, he has never shown any propensity towards actual violent behavior nor has me made any preliminary steps to carry out crimes of violence.   Rather, Dr. Termini's report notes that individuals suffering from "high functioning autism" often resort to the safety of computer communications to seek relationships and that criminal behavior online is a manifestation of failing to comprehend social norms.  Mr. Vaughan is not a danger to the community and with appropriate treatment, as opposed to prison, he can learn necessary social and vocational skills.  This would minimize the likelihood of him re-engaging in similar alarming conduct and he has expressed a willingness to commit himself to intensive treatment.  It is respectfully requested that the Court sentence Mr. Vaughan to time served and/or probation with the condition that he participate in intensive treatment provided by OPWDD.  This will adequately address his Autism Spectrum Disorder and provide him with the tools to be a productive and social member of society.  Such a

sentence would be reasonable, sufficiently satisfies the sentencing factors – particularly as to rehabilitation and societal acclimation, and is not greater than necessary.

Very truly yours,

MICHAEL K. BURKE

MKB/sg
Enc.

# EXHIBIT A

KATE TERMINI, PSY.D.
FORENSIC AND CLINICAL PSYCHOLOGY

Michael K. Burke, Esq.
55 Church Street, suite 211
White Plains, NY 10601

June 19, 2019

RE: Brendan Vaughan
Indictment No. 18 Mag 9807

Dear Mr. Burke,

At your request, I examined your client, Brendan Vaughan, on March 15, 2019 at the Metropolitan Detention Center, in order to assist you in gaining a better understanding of his mental, psychological, and cognitive state at the time of the events that led to his arrest. Mr. Vaughan is charged with Threatening Interstate Communication and other related charges. In preparing for this evaluation, I reviewed various relevant documents and conducted collateral interviews. I issued a final report of my findings on May 14, 2019. It is my understanding that some questions were raised regarding my findings, thus the purpose of this letter is to clarify some of the content of my report.

As per my report, I believe Mr. Vaughan currently meets criteria for Autism Spectrum Disorder and Persistent Depressive Disorder (Dysthymia). The finding of Autism Spectrum Disorder was based on numerous pieces of data, including Mr. Vaughan's presentation, his cognitive profile (as per testing he underwent at Four Winds), review of records, his parents report, and results of objective testing administered to his parents. His history of sensory issues, speech difficulties, difficulties in communicating, his social awkwardness, his difficulties with nonverbal communication, his difficulties making and maintaining friends, his inability to read social cues, his difficulties understanding other people's needs and feelings, as well as the findings of the test results from Four Winds support the diagnosis. Emotionally, he may be impulsive and reckless, and experiences symptoms of depression, and subjective measures administered to his parents indicated significant autism symptoms. These findings, combined with his history of poor social functioning, poor emotional functioning, and behavioral problems provide clear indication for a diagnosis of Autism Spectrum Disorder. He has what would be considered "high functioning autism," or what was previously referred to as Asperger syndrome. His intellectual profile, indicating stronger verbal skills, combined with poor social cognition, is exactly the profile you would expect to see in an individual with this diagnosis. Additionally, individuals with autism tend to suffer from prolonged depression due to their inability to

KATE TERMINI, PSY.D.
FORENSIC AND CLINICAL PSYCHOLOGY

establish close relationships and going through their entire lives feeling disconnected and "different," thus he also meets criteria for a Persistent Depressive Disorder.

It is important to note that clinicians at Four Winds also believed Mr. Vaughan displayed symptoms of Autism Spectrum Disorder, as well as Antisocial Personality Disorder. They noted the personality disorder because he reportedly exhibited lack of empathy, lack of remorse, and always feeling he is right. All of these symptoms are also associated or can be perceived in individuals with autism. In fact, poor social functioning and poor emotional reciprocity are hallmark symptoms of high functioning Autism Spectrum Disorder. In Mr. Vaughan's case, his lack of social and emotional awareness is not due to a callous and aggressive temperament, but rather a neurocognitive profile that is developmental in nature. Personality disorders are generally believed to be caused by environmental factors that occur during our formative years. They are factors embedded in the way we view the world and react that are formed mostly based on our childhood experiences. However, the development of Autism Spectrum Disorder is due to specific neurocognitive networks, patterns and deficits that occur within our brains. Thus, though on the surface individuals with these two diagnoses may present with some overlapping symptoms, the etiology and core of these diagnoses is vastly different.

The question may remain - if Mr. Vaughan is not callous in nature, why did the instant offense occur? Recent articles have highlighted the high number of individuals with autism who are arrested for computer related crimes, with no contact offense. An article written by The Marshall Project highlights some of the reasons these individuals resort to such behaviors. "People on the high-functioning end of the autism spectrum can have impressive cognitive abilities that mask areas of extreme deficit. They might be intellectually adult but socially childlike, hobbled by their inability to read emotion or understand non-verbal communication. They long for meaningful relationships but are routinely rejected because they are unable to navigate the intricate, invisible rules of social interaction…And so a great many people with high-functioning autism take refuge in computers, which allow them a way of approaching the world without the discomfort and risk of face-to-face interaction. And they transfer to that computer the same naivete, the same lack of street smarts and common sense, that they have in their everyday life.[1] " Thus, individuals with Brendan's diagnoses and specific struggles are acting out on the Internet with increasing frequency. This does not justify his actions, but rather provides understanding for the motivation behind the behavior and a thus a starting point for therapeutic intervention.

Mr. Vaughan, like many individuals with high functioning Autism Spectrum Disorder, has gone undiagnosed and thus inappropriately treated throughout his childhood and

---

[1] The Marshall Project. "Downloading a Nightmare." Filed May 31, 2017

303 FIFTH AVENUE, SUITE 403, NEW YORK, NY 10016
Telephone (212) 532-2119 Fax (212) 532-2219 E-Mail: kftermini@gmail.com

KATE TERMINI, PSY.D.
FORENSIC AND CLINICAL PSYCHOLOGY

adolescence. As addressed, this has led to prolonged feelings of depression, alienation and anger, again not uncommon in this population. However, with the right intervention, Mr. Vaughan's emotional and social functioning can improve. He is not violent or hateful in nature, but rather requires intervention to learn how to properly process and cope with his emotions, and to help him develop more appropriate social skills. With the correct mental health treatment and supervision, Mr. Vaughan's mental state will improve and has a relatively good prognosis. Additionally, he has never been violent in the past, has not owned a firearm, and is motivated for treatment. Thus, with the correct intervention, Mr. Vaughan is considered a low risk of violence. With improvement of his mood symptoms and once he has begun to develop more adaptive coping resources in treatment, he would be considered a low risk to his community.

Respectfully submitted,

Kate Termini, Psy.D.
Licensed Clinical Psychologist
Adjunct Faculty, Department of Psychiatry,
Albert Einstein College of Medicine

KATE TERMINI, PSY.D.
FORENSIC AND CLINICAL PSYCHOLOGY

# FORENSIC PSYCHOLOGICAL EVALUATION

## BRENDAN VAUGHAN
### Ind. 18 Mag 9807

### May 14, 2019

Michael K. Burke, Esq.
55 Church Street, suite 211
White Plains, NY 10601

Dear Mr. Burke,

At your request, an independent psychological evaluation of Brendan Vaughan was performed in order to assist you in gaining a better understanding of his mental, psychological, and cognitive state at the time of the events that led to his arrest. Mr. Vaughan is charged with Threatening Interstate Communication and other related charges.

Mr. Vaughan was examined by the undersigned, Dr. Kate Termini, at the Metropolitan Detention Center on March 15, 2019. In conducting this evaluation, I reviewed Mr. Vaughan's personal, social, educational, vocational, and psychiatric history, and reviewed his understanding of the circumstances that led to his arrest. In addition, I conducted a telephone interview with his mother, Laura Vaughan and reviewed the following collateral sources of information in making my assessment:

1. Police Report, dated 9/18/2016
2. Sylvain Nakkab, M.D. medical records, dated 11/30/2017- 1/8/2019
3. Four Winds Hospital medical records, dated 6/8/2018-3/12/2019
4. Sealed Complaint, dated 11/19/2018
5. Letter to The Honorable Lisa Margaret Smith, dated 1/7/2019

## HISTORY

Mr. Brendan Vaughan is a 19-year-old, Caucasian male born on January 3, 2000 in Goshen, NY, and raised in Campbell Hall, NY. His mother, Laura Moran Vaughan, age 62, is the Vice President of a company called Inspire. She has no reported history of mental illness or substance abuse. His father, John Vaughan, age 69, is retired from his position as a manager at a trucking company. He has reportedly battled alcoholism but has been sober

303 FIFTH AVENUE, SUITE 403, NEW YORK, NY 10016
Telephone (212) 532-2119 Fax (212) 532-2219 E-Mail: kftermini@gmail.com

*Forensic Psychological Examination*
*Brendan Vaughan*

for nearly one decade. Both of Mr. Vaughan's parents immigrated from Ireland, where all of his extended family remain. Mr. Vaughan has one sister, Kelly Vaughan, age 30, who is in good health but suffers from anxiety. Mr. Vaughan and his sister were raised in an observant Christian home and the family was actively involved in their local church. Mr. Vaughan stated that he considers himself Christian and is willingly involved in church. He denied a history of abuse of any kind and reported being raised in a "comfortable" home, financially. He stated that despite his father's reported alcohol abuse when he was a child, Mr. Vaughan was never aware of his father's drinking in childhood and his father was not violent or aggressive when drunk. He reported that his father at time would yell.

Mr. Vaughan reported no complications with his mother's pregnancy or delivery of him but remarked that he was conceived via in vitro fertilization when his mother was 42 years of age. He denied a history of developmental delays, but for the development of a stutter. He recalled receiving speech therapy from the age of two or three until fourteen. His mother corroborated this and noted that he suffered from a speech impediment, auditory processing disorder, social difficulties, and sensory sensitives. Mr. Vaughan stated that since he was a very child, he has had great difficulty socializing and that he was a "chubby" child who was often teased. Additionally, he has always experienced significant sensitivity to light and sound, as well as certain textures. He reported having a "phobia" of yogurt as child because of its smell and texture, noting that as a child he could not comfortably be in the same room as yogurt. That phobia has lessened as he's gotten older. His mother corroborated this and noted that students used to taunt her son with yogurt, as they were aware of his phobia. Mr. Vaughan reported having obsessions or fixations, beginning with sports cars when he was a young boy. He also had a fixation with Yu-Gi-Oh cards that lasted through middle school, which he described as "a little extreme." He stated that crowds give him severe anxiety and he has difficulty adjusting to even slight changes in schedule. He tends to eat the same thing every day and tends to stick to a very strict routine. Again, his mother also reported these patterns of behavior. Mr. Vaughan stated that, especially as a child, he had no filter and was often told he said inappropriate things. He stated that he continues to have a difficult time knowing what is appropriate and what is not.

Mr. Vaughan attended elementary school at Most Precious Blood Christian School. He reported doing well academically. He recalled being verbally bullied beginning in the first or second grade. He stated that though he had one or two friends who he socialized with at school, he was generally withdrawn, with feelings of hopelessness. He stated that he preferred to be alone as a child. In the fourth grade, he reportedly developed a "tic cough" which caused him to involuntarily cough every few seconds. He stated that he was taken to see a neurologist who diagnosed the tic and treated it with medication. He recalled being home schooled through much of the fourth grade due to this severe tic. His mother corroborated this. Over the course of that year, the tic reportedly resolved with treatment and he returned to school in the fifth grade. In the fifth or sixth grade, Mr. Vaughan's parents reportedly took him to see a psychotherapist; however, he was unsure as to why they initiated therapy. He attended therapy weekly through the seventh grade at which time he

terminated treatment, receiving no mental health treatment again until his final year of high school.

Mr. Vaughan attended Washingtonville Middle School after begging his parents to take him out of Christian school. He stated that the Christian school was very small and he "hated" it there. He recalled liking public school more and being bullied less there. Though the bullying continued, his stutter had improved and he had lost weight, thus the bullying reportedly diminished. He reported being bullied by one fellow student, Danny, and his friends. There had reportedly been some conflict between Danny's family and Mr. Vaughan's family many years ago, causing Danny to act out towards Mr. Vaughan. Thus, Danny and his friends bullied Mr. Vaughan. Despite being bullied by that one circle of friends, Mr. Vaughan was able to make a few friends in middle school. He became interested in basketball in the seventh grade, a skill that helped him socialize a bit more. However, he stated that he still liked to be alone much of the time and often isolated himself during non-school hours. He stated that his sister played basketball in college, thus he was often exposed to it and encouraged to play. He stated that he became very dedicated to basketball and had a very specific work out that he did to train every single day. He stated that if he did not train for exactly four hours each day, he would "have a fit." He continued to play basketball throughout middle school, graduating to high school in a timely manner.

Mr. Vaughan attended John S. Burke Catholic High School for the ninth and tenth grades. He stated that he attended that school because all the other members of his family had attended school there, but he was tirelessly bullied. He stated that the bullying was verbal and emotional, with some pushing and shoving. Most of the students at that school were those he had gone to elementary school with, thus they resumed the bullying they had facilitated towards him in elementary school. He had one or two close female friends, but otherwise kept to himself. By the end of tenth grade, he desperately wanted to go to the local public school, but his parents were not pleased with that decision due to their legacy at John S. Burke Catholic High School. However, with persistence, his parents agreed to allow him to transfer to public school.

Mr. Vaughan began the eleventh grade at Washingtonville High School and reportedly "loved it." He stated that some of the bullying stopped, but he continued to be bullied by Danny and his friends, as well as students from his old school. According to records, a student from his old school threatened to shoot Mr. Vaughan and his family with an AK47, desecrate their graves, and other foul threats. Mr. Vaughan made a criminal complaint and legal action was taken. Mr. Vaughan stated that when basketball season arrived in his junior year, he was told he could not play that year because of a "transfer rule." This was very upsetting to Mr. Vaughan. According to Mr. Vaughan, he in fact tried out for the team but did not make it, an event that was very upsetting to Mr. Vaughan. He stated that due to not playing basketball his junior year, he "got a little depressed," was more isolated, sad all the time, with low energy. That depressive episode reportedly lasted until the Spring, at which time he began the Amateur Athletic Union (AAU) basketball season, a team he had been playing on for many years. Once he began playing basketball again, his mood

*Forensic Psychological Examination*
*Brendan Vaughan*

improved. He completed the eleventh grade without incident, becoming a volunteer at the local fire department in December 2017.

Mr. Vaughan denied ever engaging in drug or alcohol use because of his father's past alcoholism. He had his first romantic relationship with a female at the age of 15. She was of similar age and he was sexually active with her. The relationship lasted three months. In the tenth grade, he dated another female student for most of the schoolyear, but the relationship ended before school let out for the summer. During the summer after tenth grade, Mr. Vaughan was in a romantic relationship with a male. He was sexually active with that male, and the relationship lasted through the summer, but ended before the schoolyear began. He has no had any other monogamous relationships since that time. He considers himself bisexual but stated that he plans to marry a female. He recalled becoming aware of his bisexuality at the age of 12 but noted that he does not feel it negatively affected his sense of self or his mood.

Mr. Vaughan was excited to finally be on the school basketball team his senior year. He began the schoolyear looking forward to the basketball season. However, just before the try outs, Danny reportedly had his friend leave a note on Mr. Vaughan's desk stating that if he tried out for the basketball team, they would kill him. Mr. Vaughan knew that if he went to basketball try outs and eventually made the team, he would be harassed endlessly by Danny and his friends. Thus, he decided not to try out for the team. Given his mother's report that he did not make the team the previous year, it is unclear why he did not play basketball his senior year. However, he was continually bullied throughout his high school years.

In the fall of his senior year of high school, Mr. Vaughan's parents took him to see a psychiatrist and a psychotherapist. He stated that they were probably worried about him, as he was experiencing increased anxiety, mood swings, and anger. Mr. Vaughan underwent psychological assessment, and the psychiatrist reportedly told his parents that Mr. Vaughan had Asperger's disorder, anxiety, and attention deficit hyperactivity disorder (ADHD). He was reportedly prescribed a Daytrana patch, a steady-release stimulant medication used to treat ADHD, in approximately February 2018. Mr. Vaughan felt that the Daytrana patch made him feel a "crash" in the afternoon each day, during which after school he would feel sad, upset, and unmotivated. He also stopped socializing, stopped going to the gym, lost 20 pounds, and was having great difficulty falling asleep (something that had never previously been a problem for him). He hated the patch but stated that he kept it on most of the time as his doctor had ordered him to do so. Records indicate that he was also treated with Lexapro due to symptoms of depression.

## MR. VAUGHAN'S ACCOUNT OF THE OFFENSE CONDUCT

Mr. Vaughan stated that at the age of 12, he began researching and learning about mass shootings and serial killers. He stated that he was interested in it from a legal and

psychological perspective, seeking answers to questions such as why they did it." He also enjoyed watching shows like Live PD and Law and Order SVU. He stated that he has never shot or even held a gun before and has never been violent or used weapons of any sort.

Mr. Vaughan stated that beginning in February 2018, his mood continued to decline. He became "totally isolated, hopeless, just wanted to be alone." He denied suicidal ideation. In such a state, while speaking to a friend on Snapchat, he asked, "what would you do if someone shot up the school?" He stated that he in no way meant the comment as a threat to the school. However, the local police were alerted and came to speak to him in mid-May 2018. No charges were initially pressed. However, he reportedly then wrote on Snapchat, "I need a gun." The family then went to Maryland for the weekend and when they arrived home, there were numerous police cars at their home. When Mr. Vaughan arrived, officers pointed guns at him, and proceeded to interrogate him. They reportedly searched his room and found a handwritten notebook with writings of him "complaining about stuff." He spent four to five hours at the precinct before being arraigned and charged with a class D felony on June 2, 2018. He spent 36 hours in jail, where he was placed on suicidal watch, though he denies expressing suicidal intent at that time. He was then released on bail.

Shortly after his arrest, on approximately June 7, 2018, Mr. Vaughan was admitted to Four Winds Hospital at the recommendation of his psychiatrist and attorney. He was taken off of Daytrana and his mood quickly improved. He was treated with Lamictal and Seroquel. After spending one month in Four Winds, Mr. Vaughan was released to his home and put in a partial hospitalization program (PHP) at Four Winds. After one week in the PHP, Mr. Vaughan reportedly suffered a generalized tonic-clonic (GTC) seizure, a reported side effect of Seroquel. He stated that he was told he fell, his eyes rolled back in his head, he convulsed, and bit his tongue. He spent another four to five days at Four Winds after the seizure, before then spending two weeks in the PHP program before being discharged to the care of his private psychiatrist. Seroquel was discontinued, and he was prescribed Lamictal and Saphris. He stated that he was doing well but was angry with the local police department for charging him. He stated, "I felt fucked over by the PD, so I posted to Snapchat." This was a violation of his supervised release conditions. As a result, he was placed back in Four Winds in late August for one week, during which time they increased his dosage of Saphris.

After being released from Four Winds in late August, Mr. Vaughan was reportedly doing well. He had no cell phone and no access to the Internet. He was isolated and had "too much time on my hands." He stated that at night, he would go for long walks in his neighborhood because it "helps with coping." He would talk by the local playground, which was reportedly near the State Trooper barracks, walk to his church, say a prayer, and walk home. He recalled doing this every evening at 7:30 pm, informing his mother whenever he would leave. Shortly thereafter, Mr. Vaughan posted to social media, stating that he was smarter than the local police. He stated that he was "taunting the PD, I felt fucked over, was angry." When asked if he knew he could get into more trouble, he stated that at that time, he did not care. He was angry because after his initial arrest, the "media made me out to be the next Timonthy McVeigh." Despite posting to social media which he was not supposed

to do, he stated that overall he was doing well, "getting my life together, going to GED courses."

On November 20, 2018, Mr. Vaughan was arrested on federal charges. His attorney had informed him that this could happen. Federal agents came to his home and arrested him. He was bailed out immediately and returned to Four Winds. He was there for one week in late November, with no changes to his treatment plan.

On December 23, 2018, Mr. Vaughan was reportedly in a T-Mobile store with a friend, holding her phone. He was reportedly seen holding a cell phone, which he was not allowed to do, thus this was seen as a violation. On December 24, he called 911 "taunting them." He called twice, the second time playing gunshot sound from a movie. He added, "I was bored, pissed off." On December 27, 2019, he posted about the police department on social media, again stating he was "pissed off." The following day, he texted a friend stating that he knew how to remove his ankle bracelet. He stated that he had no intention of removing it but was just informing his friend that he had found a video that demonstrated how to remove it. On December 31, 2018, he went on the Internet on his mother's tablet device, which he had taken from her. She thought she had lost it, but he had in fact taken it. When asked why he would do that, he stated, "I felt so isolated, I just had to get in contact." He used it to post on Snapchat.

On January 7, 2019, Mr. Vaughan's bail was revoked and the Judge ordered him to return to Four Winds. While there, he stated that he "woke up, realized I needed to stop." He was at Four Winds for two months, until March 12, 2019. He stated that while there he did "say stupid stuff and joked about running, but lots of people do." He stated that his doctors were comfortable releasing him and he was doing well there and cooperating, but then federal agents came and spoke to his doctors. He does not know what they told his doctors, but after that visit they seemed afraid to discharge him. After the FBI left, he was placed on 24-hour observation, despite having already been there for one month without being on 24-hour watch. He was also taken off all medications. He stated that he then removed the battery from his GPS monitor. He stated that he was so miserable there, he thought that if he took the battery out, he would be sent to jail or home, "I just wanted out." He began to be uncooperative with treatment, as he felt he was being treated unfairly after the FBI spoke to his treatment team.

A Sealed Complaint states that Mr. Vaughan was charged with one count of Threatening Interstate Communications. It alleges that on May 31, 2018, he sent threatening message to another individual about a school shooting, using interstate communication. The Complaint states that on May 10, 2018, a police officer received information from the parent of a student at the high school expressing concern about messages sent to their child from Brendan Vaughan. He reportedly wrote in a group chat asking if his friend left a note in the school bathroom saying he was going to shoot the school, what would the result be? He further states that this friend planned to type the note, wear gloves, and leave it in the bathroom next to a picture of the Columbine shooters "just to see what would happen."

*Forensic Psychological Examination*
*Brendan Vaughan*

When questioned by police on May 11, 2018, Mr. Vaughan reportedly stated that he wrote those messages and that he had Instagram accounts under names that referenced the Columbine shootings. When asked if he wanted to hurt a specific person, Mr. Vaughan stated that there was a particular student he wanted to harm. A review of Mr. Vaughan's Google search history on May 20, 2018 found searches involving mass shooting in the United States, school shooters, and "pipe bombs." On May 31, 2018, Mr. Vaughan also wrote in a private message that he needed a gun. The FBI executed a search warrant on June 3, 2018 and found written notes about revenge, feeling like a victim, and a list of mass shooters, as well as a book about the Boston Marathon Bombing and a diagram of a school room. He was arrested that day.

Mr. Vaughan acknowledged that when he is emotional, he "acts stupid," but points out that he has no history of actual violence or even yelling. He stated that he understands why his actions were taken seriously, "but I'm not violent, I hate hunting, I've never shot or held a gun." Mr. Vaughan stated that he did Google the term pipe bomb but denies Googling "how to make a pipe bomb." When agents came to his home, he did in fact falsely tell them there was a pipe bomb under his bed, something he stated because he was afraid and wanted them to leave him alone.

Mr. Vaughan had been incarcerated for three days at the time of our meeting. He was not being prescribed any medications. Mr. Vaughan stated that he finds Lamictal helpful in controlling his mood swings. He stated that his family is what "keeps me going." He plans to get his Regents diploma and attend community college. He stated that he realizes his interest in mass shootings and serial killers was not healthy and is something he should no longer engage in.

## REVIEW OF DOCUMENTS

### Police Report, dated 9/18/2016

In 2016, Mr. Vaughan and his father went to the police station to file a harassment complaint against Michael O'Day, a classmate of Mr. Vaughan's. He stated that he was being constantly harassed for the past two years, to the point he had to transfer schools from Burke Catholic High School to Washingtonville High School. Apparently O'Day made numerous threats towards Mr. Vaughan over social media stating that he was going to shoot him, light his casket on fire, break every bone in his body, etc. Mr. Vaughan stated that he did not think that Mr. O'Day would physically hurt him but that he wanted to pursue criminal charges.

### Sylvain Nakkab, M.D. medical records, dated 11/30/2017- 1/8/2019

*Forensic Psychological Examination*
*Brendan Vaughan*

Mr. Vaughan saw Dr. Nakkab at the age of 17, reporting that he was being teased in school by a boy named Danny, especially during basketball tryouts. He was noted to have a history of speech therapy for a stutter and social anxiety. He reported missing basketball tryouts after an incident in school where Danny called him names and intimidated him. At that time, he was taking Ritalin 40 mg. Dr. Nakkab administered the CPT II. He had some abnormal scores on the CPT, indicating some inattention and impulsivity. His diagnoses were listed as Social Anxiety Disorder, H/O ADHD, R/O Chronic PTSD (see police report dated 9/18/16), R/O Language Based LD. Dr. Nakkab prescribed a Daytrana patch, Deplin and Lexapro and continued to see him monthly. Over the next few months he reported decreased anxiety.

In February 2018, he reported an interest in becoming a forensic psychologist and was researching crimes such as mass shootings. He stated that his fascination was intellectual and motivation for future work in the field. On March 13, 2018, Mr. Vaughan reported increased mood swings, isolation and depression. In May 2018, he reported that the police came to his home. He agreed to be hospitalized on June 7, 2018. In August 2018, his Lamictal was increased. On August 30, 2018, he was taking Lamictal 100 mg and Saphris 5 mg, which he was discharged from the hospital with. He continued to be seen by Dr. Nakkab. He reported being arrested in November 2018, with increased agitation since his arrest. He was again hospitalized in early January 2019 after making a worrisome statement to his attorney while at court.

## Four Winds Hospital medical records, dated 6/8/2018-3/12/2019

Mr. Vaughan was admitted to Four Winds after being referred by Dr. Nakkab. His mother reported that he got into trouble the previous weekend after posting something in a chatroom about the Columbine shooting. His mother was notified by the police and FBI that he had made threats to buy a gun and shoot up the school. His mother reports that he had been bullied all his life and that in March 2016, they had to pull him out of Catholic school due to the severity of bulling. He was placed in public school but the bullying continued. In September 2016, a student threatened to buy an AK47 and shoot him and his family, etc. so a police report was filed. The student confessed. It is noted that Mr. Vaughan had no history of violence, "usually plays the role of peacemaker, avoids confrontations." It is noted that he began therapy at age 12, and medication in adolescence for ADHD. He had recently been taking Lexapro and a Daytrana patch. He reported feeling more irritable and annoyed when the patch is wearing off, and more serious when he is on it. Patient had no reported substance abuse history, father was reported to have a prior history of alcohol abuse. He was noted to be sad, depressed, nervous, anxious, distress, fearful, panicky, and irritable. He was noted to have no suicidal ideation and passive homicidal ideation. His principal diagnosis was Disruptive Mood Dysregulation Disorder, and secondary was ADHD, combined type. A note from intake states, "Recommend poss neuropsych for violence risk as well as SAVRY clinically, writer suspects just at first blush, low risk." When asked about the instant offense, he stated that he was researching Columbine to try to understand why the two boys did it, and that he also would at times research serial killers as

*Forensic Psychological Examination*
*Brendan Vaughan*

part of an intellectual interest.  He stated that he would like to become a criminal lawyer. He stated that he made the comment in the chatroom "as a sort of thought experiment – jokingly yet serious theoretically." He also reported prior physical and verbal abuse from his father. He reported being socially isolated and having difficulty relating to his peers. While at Four Winds, Mr. Vaughan reported feelings that the world was against him.  These were seen as "false beliefs," though given his extensive bullying it is likely his beliefs were generalized from actual events. He stated that his feelings of isolation lead to his threatening online posts.  He reported remorse for what he did and told his treatment team he would never hurt anyone. He was initially treated with Risperdal but suffered nosebleeds as a side effect so it was discontinued.  He was then treated with Lamictal and Seroquel. He was treated at Four Winds for nearly one month and discharged on July 5, 2018 with diagnoses of Bipolar I Disorder, Most Recent Episode Manic, severe with psychotic features, and ADHD, combined type. At the time of discharge, he reported improved mood and insight.

Mr. Vaughan underwent a Psychodiagnostic Evaluation with David Pogge, Ph.D. while at Four Winds, on June 13, 2018. At that time he was being treated with 1 mg of Risperdal. His FSIQ was calculated to be 91, with a VCI of 95 and PRI of 82.  His WMI was 92 and his PSI was 105. His academic abilities were essentially commensurate with his intellectual skills. He demonstrated impairments on a measure of verbal learning (CVLT-II) and very poor performance on a measure of novel problem solving (WCST). His results on a self-report measure of personality were invalid. A projective measure showed he has poor emotional controls, and some off, unrealistic ideas. Other measures showed low self-esteem, social isolation, and aloofness. The summary states that Mr. Vaughan has average intellectual abilities, with stronger verbal versus non-verbal abilities, poor attentional skills, some executive dysfunction and difficulty learning and retaining new information. The author notes that his profile is consistent with a non-verbal learning disability.  The author also notes that he has a profile consistent with ADHD.

After his discharge from Four Winds in early July, Mr. Vaughan was enrolled in a PHP program.  His Seroquel was discontinued and he continued Lamictal. Mr. Vaughan was again admitted to Four Winds on January 8, 2019. Upon admission he stated, "I'm not someone who loses my cool, but yesterday I lost my cool."  It states that he recently used Snapchat to speak to a friend and investigators found out, as he is not supposed to given his arrest in June 2018. He stated that when two officers came to his home the previous day, while searching his home one officer said he found something.  "Pt was concerned that the may have planted 'a gun or something' so he became verbally aggressive toward the officers. He called one officer an 'asshole' after the officer placed handcuffs on him and when he was taken out of the house he called a supervising officer a 'bitch.'"  He also reportedly made suicidal statements while at his arraignment, but he denied suicidal ideation at the time of intake. Notes stated that he had been receiving outpatient treatment for ADHD since the age of 6, had five hospitalizations since July 2018, and was diagnosed with bipolar disorder. He reported having had a seizure from taking Seroquel. His father corroborated that he suffered a seizure six weeks prior and was treated at Orange Regional Medical Center.  Dr. Nakkab then reportedly put him on Saphris and Lamictal. He arrived at the hospital from

*Forensic Psychological Examination*
*Brendan Vaughan*

the courthouse after his arrest and was wearing an ankle monitor. During treatment, his mood was mostly stable. He repeatedly reported that the lights in the hospital bothered his eyes, but otherwise generally reported no distress. He was also noted to overshare in groups and lack insight into why it's inappropriate. It was reported that he was talking to patients about a pipe bomb, but when asked he stated he was only talking about it because he was asked why he was wearing an ankle bracelet.

Mr. Vaughan underwent another assessment with Dr. Pogge on January 15, 2019. He was described as having an odd interpersonal manner and sat rigidly with little facial expression. In regard to his previous testing, Mr. Vaughan said that at that time, he was "very desperate and angry" about the testing and therefore did not respond honestly. He apologized profusely. His performance on effort measures was within normal limits and he appeared to put forth good effort during assessment. On the WAIS-II, his FSIQ was 96, in the Average range, consistent with prior IQ estimates. His processing speed was superior. His working memory was a weakness, again consistent with prior testing results. However, his performance on measures of sustained and divided attention were improved from six months ago and within normal limits. This is likely due to a change in his mental status. He continued to struggle significantly on measures of memory. Personality testing revealed limited and immature coping resources. Changes in routine and unknown stressors created confused, disorganized and impulsive behavior for him. He has great difficulty regulating his emotions. He showed no evidence of psychosis. He showed a tendency to project his own feelings and ideas onto other people, leading to misinterpretations. He is highly self-critical and very insecure. He is "exquisitely uncomfortable in his interactions with others and keeps his distance from people whenever possible." Traits that came up include schizoid, avoidant, dependent, anxious and depressed. Dr. Pogge concluded, "there is nothing in these data that suggest that Mr. Vaughan is likely to suffer from a bipolar disorder or a psychotic disorder. However, he does appear to be an emotionally volatile individual who is prone to periods of acute distress and agitation." Dr. Pogge also noted no indications of increased risk of suicide or violent behavior.

A note from January 19 describes Mr. Vaughan in an entirely different manner than previous notes. All previous notes report him with stable mood, interacting with peers, and participating in treatment. The note from the 19th describes him as "potentially dangerous pt under FBI watch due to numerous veiled and direct homicidal threats…still symptomatic, neuropsych testing confirming high risk, pt requiring further hospital based stabilization for safety." This is entirely inconsistent with the testing results and prior notes about his mental state. Another note from his treatment team states that they met with Mr. Vaughan's father who "feels FBI lying about his son and things he did that he, the father, knows he did not do." It appears over the following weeks, there were numerous times he was told he would be discharged but then would be deemed unfit for discharge. On January 24, Mr. Vaughan became upset during a family session, stating that he wanted to go to Court and storming out, throwing a Kindle and breaking it. His behavior was later discussed and he states that he had no intention of hurting himself or anyone else. A note from that date states that his treatment team was considering starting Clozaril, with no explanation as to why. On January

26, a note stated that he needed continued inpatient care as his treatment team was in the process of changing his medications to better stabilize his reported bipolar disorder. On January 28, he was started on Clozaril. On January 31, after the FBI reportedly visited his treatment team, Mr. Vaughan was placed on 24-hour watch. He began to withdraw, stopped attending groups and engaging. On January 4, he was described as still perseverating about his discharge date. He was told that "I met with FBI and they shared info/concerns pt acutely suicidal and homicidal with plans to harm others. Patient's response was 'I stopped this in August.' This writer explained to pt he appears to have an obsession to hurt others and has not stopped these behaviors prior to admission." It was noted that he was seen watching Forensic Files and his treatment team used this as the basis for his continued violent thoughts. A day later he was overhead talking about eloping from the hospital and requesting a new doctor. That same day, he removed the battery from his ankle monitor. He began to be uncooperative with treatment and blamed the FBI for his continued stay in the hospital. Depakote was added to his treatment regimen.

A note from February 9, 2019 states that he "displays sx ASD – appears to have asperger's sx of rigid thinking, lack of social awareness/skills, believes his behaviors are justified so no need to listen to authority figures like FWH treatment team." His medication plan states, "Given his sx ASD and what appears to be a violent obsession – this writer trying a Clozaril trial to try to decrease his intrusive SI/HI thoughts – although these appear ego syntonic – so pt doesn't want to take medications or decrease his beliefs." He repeatedly lied to his treatment team, seemingly making up stories. His doctor wrote on February 16 that he "appears to meet criteria for ASD (rigid thinking, poor social relationships, unable to understand others reasoning, difficulty with abstract reasoning, highly concrete thinking) and Antisocial Personality Disorder (lack of empathy, lack of remorse for past actions, always a reason why he is in the right and others in the wrong.)" It was also noted that he did not appear to meet criteria for bipolar disorder. He was gradually taken off all medications. However, he was kept in the hospital for almost another several weeks. He again began to threaten elopement and be uncooperative. He was discharged on March 12 and taken into custody at Metropolitan Detention Center.

## Sealed Complaint, dated 11/19/2018

The Complaint states that Mr. Vaughan was charged with one count of Threatening Interstate Communications. It alleges that on May 31, 2018, he sent threatening message to another individual about a school shooting, using interstate communication. The Complaint states that on May 10, 2018, a police officer received information from the parent of a student at the high school expressing concern about messages sent to their child from Brendan Vaughan. He reportedly wrote in a group chat asking if his friend left a note in the school bathroom saying he was going to shoot the school, what would the result be? He further states that this friend planned to type the note, wear gloves, and leave it in the bathroom next to a picture of the Columbine shooters "just to see what would happen." When questioned by police on May 11, 2018, Mr. Vaughan reportedly stated that he wrote those messages and that he had Instagram accounts under names that referenced the

*Forensic Psychological Examination*
*Brendan Vaughan*

Columbine shootings. When asked if he wanted to hurt a specific person, Mr. Vaughan stated that there was a particular student he wanted to harm. A review of Mr. Vaughan's Google search history on May 20, 2018 found searches involving mass shooting in the United States, school shooters, and "pipe bombs." On May 31, 2018, Mr. Vaughan also wrote in a private message that he needed a gun. The FBI executed a search warrant on June 3, 2018 and found written notes about revenge, feeling like a victim, and a list of mass shooters, as well as a book about the Boston Marathon Bombing and a diagram of a school room. He was arrested that day.

On June 6, 2018, detectives interviewed a student who told them Mr. Vaughan asked about IEDs, a claim he denies. On July 4, 2018, digital evidence from Mr. Vaughan's cell phone was reviewed, which contained videos relating to mass shootings, and how to obtain a gun. In August 2018, he posted messages alluding to guns and bombs.

**Letter to The Honorable Lisa Margaret Smith, dated 1/7/2019**

A letter was submitted to the Judge requesting that Mr. Vaughan's bail be revoked because his behavior continued "over a period of months, despite warnings from law enforcement and included social media postings and apparent research into the purchase of firearms and the construction of explosive devices." This letter outlines his behavior from June 2018 through January 2019, in which he posted messages to social media, "taunted" law enforcement, and made inappropriate and at times potentially threatening remarks. These were noted to be violations of his pretrial release conditions and it was alleged that he "poses a danger to the community and has shown he cannot be trusted to abide by any bail conditions." Thus, "The Government respectfully submits that, for the reasons stated above, the evidence is sufficient to meet the Government's burden, and the Court should revoke the defendant's bail."

## COLLATERAL INTERVIEWS

**Laura Vaughan, 4/11/2019**

A telephone interview was conducted with Laura Vaughan, Mr. Vaughan's mother. She corroborated much of what her son stated to this examiner. She noted that he began speech therapy at the age of two or three, until middle school. He suffered from first word repetition, auditory processing disorder, and attention deficit hyperactivity disorder. She noted that since childhood he has exhibited sensory sensitivities, including sensitivity to light, sound, and certain textures of food. She noted his extreme aversion to yogurt and that students in school would taunt him with the food, which at times would cause him to vomit. She noted that he was a fussy eater and only ate five foods for most of his upbringing. She described him socially as having a "lonely existence, no friends, no birthday parties." He generally would keep to himself and not complain about this, but she noticed that in sixth grade depression became more prominent. In the fourth grade, he did develop a tic cough which was treated by a neurologist with medication. The tic resolved over the course of that

*Forensic Psychological Examination*
*Brendan Vaughan*

year and he was able to return to school in the fifth grade. The tic never returned and he has never suffered another form of tic. In high school, his pediatrician reportedly recommended that he seek counseling, thus his parents put him in individual and group psychotherapy with Dr. Elaine Zimmerman. She then referred him for medical management to Dr. Nakkab. In regard to the instant offense, Mrs. Vaughan stated that her son's mental state became worse in the 11th grade after he did not make the basketball team (he stated that he was not able to try out that year because of a transfer rule). Additionally, his sister and her husband moved into their own home, further limiting Mr. Vaughan's daily social interaction. He was endlessly teased and bullied at school throughout his entire education, thus his mother feels his actions were the result of being "lonely and wanting attention." She stated that she has never witnessed him be violent or aggressive in any manner and he has never shown an interest in weapons of any sort. She stated that in fact, when she recently suffered from a severe, debilitating illness, her son helped care for her.

## TESTING RESULTS

As Mr. Vaughan very recently underwent cognitive and psychological testing while a patient at Four Winds, this testing could not be repeated within a 12-month time-frame, thus those results are believed to be the most accurate reflection of his current function. In addition to reviewing those test results, some measures of functioning were administered to Mr. Vaughan's parents to get a better sense of his overall level of functioning.

**Parent Report Measures:** Mr. and Mrs. Vaughan were administered the Adaptive Behavior Assessment System – third edition (ABAS-3), a measure of adaptive functioning. With the exception of his self-care abilities, Mr. Vaughan's adaptive functioning scores are all well below what would be expected of someone with his intellect and level of education. His overall General Adaptive Composite is at the 5th percentile, well below expectations (GAC=76). His performance is comparable on both conceptual and social indexes. His worst area of ability is in the domain of health and safety, in which his performance was rated at the 1st percentile. His performance in the area of leisure activity was at the 2nd percentile, and in the social and community use domains, his performance is at the 5th percentile. Overall, his parents' report of his adaptive functioning indicates areas of significant deficit, with overall performance well below expectations for an individual with his level of intelligence.

Mr. Vaughan's parents were also administered the Autism Spectrum Quotient, a report of symptoms of autism spectrum disorders. The overall score (raw score=29) indicates the presence of what used to be referred to as Asperger's Syndrome. They endorsed their son experiencing things such as getting overly absorbed in things, being fascinated by dates and numbers, having difficulty tracking social conversations, difficulty in all social situations, difficulty with nonsocial cues, abnormal focus on details, and poor multitasking, as well as other symptoms.

*Forensic Psychological Examination*
*Brendan Vaughan*

## BEHAVIORAL OBSERVATIONS

Mr. Vaughan presented as a Caucasian male of tall height and slim build. He was dressed appropriately in jail garb with intact grooming and freshly washed hair. Mr. Vaughan was fully oriented. He was calm and cooperative and rapport was easily established. Speech was normal for rate and volume, though monotonous. His responses were logical and goal directed, though concrete. He did appear to embellish at times, unclear if out of shame or slightly grandiose thinking. For example, he reported not trying out for the basketball team when in fact he did not make it. His responses were more blunt and detailed than is typical, showing little emotion and awareness of his unnecessarily long-winded responses. There was no evidence of thought disorder, delusions or hallucinations. His mood was slightly depressed and his affect was somewhat constricted. He denied suicidal or homicidal ideation.

Mr. Vaughan maintained proper attention and concentration throughout the evaluation and answered questions without seeming delays in response time. He reported having difficulty recognizing emotions in other people and stated at times he will say things that are inappropriate or hurtful, but he does not understand why others perceive his comments that way. He reported feeling he relates best to the elderly, noting his best social interactions occurring at his grandmother's retirement community in Florida. Mr. Vaughan stated that when he is experiencing heightened emotions, he does not think clearly. When asked what he thinks is the reason for his struggle and current difficulties, he stated that he believes he has Asperger's and anxiety. He stated that he has learned not to mess with the authorities.

Mr. Vaughan had been incarcerated for just a few days at the time of our meeting. When asked how he is adjusting, he stated that he is "getting by." He remarked that little things are "tough" like the changes in clothing/fabric, hairstyle, routine, etc. However, he is adjusting to the rigid schedule he must now abide by. He has difficulty sleeping but his appetite is normal. He has been playing chess a lot and keeping his head down in order to avoid trouble.

## FORENSIC OPINION AND FORMULATION

### Autism Spectrum Disorder
### Persistent Depressive Disorder (Dysthymia)

Brendan Vaughan is a 19-year-old man born into an intact family. As a child, he reportedly exhibited developmental speech difficulties, sensory issues, and social difficulties. Through his entire school career, he experienced severe bullying and torment. The bullying became so severe that after death threats were made towards him, the police became involved. Despite endless bullying, Mr. Vaughan has no history of violence or reciprocating the torment, with the exception of the instant offense. Throughout his life, he experienced social difficulties and intermittent depressive symptomatology. He began seeing a

*Forensic Psychological Examination*
*Brendan Vaughan*

psychiatrist during his final year of high school and was treated for depression and ADHD. In the context of continued bullying and depression, Mr. Vaughan made comments to fellow students about a school shooting and a need for a gun. Consequently, he was arrested on state charges. Following his arrest, he continued to make inappropriate comments on social media and violate the terms of his release, thus he was later arrested on federal charges.

Mr. Vaughan was raised in New York in a stable household. As a young child, he experienced developmental language difficulties, sensory sensitivities, sensory sensitivities, rigidity, poor socialization, and specialized interests. As he began school, he functioned well academically but had significant social difficulties. As Mr. Vaughan began school, he was consistently bullied. He was never involved in school social activities and had no close friends. In the fourth grade, he developed a tic cough, which as per research literature is believed to be related to stress and anxiety in school-aged children. As Mr. Vaughan began high school, he continued to experience social difficulties and was endlessly bullied. Despite the bullying, Mr. Vaughan never reacted violently, or retaliated in any respect. The torment became so severe that in the eleventh grade, a student threatened to shoot Mr. Vaughan and his family with an AK47, desecrate their bodies, as well as other horrific acts. A police report was filed. He began to experience increased depressive symptomatology, including isolation, irritability, and sadness. His parents took him to a psychiatrist during his senior year who treated him for depression and ADHD.

In the latter half of his senior year, Mr. Vaughan's psychiatric state deteriorated. He reported increased irritability and poor sleep in reaction to the medication Daytrana. These symptoms, combined with his depression, began a spiral of acting out behaviors that led to his current legal troubles. He reportedly experienced a number of psychosocial stressors around that time, including not making the basketball team, something that he had desperately wanted, his sister and her husband moving out of the family home, and his mother's chronic illness.

Mr. Vaughan reported having an interest in criminal behavior, namely mass shooters and serial killers, for many years. He even reported this interest to his psychiatrist well before any criminal charges occurred, noting that he had an interest in pursuing a career in the law or psychology and was fascinated by criminal behavior. Unfortunately, that interest combined with his neurological status, depression, irritability, and anger resulted in a series of unfortunate actions. Mr. Vaughan's initial comments to fellow students were hypothetical in terms of how they would react is someone shot up their school. The comments continued and raised alarms for students and parents. Mr. Vaughan continued this train of comments, stating that he was in need of a gun. Thus, he was eventually arrested for making threats to his school, despite never making an actual explicit, direct threat. When his home was searched, there were no weapons found and other than Google searches, it appears he made no efforts to obtain any sort of weaponry.

After his arrest, Mr. Vaughan continued to make inappropriate comments, violate the terms of his release, and in some ways taunt the local police department. He admits to anger

*Forensic Psychological Examination*
*Brendan Vaughan*

and resentment towards the police, and thus acted out with his words online. He was consequently arrested on federal charges and hospitalized psychiatrically numerous times.

Since his arrest, Mr. Vaughan has been treated at Four Winds Hospital numerous times. His initial admission resulted in a diagnosis of bipolar disorder, most recent episode manic, with psychosis. It is unclear from the hospital notes why such a diagnosis was made, with the exception of a mention of beliefs that the world was against him. Though out of context this could be seen as a paranoid belief, Mr. Vaughan's experience with lifelong bullying and poor social interactions actually makes his belief quite justified. Thus, it is entirely unclear to this examiner why a bipolar diagnosis, with psychosis, was made. During that hospitalization, Mr. Vaughan underwent psychological assessment. The cognitive results indicated an average intellect, with stronger verbal versus nonverbal abilities, poor working memory, poor verbal memory, and strong processing speed. The evaluator, Dr. Pogge, stated that his profile was consistent with nonverbal learning disorder and ADHD. His personality testing was invalid, as he admittedly feigned psychiatric symptomatology. During his most recent, two-month long admission, Mr. Vaughan's diagnosis was eventually changed and testing was repeated. He was again initially treated for bipolar disorder after making a suicidal statement to his attorney. Testing again revealed average intellect, with poor working memory and poor overall memory abilities, with superior processing speed. Personality and emotional testing revealed limited and immature coping skills, poor emotional control, especially in novel situations, social aversion, avoidance, misinterpreting others', and projecting his own feelings onto others. There was no evidence of psychosis or mania and he was noted to not be at increased risk of suicide or violence. Over time, it was noted that he met criteria for autism spectrum disorder and antisocial personality disorder, and not bipolar disorder. He was noted to have autism symptoms including rigid thinking, poor abstract reasoning, concrete thinking, lack of social awareness, poor relationships, and the inability to understand others.

Of note, Mr. Vaughan's cognitive and personality testing cannot be repeated at this time, as he has undergone testing twice within the past six months. Testing generally cannot be repeated within a 12-month period, thus the current results will be used as an indicator of his current cognitive status. However, assessment instruments were administered to Mr. Vaughan's parents to get a better sense of his level of functioning. Overall, his adaptive functioning is well below what would be expected and indicative of numerous areas of deficit, namely in the health and safety domain, leisure domain, community use, and social abilities. Additionally, on a questoinaire of symptoms of an autism spectrum disorder, his parents indicated that he experiences numerous symptoms of what used to be referred to as Asperger's Syndrome. These findings, combined with his testing results from Four Winds, are consistent with someone on the autism spectrum. In fact, nonverbal learning disorder (which Dr. Pogge mentions) is considered a diagnosis that is on the mildest end of the autism spectrum, as the cognitive and social profile is the same as those with mild autism.

Given Mr. Vaughan's background history, development, current pattern of cognitive and emotional functioning, and current presentation, he qualifies for a diagnosis of Autism

Spectrum Disorder (formerly Asperger's Disorder). It is important to note that Asperger's Disorder is no longer present in the DSM-V and was replaced by Autism Spectrum Disorder on a severity scale. Mr. Vaughan's history of sensory issues, speech difficulties, sensory sensitivities, difficulties in communicating, his social awkwardness, his difficulties with nonverbal communication, his difficulties making and maintaining friends, his inability to read social cues, his difficulties understanding other people's needs and feelings, as well as the findings of the test results from Four Winds clearly indicate an Autism Spectrum Disorder. Though this diagnosis was recently mentioned in his psychiatric records, no one ever made an official diagnosis, which is surprising given the wealth of evidence for such a diagnosis. Individuals with autism spectrum disorders, particularly when they go undiagnosed and untreated, will often develop a secondary depression, as they feel no one understands them and are unaware why they are different. For those who receive a childhood diagnosis, they are more likely to receive services and are at least able to identify why they feel different, to some extent mitigating the depression. However, Mr. Vaughan was not granted that opportunity. In addition to not understanding his own deficits, he was endlessly teased and bullied due to his neurological, and consequent social, differences.

Despite the comments he made online, Mr. Vaughan has never committed any sort of act of violence or possessed a weapon. Recent articles have highlighted the high number of individuals with autism who are arrested for computer-based offenses. An article written by The Marshall Project highlights some of the reasons these individuals resort to such behaviors. "People on the high-functioning end of the autism spectrum can have impressive cognitive abilities that mask areas of extreme deficit. They might be intellectually adult but socially childlike, hobbled by their inability to read emotion or understand non-verbal communication. They long for meaningful relationships but are routinely rejected because they are unable to navigate the intricate, invisible rules of social interaction…And so a great many people with high-functioning autism take refuge in computers, which allow them a way of approaching the world without the discomfort and risk of face-to-face interaction. And they transfer to that computer the same naivete, the same lack of street smarts and common sense, that they have in their everyday life."[1] This is namely because those with autism have an inability to place themselves in someone else's shoes, something Mr. Vaughan stated has been an issue for him throughout his life, being unaware of how his actions might feel to others. Thus, repeated comments about Mr. Vaughan's inability to understand the severity of his actions are in fact accurate, as he has difficulty understanding why his comments would be so frightening to others.

Given Mr. Vaughan's lack of violence, lack of steps to obtain weaponry, and the passive nature of his comments (online), it appears that at the time of the instant offense, he did not have actual intent to commit a school shooting. He was depressed, angry, and overwhelmed by his emotions. Individuals on the autism spectrum have great difficulty appropriately processing strong emotions, similar to how a child might experience them in the form of a tantrum or absurd, angry statements. This too explains his repeated impulsive,

---

[1] The Marshall Project. "Downloading a Nightmare." Filed May 31, 2017.

defiant comments towards law enforcement. He was acting out against strong emotions that he lacked the ability to properly cope with. He has repeatedly stated that he was at no point actually homicidal, or suicidal for that matter. Though one would often be inclined to not believe someone in Mr. Vaughan's situation, there is no evidence to believe the contrary. Thus, it is highly likely that Mr. Vaughan was being truthful in stating his lack of intent to harm anyone.

In total, the sum of these various static, dynamic, mitigating and aggravating factors contributed to Mr. Vaughan's committing the act for which he is charged. Though he does not exhibit intellectual and cognitive dysfunction to the level that would render him incapable of comprehending the wrongfulness of his actions, cognitive factors, namely the presence of an autism spectrum disorder, did contribute to his poor judgment. These psychological and cognitive factors findings played, in my professional opinion to a reasonable degree of psychological certainty, a significant role in the commission of the act and could be considered as mitigating factors in rendering a fair and just sentence for Mr. Vaughan. Mr. Vaughan does require ongoing supervision, psychotherapy to provide psychoeducation and help reinforce him the wrongfulness of his actions. This therapy should be provided by someone with experience treating individuals on the autism spectrum. Additionally, participating in group therapy to improve his social skills might help provide him with some tools to engage in an appropriate, adult relationships. Social skills training and occupational training would also be particularly helpful in aiding Mr. Vaughan's transition into adulthood and his ability to function and care for himself independently. Given that his is a developmental diagnosis, he would be most appropriately referred for services to the Office for People with Developmental Disabilities.

Respectfully submitted,

**Kate Termini, Psy.D.**
Licensed Clinical Psychologist
Adjunct    Faculty,    Albert
Einstein College of Medicine

# EXHIBIT B

 **NEW YORK STATE OF OPPORTUNITY.** | **Office for People With Developmental Disabilities**

ANDREW M. CUOMO
Governor

THEODORE KASTNER, MD, MS
Acting Commissioner

June 18, 2019

LAURA MORAN
32 HAMPTONBURGH RD
CAMPBELL HALL, NY    10916

RE:  Determination of Developmental Disability (TABS ID 457435)

Dear Brendan Vaughan:

An eligibility packet was submitted to Hudson Valley DDSO in
support of your request for a determination of developmental disability
and eligibility for OPWDD services. The 1ST Step review was completed
on 05/17/2019, at which point staff was unable to render a determination.
The packet submitted for 2nd Step Review on 05/17/2019 included:

Wechsler Test WAIS-IV
Adaptive Behavior Assessment System ABAS-III
1/8/19     Four Winds - Katonah Psychiatric Assessment (p. 1-2 of?)
10/25/17   Physical Examination & Immunizations Report
6/8/18     Four Winds - Katonah Psychiatric Assessment
6/8/18     Four Winds - Katonah Medication Verification and Reconciliation
Form at Admission
6/8/18     Four Winds - Katonah Psychosocial Assessment
7/5,6/18   Four Winds - Katonah Discharge/Referral Summary (section
"4" is missing)
6/8/18     Four Winds - Katonah Medication Verification and Reconciliation
Form at Discharge
Undated    Four Winds Hospital Parent Dialectical Behavior Therapy (DBT)
Undated    Personalized Recovery Oriented Services (PROS) (p. 1-2 of 4)
6/13/18    Four Winds Hospital Psychodiagnostic Evaluation
8/15/18    Four Winds - Katonah Psychiatric Assessment
8/15/18    Four Winds - Katonah Medication Verification and Reconciliation
Form at Admission
8/15/18    Four Winds - Katonah Psychosocial Assessment Update
8/15/18    Four Winds Hospital Admission Medical History & Physical
Examination
8/22/18    Four Winds Discharge/Referral Summary
8/22/18    Four Winds - Katonah Medication Verification and Reconciliation
Form at Discharge
8/22,23/18 ECG
8/15,16/18 18   Lab Reports
11/28/18   Four Winds - Katonah Psychiatric Assessment

| 11/28/18 | Medication Verification and Reconciliation Form at Admission |
| 11/28/18 | Four Winds - Katonah Psychosocial Assessment |
| 12/5/18 | Four Winds Discharge/Referral Summary |
| 12/5/18 | Four Winds Medication Verification and Reconciliation Form at Discharge |
| 11/28/18 | ECG |
| 11/28,29/18 | Lab Reports |
| 5/14/19 | Forensic Psychological Evaluation |
| 4/12/19 | Forensic Psychological Evaluation |
| 4/25/19 | ABAS-3 - Adult form (unscored) |
| Undated | Autism Spectrum Quotient questionnaire (unscored) |

Based upon the information you provided and the results of the 2nd Step Review, we have determined that you have a developmental disability and you are eligible to apply for OPWDD services. Please note that some OPWDD services have additional eligibility criteria that have not been reviewed through this process.

*For more information and to apply for services please contact your Care Coordination Organization "CCO", if you are not yet affiliated with a Care Coordination Organization "CCO" please call one of the agencies that service your region. <u>See Attached Listing OR</u> please feel free to contact The Orange County Front Door at 845-695-7330.*

DDRO Staff Signature _____ Date _6/19/7.19_

Printed Name _Philip Bomzer, PsyD_____ Title _Eligibility Coordinator_
MAW

*PLEASE MAIL ALL CORRESPONDENCE TO ADDRESS BELOW*

# EXHIBIT C

| 1. Agency F2 TROOP F - ZONE 2 | 2. Div/Precinct F231 | New York State INCIDENT REPORT | 3. ORI NY1350200 | 5. Case No. | 6. Incident No. 7141749 |
|---|---|---|---|---|---|

| 7,8,9. Date Reported (Day, Date, Time) SUNDAY 09/18/2016 11:45 | 10,11,12. Occurred On/From (Day, Date, Time) SUNDAY 09/18/2016 11:45 | 13,14,15. Occurred To (Day, Date, Time) |
|---|---|---|

| 16. Incident Type HARASSMENT-AGGRAVATED HARASSMENT | 17. Business Name |
|---|---|

**19. Incident Address (Street Name, Bldg. No., Apt. No.)**
32 HAMPTONBURGH RD

**20. City/State/Zip**
CAMPBELL HALL NEW YORK 10916

| 21. Location Code (TSLED) HAMPTONBURGH TOWN 3657 | 23. No. of Victims 0   - | 24. No. of Suspects 0 | 26. Victim also Complainant? YES |
|---|---|---|---|

**Location Type**
SINGLE FAMILY HOME

| 22. OFF. No. | LAW | SECTION | SUB | CL | CAT | DEG | ATT | NAME OF OFFENSE | CTS |
|---|---|---|---|---|---|---|---|---|---|
| 1. | PL | 240.30 | | A | M | 2 | C | AGGRAVATED HARASSMENT-2 | 1 |

## ASSOCIATED PERSONS

| 25. TYPE | Name (Last, First, Middle, Title) | DOB | Street Name Bldg., Apt.No., City, State, Zip | Res. Phone Bus. Phone |
|---|---|---|---|---|
| PERSON INTERVIEWED | VAUGHAN, JOHN, F | 01/02/1951 | 32 HAMPTONBURGH ROAD CAMPBELL HALL NY, 10916 HAMPTONBURGH NY 10916 | |
| SUSPECT | | | NY | |
| VICTIM/COMPLAINANT | VAUGHAN, BRENDAN | 01/03/2000 | 32 HAMPTONBURGH RD CAMPBELL HALL NY 10916 | |

## VICTIM

| Name VAUGHAN, BRENDAN | 27. DOB | 28. Age 16 | 29. Gender MALE | 30. Race WHITE | 31. Ethnicity NOT HISPANIC | 32. Handicap | 33. Residence |
|---|---|---|---|---|---|---|---|

## SUSPECT

| Person ID # | 34. Type SUSPECT | 35. Name (Last, First, Middle) |
|---|---|---|

| 37. Apparent Condition | 38. Address (Street Name, Bldg., Apt., City, State, Zip) NY |
|---|---|

| 39a. Home Phone | 39b. Work Phone | 40. Social Security | 41. DOB | 42. Age | 43. Gender MALE | 44. Race WHITE |
|---|---|---|---|---|---|---|

| 45. Ethnicity NOT HISPANIC | 46. Skin | 47. Occupation |
|---|---|---|

| 48. Height | 49. Weight | 50. Hair | 51. Eyes | 52. Glasses UNKNOWN | 53. Build |
|---|---|---|---|---|---|

| 54. Employer/School | 55. Employer Address NY |
|---|---|

**56. Scars/Marks/Tattoos /Description**

**36. Alias/Nickname/Maiden Name**

| Last Name | First Name | MiddleName |
|---|---|---|

## NARRATIVE

| Date of Action | Date Written | Officer Name & Rank |
|---|---|---|
| 09/18/2016 | 09/18/2016 | STARR, KERI (TPR) |
| Narrative | | |

1. On the above said date I patrolled to SP Montgomery for walk in complaint.

2. I proceeded to interview, JOHN VAUGHAN and his son, BRENDAN VAUGHAN in reference to a harassment complaint. In sum and substance B. VAUGHAN stated within the past two years he was being constantly harrassed by a classmate, _____. B. VAUGHAN stated it was to the point where he had to transfer schools from Burke Catholic High School, Goshen NY to Washingtonville High School, Washingtonville, NY. B. VAUGHAN stated he proceeded to receive messages on KIK from whom he believes to be _____ based on prior conversations and his picture being displayed when a message is sent. On September 9, 2016 B. VAUGHAN received a message on KIK from an account with _____ picture displayed stating, " Piece of shit you ain't settling shit when I pull up your just gonna hear three shots and its gonna be really slow for u after that I'm gonna shit on your fucking grave and light your casket on fire at your wake I'll break every bone in your body and watch u scream in agony and when your screams start to annoy me it's a shot the head and finished". Additionally on September 15, 2016, B. VAUGHAN received a message on snapchat which he also believes to be _____ stating, ", Me and my squad are gunna pull up with our AK-47's and shoot your nephew up."

3. B. VAUGHAN states he personally does not think _____ ould physically hurt him. B. VAUGHAN further states he would like to pursue criminal charges.

ITC.

## ADMINISTRATIVE

| 74. Inquiries | 75. NYSPIN Message No. | 76. Complainant Signature | |
|---|---|---|---|
| 77. Reporting Officer Signature (Include Rank)<br>TPR KERI STARR<br>*Neopolitano : Investigation Reporter* | 78. ID No.<br>2755 | 79. Supervisor Signature (Include Rank) | 80. ID No. |
| 81. Status<br>PENDING INVESTIGATION | 82. Status Date<br>09/18/2016 | 83. Notified/TOT | |

*Jordan*

| | Solvability Total | 0 |
|---|---|---|

# EXHIBIT D

**THE HELP CENTER**
ELAINE ZIMMERMAN, LCSW-R

84 Old Route 9W, Suite 200
New Windsor, NY 12553
Telephone: (845) 562-3022
Fax: (845) 562-3032

January 8, 2020

RE: Brendan Vaughan

Honorable Judge Kenneth M. Karas:

I am writing this letter on behalf of Brendan Vaughan currently presented for sentencing in your court. I am a licensed certified social worker for over 35 years with an additional R (Registered) certification- I have been the director of The Help Center (private practice group) since 1996.

I was first introduced to Brendan Vaughan in late 2017 having been referred by both Washingtonville school district and father John Vaughan. Symptoms included both severe anxiety, depression and PTSD symptoms. Brendan had been the object of severe bullying in both middle and high school. His treatment included both individual, family and later group treatment. He attended all sessions without resistance. I did refer Brendan for psychiatric evaluation with Dr. Sylvain Nakkab. He was treated with various medications, hospitalized several times at Four Winds in Katonah, New York.

Brendan is a young man who when I met him (although depressed) had aspirations to graduate college and further his studies as an attorney. He had a strong relationships with nuclear family especially young nephew whom he gave a good deal of positive attention.

As I worked with Brendan it became clear this young man had little ability to make his hurts important. He is a perfectionist and stepped back from confronting others who hurt him. These skills are vital to learn in order to live a productive life. This young man needs mental health intervention, not jail. He has a very supportive family who will assist him in complying to any of the courts requirements.

I strongly recommend that you consider the amount of time he has already served and the latest court evaluations.

Sincerely,

Elaine Zimmerman

Elaine Zimmerman, LCSW-R

EXHIBIT E

January 8, 2020

Helen Lynch
16 Ferrante Drive
Montgomery, NY 12549

Honorable Kenneth M. Karas
United States District Court Judge
United States District Court
300 Quarropas St.

Your Honor,

I am writing to you on behalf of Brendan Vaughn. I worked in the parochial school that Brendan attended. I have since left that position and now work in a public elementary school as the library media specialist.

I came to know Brendan when he was in fifth grade. I was his classroom teacher for all subjects. Brendan was shy and at times seemed awkward around his classmates. As his teacher I had prior knowledge to some of Brendan's challenges. While in the fourth grade he developed a tick. He made involuntary noises and this ostracized him from the other children in his class.

During his time in my class, he seemed to struggle fitting in with the other students. I created a supportive and accepting classroom environment and overtime I watched Brendan grow in confidence. He began to participate in activities and made friends with the other children in the class. I left my position at that school to care for my disabled child. I heard from Brendan's family that his troubles with the other children in class resumed. I also understood that these troubles of being bullied and feeling ostracized continued in the years to follow.

Brendan had grown and overcome many obstacles during the time I saw and knew him on a daily basis. I was shocked to learn of his current circumstances, but also wondered if the alienation he felt growing up through his grade school years could have been a contributing factor in Brendan's thought processes and choices. Brendan is part of a close and loving family who love and support him. I believe, with correct support, Brendan can move onto a healthy and happy life.

Respectfully,

Helen Lynch

Helen Lynch

# EXHIBIT F

January 8, 2020

Kenneth G. Lynch
16 Ferrante Drive
Montgomery, NY 12549


Honorable Kenneth M. Karas
United States District Court Judge
United States District Court
300 Quarropas St.

Your Honor,

    I am writing this brief letter to you to speak on behalf of the character of Brendan Vaughn. I am a New York City firefighter. I have been a friend of Brendan and his family for over 10 years. My relationship with Brendan began when he was in fourth grade. I was one of his basketball coaches at his elementary parochial school. He was an avid player who loved the game, and excelled at it.

    I later became good friends with his parents and sister. Brendan has a close relationship with his sister; this became apparent to me when I visited the Vaughn's home. When Brendan's brother-in-law deployed overseas with the U.S. Navy, I witnessed Brendan step up and help his sister with her young son. Brendan was a constant companion for his nephew, Mason.

    A few years ago Brendan began to show interest in firefighting and I suggested he join the local volunteer fire department where I have been a member for 30 years. I sponsored Brendan and introduced him to the members. Brendan was elected and excepted a position as a junior member. Brendan had just started his training when his current circumstance began.

    I believe with the right support and his strong and loving family, Brendan can move forward to lead a successful and happy life.

Respectfully,

Kenneth G. Lynch

# EXHIBIT G

January 9th 2020

Your Honor:

I am writing to you in regards to the case of United States vs Brendan Vaughn. As you are aware this is a tragic situation for everyone involved and the true purpose of my writing is to ask for the consideration of remittance to a facility in Lake Placid as per the recommendation of the OPWDD for psychological treatment.

As the parish priest at Saint Mary's in Washingtonville for over ten years I have known Brendan only superficially through Mass (until he was a freshman in HS) and then, naturally through the notoriety of the events in our town which are at the heart of this case.

But I am writing on behalf of his father, an older man, who while also caring for his wife, will be better served by his son being closer. He is, as the Irish used to say, "a sainted man", who has maintained his sobriety, with the help of his friends from AA and his faith. I am writing this on his behalf because he believes that his son will be better served in the facility recommended to him as outlined above.  Because of the secure nature of the facility I believe that with treatment and as his lawyer (and tutor in the Brooklyn facility) indicate and eventually he could be possibly (after serving his time) returned to a place in society.

Please know of my prayers for wisdom as you deliberate this delicate and critical decision.

Sincerely,

Rev. Jeffrey Maurer, Pastor

Honorable Kenneth M. Karas
United States Distrcit Court Judge
United States District Court
300 Quarropas St.
White Plains, NY 10601

EXHIBIT H

George Frazier
Hoops Express Inc
367 Windsor Highway
New Windsor, NY 12553

(845) 640-1818

Email: hoopsexpressinc@aol.com

01/09/2020

Honorable Kenneth M. Karas
United States District Court Judge
United States District Court
300 Quarropas St.
White Plains, NY 10601

 Your Honor,

I am writing this letter concerning Brendan Vaughan. I have known Brendan for three years. I worked one on one with him on many occasions as a youth basketball player in my program. Brendan was and still is very passionate about the sport. I never in years witnessed an outburst, an argument, or even a conversation with raised voices while teaching him the game.

Brendan is an introverted individual because he was subjected to many years of bullying. Basketball was the place where he felt like he fit in. When he was on the court, he was part of team, working with others harmoniously, to achieve a goal. He has made a mistake and has acknowledge it by pleading guilty. I would like to ask that this be taken into consideration when sentencing is being handed down.

I personally run a Non for-profit organization Hoops Express Inc. We Offer a multitude of opportunities and services to inner city and at-risk youth. I have had the pleasure of serving my community for over twenty years and it saddened me to find out the events that transpired with Brendan. He is great young man at his core and he has the ability to do great things with guidance. Thank you for your time and consideration.

Sincerely,

George Frazier

*Executive Director*
Hoops Express Inc

# EXHIBIT I

Honorable Kenneth M. Karas
United States District Court Judge
United States District Court
300 Quarropas St.
White Plains, NY 10601

January 3rd, 2020

Dear Honorable Kenneth M. Karas,

My name is Kelly Vaughan and I am writing to you on behalf of my brother, Brendan Vaughan. I am an elementary special education teacher in Orange County New York and I feel my education and work experience have led me to an interesting insight into my brother and his actions. Throughout my experience as a special education teacher and as a volunteer basketball coach I have encountered hundreds of children both with and without disabilities. MY collegues have also commented on my canny ability to understand children and their inner workings. I am stressing my experience with children with disabilities in hopes that you put some weight on my view of my brother and what has happened.

I'm writing you this letter on my brother's twentieth birthday. Yes, on paper he is twenty but mentally and emotionally he has not transcended adolescence. My brother has also been different and always had a very hard time socially. When he was younger he had a significant speech delay which impacted his relationships with his peers for years. There was a time where I was the only one who could truly understand what he was trying to say. I witnessed my brother being teased for his stuttering which only made his stuttering become worse. Additionally, he often got picked on for being overweight until he was about 11 or 12. Through all of that Brendan continued to try to make connections with his peers but continued to fall short. As his much older sister it broke my heart to see him try so hard to fit it and it just not click for him. This pattern of not quite fitting in continued into high school. However, as he got older I observed that something more was off besides just his speech. Brendan did not pick up on social cues and he could not relate to others outside of his family. However, he continued to try to make friends and just fit in. I cannot tell you the amount of times I picked him up from school or practice to see him walking by himself and not with a friend or two. Brendan was struggling socially and it got bad enough that he asked to be taken out of the Catholic high school he attended and go to his home public school district instead. I had such hopes that Brendan would be able to find his niche in an environment that would have a more diverse student body. Sadly, that did not happen. Brendan repeatedly felt like an outcast and was desperate to connect to anyone. As he got older I became more concerned that he could be on the autistic spectrum and my worries were validated when he was recently diagnosed as autistic. You see sir, our world is an extremely tricky and confusing place for people like my brother. I am not making excuses at all for things that he said. I'm just saying, in my opinion, our world does not have enough support and resources for people on the autistic spectrum. Our parents have worked tirelessly to come

up with a plan for Brendan to get the maximum amount of support he can get when this situation has come to a close. As his sister and as a professional my heart aches to see my brother suffering and not getting the help he so desperately needs.

      My brother does struggle with people outside his family, however, he does bring a light to those who have the privilege of knowing the real Brendan. When I had my oldest child, Mason, Brendan connected with him in a way that is truly special. Brendan was 13 when I had Mason and I vividly remember him crying when Mason was in the NICU and could not come home. Mason and I lived with my parents and Brendan while my husband was deployed. Brendan was over the moon to be an uncle. He loved to help me take care of Mason and as Mason got older Brendan loved to play with him. My son loves Brendan and cannot wait until his uncle can play basketball with him again. I also have two beautiful baby girls now and I can't wait for the day where their uncle Brendan can see them. My brother is extremely sensitive even though he tries his best to hide it. He despises hunting season because he can't stand the thought of people killing animals. I know my brother has a lot of work to do in order to further himself as a person but I have seen him put in hard work when he is determined. I have not been able to attend my brother's court appearances because of my job and my second job as a mom. However, I have gone to see him a few times, and I talk to him regularly. Brendan is determined to follow through on getting the help he needs. He understands that he needs help and has verbally asked for it. I have been corresponding with him via email in order to help prepare him for his English Regents. He is determined to pass his English Regents and start taking college classes as soon as he can. I know that my brother made some horrible mistakes and he takes responsibility for them. I also know that he wasn't getting the support he needed when he made them. I hope from the bottom of my heart that he is able to get the help, therapy, and medicine that he needs sooner than later so that he can achieve the potential I know he is capable of.

      Thank you for taking the time to read my letter.

                    Sincerely,
                    Kelly Vaughan
                    M.S. Ed, Special Education

# EXHIBIT J

Honorable Kenneth M ,Karas,
United States District Court Judge
United States District Court
300 Quarropas St.,
White plains, NY 10601

Dear  sir,

My name is  Elizabeth Lynch, i live in Duleek Co. Meath , Ireland. I am Brendan Vaughans aunt and godmother.  I am a chartered physical therapist  with special interest in childhood development and worked in the Greenwich Hospital, Greenwich , Conn. following my graduation. I did a post grad in pschology and healthcare riskmanagement.

Brendan has been part of my life since he was born all those 20 years ago.  I have  been  with  the  family at his christening, communion and confirmation in Goshen Church and many other family celebrations eg .his sisters wedding in West Point.

His early  physical development appeared to be normal but he had auditary and speech delay, this was addressed  with speech and language therapy.Because of those early difficulties he appeared to have had comprehension  problems. As the years progressed he did have some sociability difficulties that i observed both in his home and on vacation in Ireland. He had difficulty mixing with his many cousins but was better on a one to one basis as he would have total focus. Perhaps this led to an overprotective approach by his mature parents, my brother Sean and his wife Laura. They did what they thought was best, as we all would do for our children.

His home is in a beautiful but very rural area with wild turkey and deer etc. Brendan was always very concerned for their welfare during the hunting season, that is why i was amazed to see that he is being charged with planning to cause harm. He was also very caring with the domestic animals and saw to their welfare daily.

 In his  teenage years i never met any friends at his house and thought perhaps it was because of his rural location. I did attend a number of basketball matches at which he excelled both at school,town and state level. However that came to an abrupt end following a difficulty with some of his peers.

On a vacation in Florida with Brendan and his mother i was amazed at his in depth knowledge  of European history  but was quite obsessive  on the subject. However on that same vacation he was very caring to me following a minor accident, again i cant imagine him hurting a fly as they say.

His difficulty socialising, communicating and being at ease in groups would lead me to believe he could be on an autistic spectrum  now that this phenomenon  is more common in our society.

As his aunt and godmother and all of his extended family are devestated by the situation Brendan is now in. We love him to bits and our family would do anything to further his welfare and support him in anyway we can

Yours truly

Liz lynch.

EXHIBIT K

January 10, 2020

Honorable Kenneth M. Karas

United States District Court Judge

United States District Court

300 Quarropas St.

White Plains, New York 10601

Honorable Judge Karas,

My name is Sean Vaughan and I am Brendan's father. Brendan was born in 2000. By the time Brendan was two years old he was diagnosed with a speech delay my wife and I got him professional help and Brendan continued getting speech therapy for the following eleven years. Over the years his speech improved slowly. Unfortunately when Brendan started elementary school he was picked on. This continued for many years so from the beginning of his education he was on the outside looking in.

Growing up Brendan was a very caring child. The event that comes to mind is when the troubles started in Syria he was very concerned about the refugees getting safely to Europe. He would get very sad when some refugees drowned in the Mediterranean Sea. Additionally Brendan has also been very caring of our dogs and cats.

Brendan's sister Kelly who is eleven years older got married in 2012 and continued to live in our home for the following four years. The reason for this was my son in law was in the Navy at the time and during this time he was overseas for a year. During this time my grandson was born in late 2013 and Mason was like a little brother to Brendan. To this day when I go to visit Brendan one of the first questions he asks is how is Mason and his younger nieces Ella and Juliette are doing.

Brendan's greatest love growing up was playing basketball. During his high school year he was going to the gym at least four or five times a week. Mr. George Frazier took Brendan under his wing and was coaching him in basketball training. Unfortunately when Brendan transferred to a public school in his eleventh grade he was afraid to go to tryouts and also reluctant to go to gym classes. Both these situations were reported to the school administration and they chose not to intervene to provide guidance or counseling that Brendan needed.

Lastly Your Honor, I would like to bring to your attention the last Psychological exam performed by Dr. David Pogge P.H.D. at Four Winds Hospital on January 15, 2019 concluded that Brendan struggles with the tasks of learning, memory and the retention of information. Also Brendan lacks the necessary coping skills to sometimes manage his stressors. The diagnosis confirmed he is on the Autism Spectrum.

In June 2019 Brendan was deemed eligible for services to be provided by the New York State Office of People with Development Disabilities (OPWDD) and is classified as having both an intellectual disability and a developmental disability (IDD). Brendan is eligible to receive intensive intervention and therapeutic services in a New York State licensed Inpatient facility for acute care and upon discharge can receive lifelong services as a person with a disability.

I am confident upon release Brendan will strive to achieve a productive life and will become the young adult he wants to be and continue his education and complete his only remaining requirement to earn a NYS Regent Diploma which is to earn a passing grade on his English Regents exam.

Thank you for reading my letter.

Sincerely,

Sean Vaughan

# EXHIBIT L

January 10, 2020

Honorable Kenneth M. Karas

United States District Court Judge

United States District Court

300 Quarropas St.

White Plains, New York 10601

Honorable Judge Karas,

My name is Laura Moran ( Vaughan ) and I am Brendan's mom. I am a licensed Certified Public Accountant. I am the Chief Financial Officer for Inspire and the Inspire Foundation whose headquarters are located in Goshen, New York. This is my twenty third year of working at Inspire. I do not think of it as work as I enjoy my job at my agency which employs close to three hundred people who provide educational and multiple other services for children and adults with disabilities. I participate in community and fundraising efforts held throughout Orange County whenever I can.

Brendan is a sweet and caring son, brother and uncle. Brendan made our family complete when he was born in 2000. Brendan was never in any trouble until May 2018 when he was eighteen years old. Every year throughout Brendan's life we traveled to Florida every summer and sometimes during Easter vacation to see my parents. I would always give my children the option of flying but Brendan always enjoyed the experience of traveling with me and his sister. So we would pack up the car, make what we called Florida sandwiches for the ride and drive to Florida with endless negotiations over who got the back seat as the day turned into night.

In December of 2017 Brendan became a volunteer fireman at our local firehouse. Brendan always enjoyed helping other people before himself. Brendan enjoyed attending Sunday mass in our local parish. Even as a teenager he would willingly and happily go to mass.

My husband and I have attended each court hearing. At the last court date Brendan plead guilty as you know. He has taken responsibility for the foolish things he was accused of.

We now know Brendan has been diagnosed as being on the autism spectrum. This knowledge now allows us to obtain the necessary treatment for Brendan. Brendan's disability will be treated at an upstate OPWDD facility where he will learn better communication and coping skills and be treated with the necessary medications and intensive therapy that are effective for someone on the spectrum. In fact, the conclusion drawn by Dr. Kate Termini , a Forensic Psychologist who examined Brendan at MDC in Brooklyn made this same recommendation in the closing paragraph of her 18 page evaluation.

I am confident upon release Brendan will strive to achieve a productive life and will become the young adult he wants to be and continue his education and complete his only remaining requirement to earn a NYS Regent Diploma which is to earn a passing grade on his English Regents exam. Brendan can't wait to begin attending college and earning a college degree.

Brendan has not been in his own home for over a year. Our house is not a home without Brendan and we are fully committed to making certain he receives the ongoing help which he is anxiously awaiting to receive. He will be placed in an OPWDD facility within days after his release.

Thank you for reading my letter.

Sincerely,

Laura Vaughan