1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ----------------------------------x

3   UNITED STATES OF AMERICA,
                                         VOLUME 2
4                     Plaintiff,

5          v.                        19-cr-00526 (KMK)
                                     VIA VIDEOCONFERENCE
6   BRENDAN VAUGHAN,                 FATICO HEARING

7                     Defendant.

8   ----------------------------------x

9

10          ** V I D E O C O N F E R E N C E **

11                          United States Courthouse
                            White Plains, New York
12
                            March 3, 2021
13

14  B e f o r e:

15                          HONORABLE KENNETH M. KARAS,
                            DISTRICT COURT JUDGE
16

    V I D E O C O N F E R E N C E   A P P E A R A N C E S:
17
    AUDREY STRAUSS
18          United States Attorney for the
            Southern District of New York
19  SAMUEL S. ADELSBERG
    MARGERY FEINZIG
20    Assistant United States Attorneys

21
    HODGES WALSH & BURKE LLP
22    Attorney for Defendant
    MICHAEL BURKE
23

24  ALSO PRESENT:  Brendan Vaughan, Appearing Telephonically

25

                    PAMELA GRIMALDI, CRR, CLR
                        914.390.4053

                              Proceedings

1          THE DEPUTY CLERK:  The Honorable Kenneth M. Karas

2   presiding.  United States versus Brendan Vaughan 19 cr 526.

3          Counsel for defendant, please state your appearance

4   for the record.

5          MR. BURKE:  Michael Burke, Hodges, Walsh & Burke on

6   behalf of Brendan Vaughan.  Good morning, everyone.

7          THE COURT:  Good morning.

8          MR. ADELSBERG:  Sam Adelsberg on behalf of the United

9   States.  I'm joined by Margery Feinzig as well.

10          THE COURT:  And Ms. Becker.

11          MR. ADELSBERG:  And the irreplaceable Shannon Becker.

12          MS. FEINZIG:  Good morning, your Honor.

13          THE COURT:  Good morning, everybody.

14          So for the record, we are proceeding with day two of

15   this sentencing hearing.  Because of the pandemic, we are using

16   Zoom in lieu of doing this in person.

17          And Mr. Burke, I'm -- just want to make sure we check

18   this box, your client is still willing to proceed by way of his

19   telephonic participation in this Zoom hearing; is that correct?

20          MR. BURKE:  That's correct, your Honor.

21          THE COURT:  He does understand he has a right to have

22   this proceeding done in person.  He might have to wait a little

23   bit because of the pandemic, but he does understand he has that

24   right?

25          MR. BURKE:  He does, and he wishes to move forward

Proceedings

1   today.

2           THE COURT:  Okay.  All right.  So we left off

3   yesterday with Mr. Burke's cross examination of Dr. Klagsbrun.

4           Doctor, I'll remind you you're still under oath.

5           Mr. Burke, you may continue.

6           MR. BURKE:  Your Honor, I just need to address one

7   logistical issue.

8           THE COURT:  Yes.

9           MR. BURKE:  Well, it's not really a logistical issue.

10  It's to respond to one thing that the U.S. Attorney referenced

11  at the end of the day.

12          There was a call made to Mr. Adelsberg from the phone

13  number at the jail, and I understand there was another call

14  today.  But the calls that were being made were when the

15  officer was reaching out.  He had a piece of paper that had the

16  U.S. Attorney's phone number, it had my number, and it had the

17  wrong phone number, an 888 number, to call in.  So they called

18  me again after this happened.  Any of the calls that were made

19  was with the officer present or by the officer.  I believe the

20  calls were actually made by the officer.  So I just wanted to

21  clear that up.  I'm not addressing the prior instances of phone

22  calls, but that's what I've come to learn, that there was

23  another call today, and it was really more just trying to reach

24  out to get onto the line, to get onto the Zoom, by the officers

25  at the Orange County Jail.

Proceedings

1           THE COURT:  So you're talking about a call yesterday

2    morning that Mr. Adelsberg talked about where the Wife's maiden

3    name was mentioned?

4           MR. BURKE:  I think he said he believes that's what

5    happened.  If we want to have -- I wasn't -- I think he said, I

6    believe my wife's maiden name was referenced.

7               Is that correct, Sam?

8           MR. ADELSBERG:  That's correct.

9           THE COURT:  When you say you believe, the way that's

10   being phrased is that maybe there was some possibility that it

11   was not your wife's maiden name that was mentioned.

12          MR. ADELSBERG:  Well, I got a call from an unknown

13   number.  I heard one word in a voice that I've come to

14   recognize as the defendant's voice, and it sounded -- my wife's

15   maiden name, which I prefer not to put on the record, is not a

16   common word, and it sounded like that.  I wasn't expecting to

17   hear on my work phone that word.  I want to cabin it or qualify

18   it that I can't be 100 percent sure it was that word, but

19   that's certainly what it sounded like to me.

20          THE COURT:  Okay.  All right.

21          MR. ADELSBERG:  And I don't know if you want to go

22   into it further, Judge.  This is the fourth time that I've

23   received calls from the defendant, and each of the other

24   times -- they were spread out over the last year and a half --

25   I've alerted Mr. Burke, and Mr. Burke has assured me that he

Proceedings

1    has told the defendant each time that, you know, he should not

2    be contacting me.

3                THE COURT:  Okay.  So Mr. Burke, is the theory that

4    whoever made the call yesterday was somebody from the prison

5    who spoke to Mr. Adelsberg, or is it --

6                MR. BURKE:  My understanding is that the call was

7    made by the officers, and -- they dial out.

8                THE COURT:  And so they said something that was not

9    Mr. Adelsberg's wife's maiden name?  Or they somehow know her

10   maiden name?  I'm not sure I understand what your theory is.

11               MR. BURKE:  My theory is that there was a call that

12   was made from the jail, and it was made in the officer's

13   presence by the officer dialing out to Sam's number.  All

14   right?  And I understand that when it was realized it was the

15   wrong number, or not the number that should be connected, it

16   was hung up on.  I don't know who was on the phone, who spoke.

17   I can further inquire.  I just want to let the Court know that

18   the circumstances around it -- as to what happened.

19               THE COURT:  Okay.  I'm not sure I'm following this.

20   So we distributed a number to people -- for people to dial in

21   to the Zoom.  And is the theory that somebody from the facility

22   had mistaken Mr. Adelsberg's number for the Zoom number and

23   then blurted out -- because if it's the wrong number, they

24   should say, Oh, is this -- this is not the Zoom number.  I'm

25   sorry, this is the wrong number.  That seems to be the -- a

Proceedings

1   plausible scenario.

2           This, it sounds like, at least from what

3   Mr. Adelsberg's saying, what he heard was one word, it sounded

4   an awful lot like his wife's maiden name.  He doesn't want to

5   put it on the record.  I don't blame him.  But it sounds like

6   it's not something that's confused with, Oh, sorry, wrong

7   number.  So I'm still not sure I understand what the theory is

8   in terms of responding to this.

9           MR. BURKE:  I guess, your Honor, this is all I wanted

10  to say.  There was an 800 number that was provided.  Not by me.

11  I don't know where they got an 800 number.  But I gave to the

12  jail the 929 number to dial in.  It was sent on to Captain

13  Potter and to another officer to have the call made.

14          I think for the time being I would need to -- my

15  understanding was that Sam's number was called and the call was

16  then terminated.  I'll find out more information.  We can table

17  it.  I don't want to belabor moving forward with the hearing.

18  I do think that there's some answers to it, but I don't want --

19  or have my client make any statements right now.

20          THE COURT:  Yeah.  Your client should not be making

21  any statements, of course.

22          All right.  So are we ready to resume, then, with the

23  cross-examination?

24          MR. BURKE:  We are.

25          THE COURT:  Okay.

Klagsbrun - Cross -

1           MR. BURKE:  If I could ask Ms. Becker to pull up page

2    94 of Government Exhibit 2, please.

3    CONTINUED CROSS EXAMINATION

4    BY MR. BURKE:

5    Q    Good morning, Dr. Klagsbrun.

6    A    Good morning.

7    Q    Since we completed yesterday, have you spoken to anyone

8    about your prior testimony?

9    A    To my husband.

10   Q    And in speaking with your husband about your prior

11   testimony -- well, were there any discussions of needing to

12   change your testimony?

13   A    Absolutely not.

14   Q    The -- is your husband an attorney?

15   A    He is.

16   Q    Is he your attorney in this proceeding?

17   A    Not in this proceeding, no.

18   Q    All right.  I'm not going to get into any of the

19   conversations with your husband, who is also an attorney.

20        But when we were -- we were discussing yesterday about the

21   clinicians and doctors at Four Winds.  And you would agree with

22   me, Doctor, would you not, that it's important for clinicians

23   and doctors to keep accurate medical records so they can

24   properly treat patients?

25   A    Yes.

Klagsbrun - Cross -

1   Q    And, in fact, there's an ethical and legal obligation that

2   they keep accurate medical records, correct?

3   A    Correct.

4   Q    So that they could properly diagnose the patient, right?

5   A    No.

6   Q    Well, if -- the keeping accurate medical records assists

7   other doctors or clinicians to properly treat patients, right?

8   A    Not always.

9   Q    If a clinician or doctor is treating a patient after

10  someone else saw them, they would typically review the prior

11  entries and notes, would they not?

12  A    Yes.

13  Q    Okay.  And reviewing those prior entries and notes would

14  give them a sense of the history and assessments, would they

15  not?

16  A    Yes.

17  Q    Okay.  On page 94 of my client's Four Winds medical

18  records, Government Exhibit 1, we left off at the bottom of the

19  Nursing Assessment section where it indicates the nurse's

20  entry, it's four lines from the bottom, where it starts,

21  Psychiatric assessment states.

22       Do you see that?

23  A    Yes.

24  Q    And it says, Psychiatric assessment states patient has no

25  history of violence; is that right?

Klagsbrun - Cross -

1    A    Yes.

2    Q    And if we scroll further down -- so that means that in the

3    assessment there was the determination no history of violence,

4    correct, based on this entry?

5    A    Yes.

6    Q    All right.  But further down it says, Psychiatric

7    assessment states that patient made many threats in chat room

8    that consisted of killing himself and others.

9         Do you see that entry?

10   A    I see that entry.

11   Q    Okay.  So there it's saying that there were threats made

12   consisting of killing himself and others, yet the assessment

13   said there was no history of violence; is that right?

14   A    Yes.  The assessment says --

15             THE DEFENDANT:  Oh, really?

16             (The court reporter requested clarification.)

17             THE COURT:  Mr. Vaughan was talking to somebody in

18   the background, right?

19             THE DEFENDANT:  Yes, sir.

20             MR. BURKE:  And if we could turn to the next page,

21   Ms. Becker, please.

22   Q    And I direct your attention, Dr. Klagsbrun, where it says,

23   Patient scored a zero on the alcohol and substance abuse.

24        Is that right?  Do you see that here?

25   A    Yes.

Klagsbrun - Cross -

1  Q    Patient scored a zero on the alcohol and substance abuse

2  disorder and identification test.  And then it says, Patient

3  denies sexual inappropriateness, fire setting, and animal

4  abuse.

5       Correct?

6  A    Yes, it says that.

7  Q    And this here, you can see this was the initial admission

8  from June of 2018; is that right?

9  A    Yes.

10 Q    That was information that was recorded and maintained in

11 the records by the nurse doing the initial progress note?

12 A    Yes.

13       MR. BURKE:  Ms. Becker, if we could please forward to

14 157, middle of the document where it says Assessment.

15       Thank you.

16 Q    The Assessment portion of the document -- and this --

17       MR. BURKE:  I'm sorry, Ms. Becker.  Can we just

18 scroll up top?  I just want to get the date of this.  Top

19 right.  There we go.

20 Q    This was an entry from June 11, 2018 during his first

21 admission.  And if we scroll down, it says here that -- where

22 it says, Patient also likely.  Do you see that entry?  Patient

23 also likely on autistic spectrum given concreteness and

24 difficulty with social interaction and cues, right?

25 A    Yes.

Klagsbrun - Cross -

1    Q    So this is an assessment on June 11 indicating that he's

2    likely on the autistic spectrum given his concreteness and

3    difficulty with social interactions and cues.  And this was an

4    entry made by Dr. Campbell in June of 2018; is that right?

5    A    Yes.

6    Q    So she identified that he's likely on the spectrum during

7    his first admission; is that right?

8    A    Yes.  I didn't see if he signed the note, but I'm assuming

9    that the note is signed by Dr. Campbell, just because I can't

10   see it and it was a long time ago.

11   Q    Understood.

12        Just so we clarify that, so that you can see the

13   signature --

14            MR. BURKE:  Page 163, Ms. Becker, please.  At the

15   bottom.

16   A    Yes.

17   Q    Sorry.  So it was Dr. Campbell that made that entry in

18   June of 2018?

19   A    Yes.

20            MR. BURKE:  Turn to page 228, please.

21   Q    And here, Dr. Klagsbrun, you have an entry from June 23,

22   again, during his first admission, it says, No SI/HI.  Right?

23   A    Yes.

24   Q    And that means no suicidal ideations, no homicidal

25   ideations, correct?

Klagsbrun - Cross -

1    A    Yes.

2    Q    And then it says, Denies thoughts/intent to harm others?

3    A    Yes.

4    Q    And also, No aggression on the unit, right?

5    A    Yes.

6    Q    Okay.  This is a doctor or a nurse's entry as to their

7    assessment of progress related to suicide or homicidal

8    ideation, thoughts or intents to harm others, and their

9    observations as to aggression on the unit; is that right?

10   A    Yes.

11            MR. BURKE:  We can turn to page 245.

12            Thank you.

13   Q    Here is an entry on June 26, Doctor, where it's an entry

14   from an Elaine Shields, who is a licensed social worker.

15            MR. BURKE:  You can scroll down.  Sorry.

16   Q    Right?

17   A    Yes.

18   Q    And is Ms. Shields still with Four Winds?

19   A    No, she's not.

20   Q    In the box on this entry from June 26, it talks about her

21   facilitating a treatment group related to understanding

22   one's -- TX means treatment, right?

23   A    Correct.

24   Q    Okay.  So it says, Writer facilitated TX group related to

25   understanding one's DX.

Klagsbrun - Cross -

1       That's diagnosis, right?

2   A    Correct.

3   Q    Okay.  And it says next, The patient actively participated

4   in group discussions which addressed the following issues.  The

5   purpose of diagnosis is to better understand one's SX -- which

6   is symptoms, right?

7   A    Yes.

8   Q    -- and to receive the proper TX.

9       Treatment, right?

10  A    Yes.

11  Q    Two, Barriers to accepting one's DX, diagnosis.

12      I'm just going to read them as if the words are written

13  out in full just so I don't have to keep doing that.  Is that

14  okay with you?

15  A    Yes.

16  Q    Okay.  Three, Symptoms of depression.  Four, Symptoms of

17  anxiety.  Five, Symptoms of bipolar disorder, and the

18  differences between bipolar 1 --

19          MR. ADELSBERG:  I think Shannon lost connection for a

20  minute, but she's coming back on she said.  She's gone again.

21          What page were you on?

22          MR. BURKE:  Page 245, Sam.

23          Thanks, Sam.

24  Q    I think I left off with, Symptoms of bipolar disorder,

25  differences between bipolar I and II, and the patient actively

Klagsbrun - Cross -

1    participated in group discussion of depressive symptoms.

2        Is that correct?

3    A    Yes.

4    Q    All right.  So nowhere in this entry of June 28 does it

5    say that he was superficially participating, does it?

6    A    It does not.

7    Q    Okay.  And, in fact, it says he was actively participating

8    in group discussions about his symptoms and treatment; isn't

9    that right?

10   A    It says that, yes.

11   Q    And you have no reason to doubt this entry, do you?

12   A    No.

13           MR. BURKE:  If we could go to 254, please.

14   Q    Starting at the bottom of Data where it says, He is

15   tearful.  Do you see that?

16   A    Yes.

17   Q    He is tearful again about being hospitalized.

18       That would indicate that he had previously been tearful,

19   as well, during some of his treatment; isn't that right?

20   A    Yes.

21   Q    Okay.  And he goes -- in quotes, he says, I miss my family

22   and I want to go home.

23       Right?

24   A    Yes, it says that.

25   Q    Okay.  And it says, He responds well to support, no

Klagsbrun - Cross -

1  suicidal id -- looks like it was misspelled -- but ideation, no

2  homicidal ideation.

3       Right?

4  A    Yes.

5  Q    And you would agree with me, would you not, that being

6  tearful shows a degree of emotion in connection with his

7  family?

8  A    Not necessarily.

9  Q    But in this instance that's what the writer reported, is

10 it not?

11 A    No, I would not say that's what the writer reported.

12 Q    He reported him being tearful and missing his family,

13 right?

14 A    Yes.

15 Q    And he wanted to go home?

16 A    Yes.

17 Q    And also that there's no suicidal ideations or homicidal

18 ideations, right?

19 A    Yes, that was reported.

20 Q    And that was reported by Dr. Riccardelli.  Just to confirm

21 that, on page 257 is the signature page for this note.

22 A    Correct.

23           MS. BECKER:  I'm back on line now, Mr. Burke, so if

24 you need anything, I can pull it up.

25           MR. BURKE:  Okay.  Thank you.

Klagsbrun - Cross -

1          Thank you, Sam.

2          If we could, Ms. Becker, please turn to 282.

3    Q    Dr. Klagsbrun, based on these entries, this is the -- he's

4    still in his first admission for an inpatient; isn't that

5    right?

6    A    Yes.

7    Q    He was there from June 8, 2018 through July 5, 2018,

8    right?

9    A    Yes.

10   Q    Okay.  And in this entry -- these are the progress notes

11   called the MD/NPP Progress Notes, which stands for doctor and

12   nurse practitioner; isn't that right?

13   A    Yes.

14   Q    And on the first entry there from July 1 it says, Patient

15   known to writer from admission and some F/U.

16         Follow-up, right?

17   A    I lost you for one second.  If you could just repeat.

18   Q    Okay.  The 7/1 entry, it references, Patient known to

19   writer from admission and some F/U -- that means follow-up --

20   as DOC.

21         What's DOC mean?

22   A    Doctor on call.

23   Q    Okay.  And in the entry it says, He's sounding clearer to

24   writer, less distressed and anxious and ambivalent,

25   participating appropriately in program, good peer interactions,

Klagsbrun - Cross -

1    compliant with staff and meds, with no SE now from the latter.
2        What's no SE mean?
3    A    Side effects.
4    Q    Okay.  So in that entry, the doctor on call who had
5    previously dealt with Brendan is saying he's doing better, he's
6    compliant with medication, participating in programs, and
7    compliant with staff.  That's his entry, right?
8    A    Yes, that's the entry of the doctor on call.
9    Q    And you have no reason to doubt his entry here and what he
10   put in as far as compliance with treatment, compliance with
11   medication, interaction with staff and peers, do you?
12   A    Well, it depends what you mean by "doubt."
13   Q    Right.  Well, you don't have -- this is what he entered,
14   and he has a legal and an ethical obligation to make these
15   entries and make them accurate, does he not?
16   A    Yes.
17   Q    Okay.  And that's the legal and ethical obligations that
18   he would follow in making his entries, and that's what he did,
19   correct?
20   A    Correct.
21   Q    And again, just so we have some understanding who is
22   making these entries, if we could just turn to page 283 for a
23   moment, and then we'll go back to 282.  That's Dr. Riccardelli,
24   right?
25   A    Correct.

Klagsbrun - Cross -

1    Q    Okay.

2         MR. BURKE:  Now if we could just turn back to 228,

3    Ms. Becker, please.

4    Q    And on the June 9 entry --

5         MR. BURKE:  If you could just scroll down a little

6    bit.

7    Q    -- it again references, at least prior to the July 1 entry

8    where Dr. Riccardelli was on call, and he says in this report,

9    He has been compliant with Seroquel, denies any side effects,

10   sleeping well, tolerating dose increases well, eating well,

11   denies any constipation, on MSE.

12        And if we could -- it says, On MSE.  He is seated and

13   states that he finds it easier to think and concentrate, feels

14   calm, talks about having more control over thoughts, denies

15   thoughts intent or plan to harm himself or others, and open to

16   continuing treatment at the outpatient level.  He goes on to

17   say that his thoughts are more linear and rational than

18   compared to earlier in the admission, and talks about being

19   thankful he's in the hospital now and not in his jail cell.

20        Do you see that entry?

21   A    I do.

22   Q    Okay.  And I read it correctly, right?

23   A    Yes.

24   Q    And in that entry, Dr. Riccardelli is saying that he's

25   seen improvement in Mr. Vaughan's linear and rational thinking

Klagsbrun - Cross -

1   compared to the earlier admission, right?

2   A    Yes, Dr. Riccardelli is saying that.

3   Q    And that's his opinion based on treating him over a period

4   of time, correct?

5   A    Correct.

6   Q    And he also said that in his opinion --

7          THE COURT:  Mr. Burke, can I just interrupt one

8   moment?

9          Doctor, if you could just try to stay on video.

10         THE WITNESS:  You know what?  That must be our

11   connection.  I'm sorry.  I touched my mouse by accident.

12   Sorry.  Apologies.  I did not even notice.

13         THE COURT:  That's okay.  I just have to be able to

14   make findings, and I'm sure you can understand it's difficult

15   to do if you aren't on video.

16         THE WITNESS:  It was accidental.  Apologies.

17         THE COURT:  I didn't think it was otherwise.

18         Go ahead, Mr. Burke.  Sorry to interrupt.

19   Q    And then earlier down -- further down in the document it

20   has the June 25, 2018 reference that we just went through.  Do

21   you see that?  We went through it earlier in my examination.

22   A    Yes.

23   Q    The June 27 entry from Dr. Riccardelli, he then says

24   again, Further compliance with medication, tolerating doses

25   well, no side effects reported or noted.  He slept well last

Klagsbrun - Cross -

1    night.  And he said, Today he talks about easier to change

2    thoughts.  I don't feel stuck on the same thought like before.

3        So at least from that entry it's reported that he's

4    tolerating the medication well, right?

5    A    Yes.

6    Q    And that there was no side effects reported, correct?

7    A    Yes.  As per Dr. Riccardelli, yes.

8    Q    And per Dr. Riccardelli -- who works for you, right?

9    You're the director?

10   A    No longer, he's no longer --

11   Q    But he did then?

12   A    Absolutely.

13   Q    Right.

14       And he left to go do an externship or something?

15   A    Yes.  An addiction fellowship.

16   Q    Okay.  But he left on his own accord.  He wasn't fired or

17   anything, right?

18   A    No.

19   Q    There was no issues with him there?

20   A    No.

21   Q    Good.  Okay.

22       So there it's indicating he's compliant with medication,

23   tolerating it, and that there's references that it's helping

24   his thought process being clearer.  Correct?

25   A    Yes, that is what it says.

Klagsbrun - Cross -

1   Q    Now, the June 25 entry, it also -- again, two days before

2   the last entry, it says, Compliant with medication over

3   weekend.

4        Right?

5   A    Yes.

6   Q    Denies some of the side effects that he could have from

7   Seroquel, further down, right?

8   A    Yes.

9   Q    Further down it says, He's been attending program, right?

10  A    Yes.

11  Q    Okay.  So there it talks about medication compliance and

12  attending programs, does it not?

13  A    That's what Dr. Riccardelli reported.

14  Q    It doesn't say anything about him not being -- well,

15  withdrawn.

16       That's what he reports.

17            MR. BURKE:  And if we could turn to page 286, which

18  continues the same report.

19  Q    On July 3, again, it says he has been compliant with

20  medication, right?

21  A    Yes.

22  Q    Denies any side effects, been attending group, correct?

23  A    Yes.

24  Q    Having good interaction with staff and peers, right?

25  A    Yes.

Klagsbrun - Cross -

1    Q    Okay.  And then it also says, Decreased eye contact that

2    appeared to be norm for patient, right?

3    A    Yes.

4    Q    Okay.  And decreased eye contact is a symptom of autism,

5    is it not?

6    A    It can be, yes.

7         MR. BURKE:  If we could turn to page 297, please,

8    Ms. Becker.

9    Q    And this is a -- I don't want to mispronounce it.  Is it

10   milieu?

11   A    Yes.

12   Q    Milieu treatment progress notes from Four Winds Hospital

13   on July 5, 2018 at 12:30 p.m., right?

14   A    Yes.

15   Q    It has Dr. Campbell up on top, but I believe that's a

16   nurse's signature that's on this entry?

17   A    Yes, I think so.

18        MR. BURKE:  If we could scroll down, I think it gives

19   us the --

20   Q    It's actually an MHW.

21   A    So social worker.  Sorry.  Mental health worker.

22   Q    And the topic is Crisis Management Plan.

23        MR. BURKE:  And if you could go back up to the

24   handwritten entries.

25   Q    It says, towards the middle of the -- it says, Patient

Klagsbrun - Cross -

1    discharged at 10:50 a.m. with father --

2         I'm just going to read the whole thing, right?

3    A    Yes.

4    Q    -- to home.  Patient A&O times four.

5         That means alert and oriented times four?

6    A    Yes.

7    Q    No complaints of pain or discomfort.  Patient states no

8    AH/VH.

9         What does that mean?

10   A    Auditory hallucinations and visual hallucinations.

11   Q    HI/SI is homicidal or suicidal ideations, right?

12   A    Yes.

13   Q    And SIB is?

14   A    Self-injurious behavior.

15   Q    Okay.  So there's none reported.

16        And then it says, Patient seen by treatment team.

17        Do you know who the treatment team was then?

18   A    Not the entire treatment team.

19   Q    You don't know -- well, who was part of this treatment

20   team?

21   A    Usually it's the program director, so Eileen Scully,

22   unless she was on vacation, was part of the treatment team.

23   It's whoever the doctor or nurse practitioner, so it could be

24   Dr. Campbell, it could be Dr. Riccardelli, a social worker.  It

25   looks like Eileen -- the social worker was treating him.  So

Klagsbrun - Cross -

1   that -- it's usually the medical staff, social worker, program

2   director, and then can include the nurse manager as well.

3   Q    Okay.  So the director there, is that Eileen Scully?

4   A    Yes.  Considered the program director, yes.

5   Q    Program director.  Sorry.

6        You have Dr. Campbell's entry on the top of this, so

7   likely Dr. Campbell is part of the treatment team as well?

8   A    Her name on top doesn't mean it's an entry.  At the time

9   she was part of Lodge and one of the medical directors of

10  Lodge, so her name will appear even if somebody else writes a

11  note in the chart.

12  Q    So when it says, Seen by treatment team, it's typically a

13  doctor, the director, a case -- a social worker, and perhaps a

14  nurse, right?  Four members of a treatment team?

15  A    Yes.

16  Q    Okay.  So those four members of the treatment team deemed

17  that Brendan was not an acute risk to self or others, right?

18  A    Yes.

19  Q    Okay.  So they made a determination, even though we know

20  at the beginning of this admission he had made threats about

21  shooting up a school, referencing Columbine, that upon

22  discharge on July 5, he was not a danger to himself or others;

23  is that right?

24  A    He was assessed not to be a danger to self or to others,

25  correct.

Klagsbrun - Cross -

1   Q    And then he was released?

2   A    Correct.

3   Q    He then went to an in part -- a PHP, partial

4   hospitalization program, right?

5   A    Correct.

6   Q    And that was from July 6 through July 13 -- actually, five

7   days.  You have your 3501Q in front of you there?

8   A    Yes.

9   Q    Now, back to 3501Q, when he was discharged, it references

10  what his medication was when he was discharged, does it not?

11  A    Yes.

12  Q    Okay.  One of the medications that he was discharged with

13  was Seroquel, 500 milligrams at bedtime, right?

14  A    Yes.

15  Q    And Seroquel was for what?

16  A    That was for presumed bipolar disorder.

17  Q    It's not presumed.  It's diagnosed by your -- right?  I

18  mean, you look at your 3510Q [verbatim], it says, Discharge

19  diagnosis bipolar I, does it not?

20  A    It does say that.

21  Q    So it wasn't presumed; it was diagnosed by Four Winds,

22  correct?

23  A    It was diagnosed by Four Winds at that time.

24  Q    Right.  And that's where the medication that he was given

25  was 500 milligrams Seroquel and 50 -- is that GAM?

Klagsbrun - Cross -

1    A    Milligrams, MG.

2    Q    MG.  Okay.  I'm sorry.  The entry just says GAM on it.

3         So the 500 milligrams of Seroquel was for the bipolar,

4    right?

5    A    Yes.

6    Q    And the Lamictal was for what?

7    A    Also for the bipolar disorder.

8    Q    And when he was admitted to the partial hospitalization

9    program, Mr. Vaughan had a seizure there, did he not?

10   A    Yes.

11   Q    Okay.  And when he had the seizure, he was transferred up

12   to Northern Westchester Hospital, right?

13   A    Yes.

14   Q    Okay.  And after he was hospitalized there, he was

15   transferred back to Four Winds to stabilize; isn't that right?

16   A    Yes.

17   Q    Okay.  And at Northern Westchester they believe that the

18   seizure could have been caused by the 500 milligrams of

19   Seroquel, right?

20   A    Yes.

21   Q    All right.  So after that, he -- you took him off of the

22   Seroquel; is that right?

23   A    Yes.

24   Q    Now, the admission at the partial hospitalization program,

25   from your 3501Q you indicate that -- there you say, Seroquel

Klagsbrun - Cross -

1    seizure in dining room, taken off Seroquel by WMC.

2         That's Westchester Medical Center; is that right?

3    A    Yes.  He went to Westchester Medical Center, not Northern

4    Westchester Hospital.

5    Q    I beg your pardon.  I thought I saw Northern Westchester.

6    But it doesn't matter.  He went to an outside hospital, right?

7    A    That's correct.

8    Q    Okay.  And there his diagnosis changed upon discharge to

9    unspecified schizophrenia, right?

10   A    Yes.

11   Q    Do you know who changed that diagnosis?

12   A    Well, at partial, so whoever the medical staff was there.

13   I think it was Donna Draper.

14   Q    Okay.  So they made a determination based on the symptoms

15   and their observations that the diagnosis should be changed to

16   schizophrenia unspecified, right?

17   A    Yes.

18   Q    And that was five days after the prior diagnosis of

19   discharge with bipolar I by Four Winds inpatient, right?

20   A    Yes.

21   Q    And he had the intervening seizure between those two

22   diagnoses, correct?

23   A    Yes.

24        MR. BURKE:  Ms. Becker, will you just go back to --

25   we're at 297.  If we could just go to 298.  And scroll down --

Klagsbrun - Cross -

1   Q     This is a Discharge Risk Assessment that you fill out at

2   every discharge; is that right?

3   A     Yes.

4   Q     Okay.  And the doctor signs off on it, or the nurse

5   practitioner, right?

6   A     Yes.

7   Q     Okay.  And on this it indicates under paragraph 13, he's

8   checking off, No homicidal ideation, right?

9   A     Yes.

10  Q     Also says, No access to firearms, right?

11  A     Yes.

12  Q     And then he has the handwritten entry there where it says,

13  Investigated by police, spent some time in jail, condition much

14  improved compared to prior admission, denies intent or plan to

15  harm self or others.  Entry 7/5/18, signed by Dr. Riccardelli.

16        Right?

17  A     Yes.

18  Q     So he's indicating his condition's much improved to what

19  his condition was like when he arrived, his prior admission,

20  right?

21  A     Yes.

22  Q     And that there's no thoughts or intents or plan to harm

23  self or others, no homicidal ideation is checked off on 13, and

24  no access to firearms, right?

25  A     Yes.

Klagsbrun - Cross -

1  Q    So at that point, as we saw earlier, there was a

2  determination by the treatment team that he should be released?

3  A    Yes.

4          MR. BURKE:  If we could turn to page 302.

5  Q    This is, again, from that initial June entry -- I beg your

6  pardon, June admission, and it talks about the reason for

7  hospitalization, where it says, Brendan was admitted to Four

8  Winds after posting in a chat room the writings about Columbine

9  High School massacre, and patient had many elaborate threats to

10 kill others as well as himself.

11      Right?

12 A    Yes.

13 Q    Threats to buy a gun, shoot up his school.

14      Right?

15 A    Yes.

16 Q    And then it also talks about history of bullying, correct?

17 A    Yes.

18 Q    And past indications of being depressed and feeling

19 hopeless and helpless, right?

20 A    Yes.

21 Q    So it's reporting what the basis of the threats were, the

22 reference to Columbine, and his history of being bullied,

23 right?

24 A    Yes.

25 Q    And in the course of the hospital treatment plan for

Klagsbrun - Cross -

1    Brendan, it included medication, evaluation, and management,

2    right?  That's typical?

3    A    Yes.

4    Q    Okay.  Then the -- this is, again, part of the Discharge

5    Summary; is that right?

6    A    Yes.

7    Q    It says, The treatment plan for Brendan included

8    medication, evaluation, and management.  Patient participated

9    in daily dialectical behavioral therapy skills, training groups

10   focused on distress, tolerance, mindfulness, interpersonal

11   effectiveness, and emotional regulation.  Patient also

12   participated in individual therapy focusing on strengthening

13   use of skills, psychiatric drama, art therapy, and other

14   therapeutic activities.

15        I read that entry, right?

16   A    Yes.

17   Q    And there it's telling you that he was participating in

18   those therapy sessions.

19             (The court reporter requested clarification.)

20   Q    In this entry, the treatment team is referencing that the

21   treatment plan for Brendan included those evaluations and

22   management and that he participated in all of those, right?

23   A    Yes.

24   Q    Okay.  And there's no reference that he superficially

25   participated.  It's saying he participated in them, right?

Klagsbrun - Cross -

1    A    Yes, it says he participated in them.

2    Q    Okay.  And then it goes on to say, On admission, Brendan

3    presented a flat affect, was isolative, reports of racing,

4    intrusive thoughts, obsessive thoughts about mass shootings and

5    serial killers, bizarre thoughts about processing [verbatim],

6    as well as cognitive and intellectual deficit.

7         Correct?

8    A    Yes.

9    Q    So it's talking about his obsession with mass shooters,

10   serial killers, and bizarre thought processing, and his lack of

11   insight, then, into the seriousness of the legal charges,

12   right?

13   A    Yes.

14   Q    Okay.  It goes on to say, Due to the treatment team's

15   concerns regarding the patient's presentation of symptoms, we

16   request psychological testing.

17        Right?

18   A    Yes.

19   Q    So here it's indicating that he has an obsession with mass

20   shootings, serial killers, bizarre thought process, cognitive

21   and intellectual deficits.  Right?

22   A    Yes, that's what it says.

23   Q    And then later that day, upon discharge, the treatment

24   team made the determination that he's not an acute homicidal or

25   suicidal threat, correct?

Klagsbrun - Cross -

1  A     Yes.

2  Q     All right.

3         MR. BURKE:  If we could turn to 303, please.

4  Q     And in the hospital at the time of discharge, Brendan

5  reported certain things, right?

6  A     Yes.

7  Q     At the time of discharge, Brendan had consistently been

8  reporting improved mood stability, right?

9  A     Yes.

10 Q     And they would make that entry based on prior notes that

11 led up to the discharge?

12 A     Yes.

13 Q     Or observations?

14 A     Yes.

15 Q     And it says, Patient's insight has expanded.

16       Right?

17 A     Yes.

18 Q     I mean, he is responding or -- well, what does that mean?

19 A     It means that whoever wrote the note, in their opinion

20 that he had more insight into what's going on.  I can't specify

21 more than that because they didn't specify insight into what.

22 Q     Okay.  But insight into something, right?

23 A     Right.

24 Q     Okay.  And we know what he was there for and his

25 obsessions, and obsessions with mass shootings, so insight into

Klagsbrun - Cross -

1    something?

2    A    Yes.

3    Q    It also further on down here in the middle of this section

4    talks about, Demonstrated positive performance of ADLs.

5    Patient presented with bright affect, verbalized future

6    orientation, looking forward to starting the Four Winds

7    Hospital partial hospitalization program.

8         Right?

9    A    Yes.

10   Q    Okay.  ADLs are what?

11   A    Activity of daily living.

12   Q    Okay.  Is that some of the programming?  Correct?

13   A    No.  Showering, brushing teeth, changing clothes.

14   Q    Okay.  So there it's indicating he demonstrated positively

15   performing those duties during this inpatient hospitalization,

16   right?

17   A    Yes.

18   Q    It also, the second-to-last line, Patient denied SI/HI, AV

19   and H [verbatim], which we talked about earlier, or any manic

20   symptoms, and demonstrates good behavioral controls.

21        Right?

22   A    Yes, it says that.

23   Q    And then we know later on he gets transferred to the

24   partial hospitalization program after being discharged, right?

25   A    Yes.

Klagsbrun - Cross -

1    Q    Okay.  And then he had a discharge from the partial

2    hospitalization program on July 13, 2018, right?

3    A    Yes.

4    Q    And in order to be discharged from a partial

5    hospitalization program, there would have to be a similar

6    finding that he's not an acute homicidal or suicidal risk,

7    correct?

8    A    Well, he was readmitted inpatient when he was discharged

9    from our partial.  So no, not in this case.

10   Q    He was readmitted -- well, let me rephrase that.

11        He has a seizure while at partial, right?

12   A    Right.

13   Q    Okay.  Goes back inpatient, and that's where you have the

14   July 17 discharge?  If you look at 3501Q.

15   A    Yes.

16   Q    So there we --

17        MR. BURKE:  If we could turn to -- I have to change

18   my books.  One second, Judge.

19        THE DEFENDANT:  No, I didn't, I didn't disconnect.  I

20   was just raising the volume.

21        MR. BURKE:  Okay.  If we could, Ms. Becker, please

22   fast-forward to 648.  And scroll down, please.

23   Q    This is, again, a -- on the top of it, it's identified as

24   the Discharge Risk Assessment, correct?

25   A    Yes.

Klagsbrun - Cross -

1    Q    All right.  And it's the -- an entry by Dr. Riccardelli,

2    right?

3    A    Yes.

4    Q    It says, Legal issues -- in the entry it says, Assessment

5    of acute risk by the doctor.  Legal issues, investigated by

6    FBI.  Possible recent seizure.  Denies thoughts of intent and

7    harm to self or others.  And there's also checked off on box

8    13, No homicidal ideation and no access to firearms.

9         Right?

10   A    Yes.

11   Q    Okay.  He's then discharged because there's a

12   determination that he's not an acute risk of homicide or

13   suicidal ideations, correct?

14   A    Yes.

15            MR. BURKE:  One moment, your Honor.  I'm sorry.

16            THE COURT:  No problem.

17            MR. BURKE:  Ms. Becker, if we could please advance to

18   550.

19   Q    And this is, again, a doctor or nurse practitioner

20   progress note, first page from July 27, 2018.  So this is the

21   admission No. 4 referenced on your 3501Q index, right?

22   A    Yes.

23   Q    Okay.  And here it says -- during this admission it

24   says -- He's now nine days into the admission, right?  Because

25   he was admitted on July 18.

Klagsbrun - Cross -

1   A    Yes.

2   Q    Okay.  And he's been attending program daily,

3   participating more appropriately in groups compared to earlier

4   in his treatment here.  Reports taking Lamictal at bedtime and

5   denies any side effects.

6        I read that correctly, right?  Dr. Klagsbrun?

7             MR. BURKE:  I think we lost the doctor, Judge.

8             THE COURT:  Well, we can't have that.  I see the

9   doctor on the --

10            MR. BURKE:  Yeah, I see her.  I just don't see the

11  video connection.

12            THE COURT:  Yep.

13            MR. ADELSBERG:  I'll give her a call on her cell

14  phone.

15            MR. BURKE:  She's back.

16            THE COURT:  Doctor, are you there?

17            MR. BURKE:  I can't hear her.  She's talking.

18            MR. ADELSBERG:  Dr. Klagsbrun, you may be muted.

19            THE COURT:  It says unmuted.

20            MR. ADELSBERG:  I mean muted on her computer.

21            THE WITNESS:  Can you hear me?  I lost the power or

22  something, but I'm back.  Okay.  All right.  Sorry.  I've got

23  IT standing by.

24            All right.  I'm good, Steve.

25            Okay.  Sorry about that.

Klagsbrun - Cross -

1   BY MR. BURKE:

2   Q    Okay.  Dr. Klagsbrun, we left off where we were talking

3   about the July 27, 2018 entry.  This is during his fourth

4   admission on 3501Q that you were using as an index, the

5   admission from July 18 to August 3.  So he was already -- he

6   was there for nine days at this point, correct?

7   A    Correct.

8   Q    All right.  And this entry, the doctor's recognizing that

9   he's been attending program daily, right?

10  A    Yes.

11  Q    And participating in groups.  He's participating more

12  appropriately in groups compared to earlier in his treatment

13  here, right?

14  A    Yes.

15  Q    Okay.  So -- and then it also says, He's taking his

16  Lamictal at bedtime, denies any side effects.

17       Right?

18  A    Yes, that's what it says.

19  Q    Okay.  So it's indicating here that he's attending the

20  program, acting appropriately in the programming, taking his

21  medication, correct?

22  A    Yes.

23       MR. BURKE:  And if we could just go to page 553.

24  Q    This is, again, Dr. Riccardelli making that entry?  At the

25  bottom.

Klagsbrun - Cross -

1    A    Yes.

2    Q    Now, on the page 559, the next page, there's an entry from

3    August 1, there's a 8/1 entry from Mary Poopin (ph), the -- did

4    I pronounce that right?

5    A    Pupawn (ph).

6    Q    Poupon.  The transcript will read it correctly.

7         Mary Poupon, who is a nurse practitioner, says that,

8    Patient attended full program, and patient reports past

9    fascination with serial killers and mass shootings.  Patient

10   reports he's now interested in politics, would like to be a

11   lawyer.  Continues Lamictal at bedtime without side effects.

12        Right?

13   A    Yes, that's what it says.

14   Q    So, again, it's reporting a past fascination with serial

15   killers and mass shooters in August of 2018 to the nurse

16   practitioner as she enter -- it also says he's fully

17   participating in the program, right?

18   A    Well, it says he's attending full program.

19   Q    Attending full program.  You're correct.

20        If we could --

21        And this is two days prior to his discharge, right?

22   A    Yes.

23   Q    And he's discharged -- again, when he's discharged, there

24   would be a determination by the treatment team that there was

25   no homicidal or suicidal ideation -- no acute homicidal or

Klagsbrun - Cross -

1   suicidal ideations and he would be discharged, right?

2   A    Correct.

3   Q    And that determination was made here, and he was

4   discharged from Four Winds, correct?

5   A    Yes.

6   Q    He's readmitted 12 days later to Four Winds -- well,

7   actually, let's just go -- when he was discharged, he was

8   discharged with a diagnosis of unspecified schizophrenia,

9   right?

10  A    Yes.

11  Q    And was given Lamictal, 50 milligrams again?

12  A    Yes.

13  Q    Okay.  When he's admitted on August 15, he's readmitted

14  some 12 days later to the Lodge again, right?

15  A    Yes.

16  Q    All right.  And the discharge that we were previously

17  talking about on August 3, 2018, that was from the partial

18  hospitalization program?

19  A    Correct.

20  Q    Okay.  And a partial hospitalization program, he's there

21  during the day and goes home at night?

22  A    Correct.

23  Q    Monday through Friday?

24  A    Yes.

25  Q    Okay.

Klagsbrun - Cross -

1          MR. BURKE:  If we could please turn to 403,

2     Ms. Becker.  Actually, I'm sorry, 370.

3     Q    And this is an admission -- from the 8/15 admission that

4     we were just talking about, right?

5     A    I can't see any dates.

6     Q    Okay.  Top right.

7     A    My Zoom is covering it.  But if that's what it says,

8     then -- I just can't see it because my...

9     Q    So you don't have the document showing up on the --

10    A    I have the document.  I can only see A-D -- oh, there we

11    go.  Okay.  Yes.

12    Q    All right.  So it's in the top right-hand corner, 8/15?

13    A    Correct.

14    Q    In the second full paragraph, can you read the first entry

15    to the semicolon for me?

16    A    Patient has no history of violence at all; in fact,

17    usually plays the role of peacemaker, avoids confrontations.

18    He harbors --

19    Q    Okay.

20    A    That's it?

21    Q    Yes.  No.  Go ahead.  Continue.

22    A    He harbors no anger towards his school or the people in

23    it.  Is at times teased, but never bullied, though he

24    exaggerated bullying when he was at his Catholic school

25    because --

Klagsbrun - Cross -

1   Q    I'm just going to stop you there.  Thank you.

2        So in this entry it says, No history of violence at all,

3   right?

4   A    Yes, that's what it says.

5   Q    Okay.  And this is the admission entry being done by a

6   doctor or a nurse?

7   A    This is the admission entry I think from the June 18

8   admission that I think was copied and pasted.  I have to see

9   the entire document.  Sometimes there's copying and pasting

10  from a previous admission and then it's identical.  So it says,

11  As per last intake for inpatient admission here on June 8, '18.

12  So this might have been copied from the June 8, '18 assessment.

13  Q    Okay.  We went through the June '18 assessment earlier.

14  Do you recall ever seeing anything about playing the role of

15  peacemaker and harboring no anger towards his school or

16  classmates?

17  A    I can't recall if it's in there or not.

18  Q    But it's in here and this is in August of 2018, right?

19  A    Yes.

20  Q    Okay.  On page 371, it goes on to talk about -- actually,

21  I guess we'll have to start at the bottom of 370, I beg your

22  pardon.  In this entry it says, Denies any significant symptoms

23  of depression now or historically; no periods of hypo/mania,

24  usually feels good about himself, though on occasion not.  No

25  significant phobias.  Not shy.

Klagsbrun - Cross -

1      Then it goes on to say, Struck the writer as bright, late

2 adolescent, good-humored, realistic, honest insight about

3 himself.

4      Right?

5 A    That's what it says, yes.

6 Q    Okay.  So at least this reporter is reporting about the

7 honest insights that they've observed about Brendan Vaughan in

8 August of 2018, correct?

9 A    Correct.

10 Q    And, again, as we talked about earlier, it's not only what

11 the patient reports, but the observations of the treating

12 professionals to make the determination as to his diagnosis and

13 condition, right?

14 A    Yes.

15 Q    All right.  And you can actually even make diagnoses of an

16 individual -- a nonverbal individual based on their mannerisms,

17 et cetera?

18 A    You can.

19           MR. BURKE:  If we could turn to --

20           THE DEFENDANT:  Excuse me.

21           THE COURT:  Yes, Mr. Vaughan?

22           THE DEFENDANT:  Judge, if you don't mind, could you

23 just mute me for a minute?  Because I'm eating right now and I

24 don't want my chewing to be heard in the background.

25           THE COURT:  Sure.  No problem.

Klagsbrun - Cross -

1          MR. BURKE:  Thank you, Brendan.

2          THE COURT:  Okay.  Your client is muted for now.  I

3     assume what he'll do, Mr. Burke, is call you to let us know he

4     needs to be unmuted.

5          MR. BURKE:  Can you unmute him so -- can he hear me?

6     I guess he can hear me.

7          THE COURT:  Yes.

8          MR. BURKE:  So he can hear me now.

9          Brendan, when you're done eating, call my cell phone

10    and I'll ask the Court to unmute you, okay?

11         THE COURT:  And if nothing else, we can check back in

12    in like 10 or 15 minutes.

13         MR. BURKE:  Sounds good.  Thank you, your Honor.  As

14    long as we see the connection.  And then, like I said, we can

15    check back in.

16         THE COURT:  Yeah.  Okay.

17         MR. BURKE:  So if we could, Ms. Becker, just please

18    turn to 403.

19    BY MR. BURKE:

20    Q    This is part of a Master Treatment Plan for this

21    admission, is it not?

22    A    Yes.

23    Q    Okay.  And the Master Treatment Plan is one of the

24    documents filled out.  And this -- it shows the admission 8/15.

25    As far as high risk of psychological issues requiring early

Klagsbrun - Cross -

1   treatment planning and intervention, it's checked off that none

2   were identified, correct?

3   A    Yes.

4   Q    So at least there there was no determination of any high

5   risk of psychological issues requiring some kind of early

6   treatment by the treatment team when they were filling out the

7   Master Treatment Plan?

8   A    Yes.

9        MR. BURKE:  Please turn to page 482.

10  Q    Dr. Klagsbrun, this is an entry on August 19, again, from

11  the fifth admission at Four Winds inpatient.  And here the

12  8/19, it indicates that, the second line where it says "No

13  indication" -- do you see that?  Middle of the second line.

14  A    Yes.

15  Q    It says, No indication patient ever has or does intend any

16  violence towards anyone.  Rather, he enjoys the power in just

17  causing legal concerns abroad.

18       Right?

19  A    Yes.  That's what it says.

20  Q    That's the writer's impression of the patient, that based

21  on the history -- well, let me start the question out this way:

22  At this point in time, there's already been four prior

23  admissions, right?

24  A    Yes.

25  Q    And all of his medical records are together for this

Klagsbrun - Cross -

1    August 15 admission, right?

2    A    Yes.

3    Q    Okay.  So the treatment provider would have access to all

4    those records to review diagnosis, treatment, statements, et

5    cetera, correct?

6    A    Sometimes if a certain amount of time has gone, no.  But

7    one can then ask for access and get access.

8    Q    Okay.  But here we're not talking about years, we're

9    talking about months of prior hospitalization, so these records

10   would have been accessible, would they not?

11   A    Sometimes if after 30 days they are not, due to HIPAA

12   regulations.

13   Q    Is there any indication here that they didn't have access

14   to prior admissions?

15   A    I don't know.

16   Q    But it does say here that, at least to this writer, there

17   was no indication the patient ever had or does intend any

18   violence towards anyone, right?

19   A    Yes.

20   Q    And that writer --

21          MR. BURKE:  If we could turn to page 445.

22   Q    -- was Angela Smith at the bottom, right?

23   A    Yes.

24          MR. BURKE:  If we could just go to page 444, the

25   interim pages.  All the way at the bottom.

Klagsbrun - Cross -

1   Q    It indicates the June admission and the referral from

2   Dr. Nakkab, right?

3   A    Yes.

4   Q    It's fair to assume that the writer of this assessment had

5   access to the prior treatment records from June, July, and

6   August?

7   A    Yes, it seems that way.

8         MR. BURKE:  If we could please turn to 456.

9   Q    And this is a therapy progress note, correct?

10  A    Correct.

11  Q    There's also -- well, at the bottom of it, it indicates

12  the date and author, Nareesa Hussain, August 20, 2018, right?

13  A    Yes.

14  Q    So that's five days into the fifth admission?

15  A    Yes.

16  Q    Okay.  And she says here under progress, I1 -- do you see

17  that?

18  A    Yes.

19  Q    It says, In individual therapy, writer and patient met to

20  discuss progress in treatment.  Patient reported overall

21  improvement in his mood, less irritable, agitated.  Reported

22  feeling more focused with less racing thoughts.  He's able to

23  think clearly; due to this, has been working on a safety plan

24  on coping ahead with impulsive behaviors he may experience when

25  discharged.  Patient reports good sleep and appetite, attending

Klagsbrun - Cross -

1    ADLs.  Denies feelings of depression, SI or HI and psychosis.

2        Correct?

3    A    Correct.

4    Q    And then also I2 says, Patient compliant with medication,

5    unit rules, and one-on-one contact with staff, right?

6    A    Yes.

7    Q    So that's telling you as far as his progress, he's

8    compliant with the medications, unit rules, and his interaction

9    with staff, right?

10   A    No.

11   Q    That's not telling you that he's compliant with

12   medication, unit rules, and contact with staff under I2?

13   That's what it says.

14   A    That's what it says, but that's not what it's telling me.

15   Q    What's it telling you?

16   A    Well, what I mean is, even if somebody writes a patient is

17   compliant with medications, you don't know for sure whether or

18   not a patient is actually taking their medications.

19   Q    Okay.  But it doesn't say here, Doctor, does it, that

20   there's any indication that the patient wasn't taking

21   medication during this hospitalization, right?

22   A    Correct.  It does not say that.

23   Q    And, in fact, it says patient is compliant with

24   medication, correct?  And if he wasn't, there would be an

25   indication here under Progress, indications that patient may

Klagsbrun - Cross -

1    not be taking medication, right?

2    A    Probably.

3    Q    It also says here that he's compliant with the unit rules.

4    So that's -- fair to say that he's -- there's no issues with

5    the unit rules and his behavior, correct?

6    A    Yes, that's what it's saying.

7    Q    Okay.  And if, in fact, there were any issues with the

8    unit and his behavior, you would expect it to be reflected

9    here, would you not?

10   A    I would expect it to be reflected in the record.

11   Q    Okay.  But at least in this record, which is part of

12   Brendan's Four Winds record, there's no indication of any kind

13   of lack of compliance with unit rules, right?

14   A    This therapist is indicating that there isn't any issues

15   with compliance.

16   Q    And this is Naressa Hussain.  She was one of his treatment

17   team individuals who had been treating him for a long period of

18   time, correct?

19   A    Yes.

20   Q    And she's still employed by Four Winds, right?

21   A    Yes.

22   Q    Employed there for a while, correct?

23   A    Yes.

24   Q    And you would expect, if there was any issues of unit

25   rules or medications, Naressa Hussain would indicate that,

Klagsbrun - Cross -

1   wouldn't she?

2   A    She would indicate, yes, if she had concerns.

3   Q    Okay.  And she's saying that she didn't here, right?

4   A    Right.

5   Q    Okay.  It also reports an overall improvement in his mood,

6   correct?  Under I1.

7   A    Yes.

8        MR. BURKE:  Your Honor, I'm getting a call from the

9   jail.  Let me check -- I'm muting.

10       Your Honor, he's finished with his meal.  You can

11   unmute him.

12       THE COURT:  And he's unmuted.

13       THE DEFENDANT:  Thank you.  Thank you very much.

14       THE COURT:  All right, Mr. Burke, you can continue.

15       MR. BURKE:  Thank you, your Honor.

16       If we could please turn to 464.  And scroll down to

17   the Assessment of Acute Risk box.

18   Q    And that's the Assessment of Acute Risk completed by the

19   M.D. -- by the doctor or nurse practitioner, correct,

20   Dr. Klagsbrun?

21   A    Correct.

22   Q    And this is being done by Dr. Campbell on August 22, 2018,

23   right?

24   A    Correct.

25   Q    Okay.  And if you could -- this report that she's filling

Klagsbrun - Cross -

1    out saying, Given the risk assessment above, patient is not --

2    and that's underlined, right?  You see that?

3    A    Yes.

4    Q    Is not, underlined, an acute danger to self or others and

5    is appropriate for discharge.

6         Right?

7    A    Yes.

8    Q    So Dr. Campbell makes that risk assessment.  She, in fact,

9    even underlines it, that he is not an acute danger to self or

10   others, correct?

11   A    Yes.

12   Q    At this point in time there had been a -- in August there

13   was a second series of postings by Mr. Vaughan of emojis, were

14   there not?

15   A    Yes.

16   Q    Okay.  There was an emoji of a gun and an emoji of a bomb;

17   is that right?

18   A    Yes.

19   Q    That predated this admission, and Four Winds is making the

20   risk assessment upon discharge after treating him that he is

21   not an acute danger to self or others, right?

22   A    Yes.

23        MR. BURKE:  If we could please scroll to 498.

24   Q    Dr. Klagsbrun, this is a medication form, correct?

25   A    Yes.

Klagsbrun - Cross -

1   Q    Okay.  And it references medications that were

2   administered to Brendan during the course of -- or portion of

3   that stay; is that correct?

4   A    Correct.

5   Q    All right.  It says on August 17, indicates medications

6   were given, right?

7   A    Well, what -- that indicates medications were ordered.

8   Q    Okay.  Further down, though, it says 8/21 -- what does it

9   say?

10  A    Change melatonin 5 milligrams PO/QHS/PRN insomnia, maximum

11  daily dose one.

12  Q    Okay.  I'm sorry.  I'm talking about this entry here,

13  August 21 where it says, Please bench.

14  A    Please bench patient for 15 minutes after medication

15  administration.  Please perform careful mouth checks.

16  Q    Okay.  So that's indicating that after medication was

17  administered, they had the patient sit on the bench for 15

18  minutes, right?

19  A    Yes.

20  Q    Okay.  So Brendan sat on the bench for 15 minutes and they

21  performed a careful mouth check to make sure that he took his

22  medicine, right?

23  A    Yes.

24  Q    And there's no indication that he didn't, correct?

25  A    It wouldn't be here if he didn't.

Klagsbrun - Cross -

1   Q    There was no indication that during the mouth check they
2   found any medication, though, right?
3   A    I don't know because it wouldn't be here.
4   Q    Okay.  Where would it be?
5   A    It would be elsewhere in the record, or verbally in the
6   morning report a nurse might relay the information.  But it
7   wouldn't be here.
8   Q    If a patient wasn't taking medication, that would be
9   something important to note, though, right?
10  A    Yes.
11  Q    Okay.  And earlier we saw the progress reports and the
12  discharge that -- during this admission Brendan was compliant
13  with medication, right?
14  A    It says that statement, yes.
15  Q    So had he not been compliant with medication, you would
16  have expected that there would have been an entry by Naressa
17  Hussain that there was an incident where he wasn't compliant
18  with medication, correct?
19  A    I might have expected it.  It doesn't mean it would be
20  there.
21  Q    Well, you have no reason that she wouldn't put it in
22  there.  She's a diligent worker, correct?
23  A    Well, therapists only write notes twice a week, so it
24  wouldn't necessarily be in the therapist's notes.
25  Q    But she's reviewing the records to make a determination as

Klagsbrun - Cross -

1  to his compliance, correct?

2  A    Not necessarily.

3  Q    But in that entry where it has therapist's notes, it says,

4  Compliant with medications, what does she base that entry on

5  unless she's looking at the medical record?

6  A    Right.  So if she says medication compliant, it means she

7  feels that he's being medication compliant.  But it doesn't

8  mean he is being medication compliant.

9  Q    But it also isn't where she's putting an entry that he's

10  not medication compliant, or there's indications that he may

11  not be medication compliant, correct?  Such as cheeking his

12  meds, anything like that.

13  A    Well, this is an indication that he might be cheeking his

14  meds, and that's why the order was written.  So this is letting

15  us know that the team suspects that he's cheeking his meds.

16  There may not be proof, but this is an indication of that.  So

17  this is -- yeah.

18  Q    So this is an indication that he has doctor -- beg your

19  pardon -- Nurse Practitioner Hussain saying --

20  A    She's a therapist.

21  Q    Therapist.  A therapist saying no indication of him not

22  being compliant with his medication during this admission,

23  right?

24  A    I don't know -- I don't recall what the date was, if that

25  was before or after this -- when this order was written by

Klagsbrun - Cross -

1   Dr. Campbell.

2   Q    When --

3        MR. BURKE:  Moving to the second, entry, Ms. Becker,

4   if we could find the page 680.

5        Your Honor, I just wanted to get a sense of -- I'm

6   moving to another admission.  I don't know what the Court wants

7   to -- I'm perfectly fine continuing, but I just wanted to get a

8   sense because I'd like to reach out to my witness.  I don't --

9   with the time constraints, I believe I should be able to finish

10  this witness, but I don't think we'll be getting to Dr. Wright

11  with where we're at.

12       THE COURT:  So you're not going to get to either of

13  your witnesses?

14       MR. BURKE:  Well, I'm going to finish my cross.  It

15  depends on if Mr. -- Mr. Adelsberg has questioning.  But I have

16  a good deal left to go through.

17       THE COURT:  All right.  Well, you know, I was

18  thinking -- and Pam, you should weigh in here -- we should take

19  a break probably no later than 12:30, that would be sort of the

20  halfway point in the morning, try to limit it to a half an

21  hour.  And then maybe you can try to move things along a little

22  bit.  Let's try to get to at least your first witness today.

23  The government will have -- will you finish your cross before

24  the lunch break?

25       MR. BURKE:  I don't believe so, no.  I'm not going to

Klagsbrun - Cross -

1    finish my cross before the lunch break, I can tell you that.

2              THE COURT:  All right.  Well, I think it's too early

3    to ask the government how long they think their redirect's

4    going to be, but I don't imagine you anticipate it's going to

5    be too long.

6              Am I wrong about that, government?

7              MR. ADELSBERG:  That's correct, we don't anticipate

8    it being very lengthy.

9              THE COURT:  All right.  So let's be optimists.  Let's

10   try to move it along.  Because the problem, Mr. Burke, you know

11   if we don't finish by tomorrow, we can't pick it up on Friday.

12   There's -- you know, there's these two-week advance protocols.

13   So...

14             MR. BURKE:  I know.  Your Honor, based on the direct,

15   it led to -- well, we're talking about a nine-month period of

16   time of hospitalization with --

17             THE COURT:  I understand that.  But also there are

18   highlights to be focused on, right?

19             MR. BURKE:  And I'm trying to do that based on the

20   direct testimony, to bring out certain highlights.

21             THE COURT:  All right.  Let's get going, then, and

22   we'll break at 12:30.

23             MR. BURKE:  Thank your Honor.

24   BY MR. BURKE:

25   Q    So we're at 689.  And Dr. Klagsbrun, this is the admission

Klagsbrun - Cross -

1  from November 28, 2018, right?

2  A    Yes.

3  Q    And the indication of this entry -- where's my page?  It

4  indicates Mr. Vaughan was readmitted by his outside provider.

5  That's Dr. Nakkab, right, his primary psychiatrist and

6  therapist?

7  A    Dr. Nakkab is his outside psychiatrist, yes.

8  Q    And it's related to over the past week following

9  exacerbation of ongoing legal issues.  And then further down it

10  reflects, where it says, Patient saw his psychiatrist

11  yesterday, and it's referencing that he had been recently

12  arrested by the federal authorities regarding federal charges,

13  right?

14  A    I'm not sure where you're reading, but yeah.

15  Q    Right.  Well, you know he got arrested in November by the

16  federal authorities, right?

17  A    Yes.

18  Q    And he had previously been arrested by the state along

19  with the FBI in June, and then there was a subsequent arrest in

20  November, correct?

21  A    Yes.

22  Q    All right.  So this is talking about his readmission after

23  he had been arrested federally.

24       MR. BURKE:  And if we could turn to page 692.

25  Q    This is an Integrated Assessment Report, right, filled out

Klagsbrun - Cross -

1   by the treatment team upon admission?

2   A    Not exactly, no.

3   Q    Okay.  Well, who is it filled out by?

4   A    It's filled out -- it's part of the psychiatric assessment

5   upon admission, and it's either filled out by the therapist in

6   admission or the medical staff, either a doctor or a

7   psychiatric nurse practitioner, doing the admission assessment

8   upon admission.

9   Q    All right.  And upon admission there's a -- doing that

10  assessment, there's an area that talks about suicide and an

11  area that talks about homicide, right?

12  A    Yes.

13  Q    And there's an indication upon the admission that there's

14  no homicidal ideation and no suicidal ideation based on the

15  observations and reporting by the person filling out this form,

16  correct?

17  A    Yes.  That was filled out by the person doing the psych

18  assessment.

19  Q    And page 700 --

20       MR. BURKE:  If we could -- if we could scroll down.

21  Q    This is also during admission, it indicates at this point

22  in time --

23       MR. BURKE:  Keep scrolling.  I'm sorry.

24  Q    A picture of the person, right?  Bottom left it says,

25  Bracelet ankle monitor.  With my internet I'm unable -- did

Klagsbrun - Cross -

1   that come across?

2   A    Yes.

3   Q    So at this point in time he's on electronic monitoring for

4   the admission in November of 2018.  There's no -- as far as --

5   well, withdrawn.

6        During this admission in November, from November 28

7   through December 5, there was never any issues with Brendan and

8   the ankle monitor; is that correct?

9   A    I actually don't recall him wearing the ankle bracelet in

10  the second-to-last admission.

11  Q    Right.  So you would recall it if there was issues,

12  though, right, Doctor?

13  A    Probably.

14  Q    So -- and does this -- obviously this indicates that he

15  had the ankle monitor on during this second-to-last admission,

16  right?

17  A    Yeah.

18  Q    Okay.

19       MR. BURKE:  The next entry, if we could go to 7 --

20  page 763.

21  Q    Here's an entry.  These are, again, from the November

22  admission, Patient reporting having good day today, reports

23  that he's mood stable, very positive, believes it's due to

24  medication.

25       Right?

Klagsbrun - Cross -

1   A    Yes.

2   Q    Okay.  So it says, Denies any negative -- denies any urges

3   or intrusive thoughts, right?

4   A    Yes.

5   Q    So here it's saying that -- he's reporting that the

6   medication is helping, right?

7   A    Yes.

8   Q    Okay.

9         MR. BURKE:  If we could go to 768.

10  Q    Where the second patient-reported entry, it says, Patient

11  reported some sadness today due to a patient who got discharged

12  today stealing a shirt given to patient by his grandfather.

13  Patient denies any urges or any negative or intrusive thoughts.

14  That's indicating some degree of empathy that Brendan's

15  exhibiting to a fellow patient who had their shirt stolen,

16  correct?

17  A    No.

18  Q    It's indicating some degree of sadness due to a patient

19  who got discharged today stealing a shirt given to patient by

20  his grandfather, right?

21  A    Yes.  I think you're misinterpreting what it says.

22  Q    Okay.  So is he saying sadness that he had because he was

23  the victim of someone stealing his shirt?  Is that how you read

24  it?

25  A    Yes.

Klagsbrun - Cross -

1    Q    Okay.

2          MR. BURKE:  All right.  If we could go to 777,

3    please.

4          Scroll down.

5    Q    Again, the Discharge Risk Assessment filled out by

6    Dr. Campbell, right?

7    A    Yes.

8    Q    And Dr. Campbell says, Given the risk assessment above,

9    patient is not an acute danger to self or others and is

10   appropriate to discharge.

11         Right?

12   A    Yes.

13   Q    And it appears that "not" is written in bigger language,

14   or bigger writing; is that fair to say?

15   A    Yes.

16   Q    Okay.  So Dr. Campbell's assessment based on Brendan's

17   stay in August is he's not in acute danger to self or others

18   and should be discharged, right?

19   A    Well, based on this day.  I think you said August, but

20   this is December.

21   Q    I beg your pardon.  This was the November stay.

22   A    So based on this stay, yes.

23   Q    Based on this stay, because he gets discharged on December

24   5.  So he's there approximately a week, right?

25   A    Yes.

Klagsbrun - Cross -

1   Q    Okay.  And if there was an indication of him being an

2   acute danger to self or others, he wouldn't have been

3   discharged, right?

4   A    Yes.

5   Q    All right.  This was also the period of time that you

6   attended the Ground Round -- the grand round, right?  I said

7   Ground Round.  I guess I'm getting hungry.  The grand round,

8   correct?

9   A    Correct.

10  Q    And that was the lecture where you said that you learned

11  about school shootings, right?

12  A    Correct.

13  Q    So when you returned back after that November 29 session,

14  did you have any discussions with Dr. Campbell about what you

15  learned about school shootings and what you should be doing

16  with Brendan Vaughan before he got released on December 5?

17  A    I don't recall any specific conversation, but overall, I

18  certainly had conversations with the treatment team.

19  Q    So you had conversations with the treatment team during

20  the November admission about your class that you took at grand

21  rounds about school shootings; is that what you're saying?

22  A    Well, I'm saying I don't recall specifically what

23  conversations I had.  But since I was involved talking to the

24  treatment team, that there was discussion about Brendan.

25  Q    Okay.  You don't have any recollections of discussions

Klagsbrun - Cross -

1  happening before December 5, 2018 when he was released, right?

2  A    Not the specific discussions.

3  Q    Did you relook at Brendan's file after you got back from

4  the grand round to say, Hey, I should look at this more closely

5  before we discharge him?

6  A    I was involved the whole time with these pieces, you know,

7  so I had already been involved.  So meaning that I already

8  looked at the record and been part of these decisions.

9  Q    Okay.  So are you part of the decisions all along as far

10 as when somebody gets discharged?

11 A    Can be.

12 Q    Okay.  But here you're saying you were, right?

13 A    Yeah.

14 Q    Okay.  So you were a part of this discharge on December 5,

15 2018 after you attended grand round where it's an indication

16 that the treatment team doesn't believe he's an acute risk of

17 homicide or suicide, right?

18 A    Right.

19 Q    And if you had any feelings about him being an acute risk

20 of homicide or suicide after you attended the grand rounds

21 session, you wouldn't have discharged him, would you?

22 A    Well, it's more complicated than that.

23 Q    This is a yes or no.  So if you had concerns,

24 Dr. Klagsbrun, about Brendan Vaughan being an acute danger, an

25 acute risk of homicide or suicide, because of what you learned

Klagsbrun - Cross -

1   at the grand rounds session, you wouldn't have approved his

2   discharge, would you?

3   A    No.  If I thought he was an acute risk, no, I would not

4   have approved.

5   Q    So he was approved and he was released from Four Winds,

6   right?

7   A    Yes.  Correct.

8   Q    And -- well, withdrawn.

9          MR. BURKE:  If we could turn to 779, please.

10  Q    And here, again, this is a Discharge Summary, right?

11  A    Yes.

12  Q    Okay.  And in the Discharge Summary, it references his

13  course in the hospital, so it references that stay, right?

14  A    Correct.

15  Q    And during that stay the treatment plan for Brendan

16  included medication, evaluation, and management.  Participated

17  daily in dialectical behavioral therapy, skills training group

18  focused on distress, tolerance, mindfulness, interpersonal

19  effectiveness, and emotion regulation.

20        Right?

21  A    Yes.

22  Q    And it also says, Patient also participated in individual

23  therapy focusing on strengthening use of skills, art therapy,

24  and other therapeutic activities.

25        Right?

Klagsbrun - Cross -

1   A    Yes.

2   Q    No indication that he was superficially participating or

3   not participating in this entry during this stay, correct?

4   A    It does not say anything about superficial participation

5   in this Discharge Summary, that's correct.

6   Q    And if he was superficially participating, you would

7   expect to see something along those lines in the Discharge

8   Summary, would you not?

9   A    Not necessarily.

10  Q    Well, it's not there, is it?

11  A    It's not there, no.

12  Q    The middle of the next paragraph where it starts "he" --

13  do you see that?

14  A    Yes.

15  Q    "Also"?  Can you read that into the record, please.

16  A    He also reported that he was concerned about his mom's

17  ongoing physical illness which was affecting his mood.

18  Q    Okay.  I'm going to stop you there.

19       So -- I'll read the next.  It says, Patient's medications

20  were adjusted to help target these symptoms and has been

21  medication compliant.

22       Right?

23  A    Yes.

24  Q    Okay.  So there it's indicating in his discharge that he

25  was concerned about his mom, right?

Klagsbrun - Cross -

1    A    That's what it says, yes.

2    Q    And her ongoing health issues.  You talked about some of

3    that yesterday, right?

4    A    Yes.

5    Q    Okay.  So at least in this entry it's showing that Brendan

6    was feeling some degree of sadness as a result of what his mom

7    was going through, correct?

8    A    No.

9    Q    It says "affecting his mood," does it not?

10   A    It says "affecting his mood," yes, it does.

11   Q    And one way it could affect his mood is sadness, correct?

12   A    Sure.

13   Q    Depression, correct?  That's a mood disorder, is it not?

14   A    Depression is a mood disorder.

15   Q    And it says affecting mood.

16   A    I'm not sure I understand your question.

17   Q    So you don't know what the mood is that's being affected;

18   is that what you're saying?

19   A    No, that's not what I'm saying.

20   Q    Okay.  It says affecting mood.  And depression can be a

21   mood disorder, right?

22   A    Depression can be a mood disorder, that's correct.

23   Q    So could this be that he was depressed as a result of his

24   mother's ongoing physical illness, or at least exhibiting

25   symptoms of depression because of that?

Klagsbrun - Cross -

1    A    I don't think that's what this statement says.

2    Q    Okay.

3              MR. BURKE:  One second, your Honor.  I'm just going

4    to change to my third binder.

5              THE COURT:  No problem.

6    Q    So Dr. Klagsbrun, he gets released December 5, and then a

7    little over a month later he's admitted for his seventh

8    admission, correct?

9    A    Correct.

10   Q    Okay.  And when he was discharged on December 5, he's now

11   discharged with a diagnosis of bipolar I, most recent episode

12   depressed, severe, with psychotic features, correct?

13   A    Yes.

14   Q    So that's what the diagnosis was by the treatment team

15   when he was discharged on August -- I beg your pardon -- on

16   December 5, 2018, right?

17   A    Correct.

18   Q    He's back in on January 8, and it indicates what his

19   medication is that he was taking when he came in, right?

20   A    Yes.

21   Q    Saphris, Lamictal, and then it says, D/C meds, none.  So

22   that's discontinued meds.  That's later on at discharge,

23   correct?

24   A    That's discharge, correct.

25   Q    Okay.  Now, Doctor, when you -- you talked about

Klagsbrun - Cross -

1   Dr. Pogge's report.  He did actually two reports, did he not?

2   A    Yes, he did.

3   Q    He did one in June, the June admission of 2018, and then

4   later on he does one in January of 2018, correct?

5   A    Yes.  One in June 2018 and January 2019.

6   Q    You're correct.  I beg your pardon.  January 2019 is the

7   second evaluation that Dr. Pogge does.

8        And he's the director at Four Winds who does testing,

9   right?

10  A    Yes.

11  Q    And I think you testified earlier that the June test came

12  back inconclusive because Brendan exaggerated his condition,

13  right?

14  A    I don't know if I would say inconclusive, but yes, Brendan

15  exaggerated his condition, and so it shows malingering, or that

16  Brendan exaggerated conditions.

17  Q    Okay.  Well, do you know if Dr. Pogge made the

18  determination that because of the exaggeration of these

19  conditions, his findings were inconclusive?

20  A    Well, what Dr. Pogge said was that due to Brendan's not

21  being forthcoming about his reports of systems, that you have

22  to discount what Brendan says.  But that's what the report

23  shows, that you have an individual who is not accurately

24  reporting symptoms.

25  Q    Now, when Dr. Pogge performed the second exam in January,

Klagsbrun - Cross -

1  the January admission, that was performed on January 6,

2  correct?  You know, we can turn -- this is in the body of it.

3       MR. BURKE:  We can go to 856.

4  Q    Date of testing is the 15th, and then I think the report

5  was filled out on the 16th.  You can trust me on that one.

6       MR. BURKE:  Just stay there for a moment, Shannon,

7  please.

8  Q    So Dr. Pogge does this evaluation and reports his

9  findings, does he not?

10  A    He does.

11  Q    Does a battery of tests, correct?

12  A    Yes.

13  Q    Okay.  And during this test, it's Dr. Pogge's opinion that

14  Brendan was being forthright in his answers, correct?

15  A    Well, he doesn't say that.

16  Q    Okay.  He does say that based on the testing data and his

17  observation of Brendan taking the test, that he doesn't believe

18  that he is malingering, right?

19  A    Where does he say that?  And I can review -- I just --

20  Q    Okay.

21       MR. BURKE:  If we could turn to page 860.

22  Q    And at the bottom it's talking about that portion of one

23  of the tests he's taking, it's designed to detect efforts to

24  exaggerate or feign memories, and he's saying that his

25  performance on this test does not suggest any such effort.

Klagsbrun - Cross -

1       Do you see that?  First paragraph for Personality.

2                MR. BURKE:  Are we on the right page?

3                You've got to scroll up.  Sorry, Shannon.  I was

4       reading while you were pulling it up.

5                Keep going.  There you go.

6    Q    So you see the bottom of that last paragraph on page 5?

7    A    Yes.

8    Q    Given additional tests designed to detect the efforts to

9    exaggerate or feigning memory problems?

10   A    Yes.

11   Q    Right?  And it's saying there it didn't suggest any such

12   efforts to support such a conclusion, right?

13   A    Yes.

14   Q    Okay.  And Dr. Pogge actually renders a conclusion.  He

15   doesn't say that he thought Brendan was feigning, right?

16   A    Right.  He says it did not suggest that, yes.

17   Q    He also -- in the beginning of his report, Brendan

18   apologized for his prior game-playing with the initial testing,

19   correct?

20   A    I would have to see it.

21                MR. BURKE:  Okay.  If we could go back to 856 to 857.

22   Q    And it's the top paragraph talking about game-playing and

23   validity checks built within the testing, right?

24   A    It says "game-playing," yes.

25   Q    And in the middle of it it says, He -- he meaning

Klagsbrun - Cross -

1   Brendan -- apologized profusely for having behaved in this

2   manner and insisted it was the sign of the examiner's

3   outstanding intelligence that his game-playing was detected.

4   It was pointed out that the detection -- his dissimilation did

5   not derive from the examiner's intellect but rather validity

6   checks built within the testing measures.

7       Right?

8   A   Yes.

9   Q   Okay.  So you would agree with me, would you not that,

10  some of these -- well, a lot of the objective tests that are

11  performed by Dr. Pogge and others contain validity checks

12  within them to determine whether someone is feigning or not

13  being honest in their answers?

14  A   Yes.

15          MR. BURKE:  And if we could please turn to 859.

16  Middle of the section.

17  Q   In this test, Dr. Pogge determined that Brendan's test

18  results fall within -- when we're talking about working

19  memory -- average to low average range, right?

20  A   Yes.

21  Q   Okay.  And he further goes on to say, He's likely to have

22  difficulty in taking in new information.

23      Right?

24  A   Yes.

25          MR. BURKE:  862.

Klagsbrun - Cross -

1   Q    And the second-to-last paragraph it states, However,

2   Brendan does not present -- does not provide evidence of those

3   personality traits that are most often associated with a

4   persistent pattern of antisocial behavior.

5        Do you see that entry?

6   A    Yes, I do.

7   Q    Okay.  So in there Dr. Pogge's indicating that Brendan has

8   not provided evidence in his personality traits consistent with

9   antisocial behavior, right?  Persistent pattern.

10  A    Yes.

11  Q    And in this report he also did a risk assessment, right?

12  A    Yes.

13  Q    For violence?

14  A    Yes.

15  Q    And found him to be an average risk for violence, right?

16  A    I think that's what he said.

17  Q    Where it says -- well --

18  A    You have the page or --

19  Q    Yes.  It's at page 863.  Mr. Vaughan's risk for violence

20  against another person within the next several months would be

21  approximately 26 percent.

22       Do you see that entry there?

23            MR. BURKE:  863, top portion of it.  I'm sorry,

24  Shannon.  I was reading from my entries.

25            (The court reporter requested clarification.)

Klagsbrun - Cross -

1    Q    So here on page 8 of Dr. Pogge's January 2019 report,

2    January 15, 2019 report, it says that the test that he did, the

3    Classification of Violence Risk, Mr. Vaughan's risk for

4    violence against every 100 adult psychiatric patients --

5    A    You skipped a line.

6    Q    -- presenting with risk factors --

7         Okay.  I'm sorry.  You're right.  I did.

8         Mr. Vaughan's risk for violence against another person

9    within the next several months would be approximately 26

10   percent.  In other words, out of every 100 adult psychiatric

11   patients presenting with the risk factors presented in this

12   case, 26 percent commit an actual -- an act of interpersonal

13   violence within the next several months.

14        Right?

15   A    This is what Dr. Pogge said, yes.

16   Q    Okay.  And that was based on the Classification of

17   Violence Risk that he performed on Brendan Vaughan and the

18   results from that test, right?

19   A    Yes.

20   Q    And it also says, This places him in an average risk range

21   for adult psychiatric patients.

22        Right?

23   A    Yes.

24   Q    Okay.  And that's Dr. Pogge reporting back what his risk

25   assessment and his findings are, right?

Klagsbrun - Cross -

1    A    Yes.

2              THE COURT:  Mr. Burke, you know, you read from what

3    the document says.  The document's in evidence.  There were

4    five questions that elicited basically the same answer.  We can

5    all read it.  So, I mean, this is -- these are the kinds of

6    things we can speed up --

7                        (Simultaneous speakers.)

8              THE COURT:  -- in your presentation.

9              MR. BURKE:  Got it.  Thank you, Judge.  I appreciate

10   that.

11   Q    Now, the second-to-last -- I beg your pardon.  The last

12   paragraph of the report renders his conclusion, does it not?

13   A    Yes.

14   Q    Okay.  And in Dr. Pogge's conclusion, he's saying that

15   there's no specific psychometric indications of an increased

16   risk for suicide, and there's nothing in the status which

17   suggests Mr. Vaughan is more likely to engage in violent

18   behavior in the near future than other adults who have been

19   psychiatrically hospitalized.

20        Right?

21   A    I think we're on a different page, but I hear you reading.

22   Q    Page 864, it's saying that he doesn't believe that

23   Mr. Vaughan is a -- is more likely to engage in violent

24   behavior than any other adult who has been psychiatrically

25   hospitalized?

Klagsbrun - Cross -

1    A     Yes.

2    Q     Right?  Okay.

3    A     Yes.

4    Q     So -- and that's consistent with before where he's saying

5    26 out of 100, right?

6    A     Yes.

7    Q     So in January of 2016 Dr. Pogge renders --

8              THE COURT:  January 2019.

9              MR. BURKE:  Right, your Honor.  I'm sorry.

10   Q     January 26 of 2019 Dr. Pogge indicated that Brendan didn't

11   exhibit behaviors of -- antisocial behaviors in his report, and

12   also said that he's not -- he's merely an average risk of

13   violence, right?

14   A     Yes, that's what Dr. Pogge said in his report, correct.

15   Q     When Brendan was admitted in this January admission, how

16   long was he supposed to be there?

17   A     An average patient stays seven to 10 days at Four Winds.

18   Q     Okay.  So the -- if there's an indication on his January

19   admission that his anticipated date of discharge would be

20   January 1, 2019, that would be consistent with the average stay

21   of a patient, right?

22   A     Yes.

23                    (Simultaneous speakers.)

24              MR. BURKE:  Sorry, your Honor.  Just hang on one

25   second.

                    PAMELA GRIMALDI, CRR, CLR
                         914.390.4053

Klagsbrun - Cross -

1          Brendan?

2          THE COURT:  Mr. Burke, I think Dr. Wright's trying to

3    get into the waiting room, which is not a good idea, right?  So

4    can you just -- well, we might want to just take our break and

5    then you can reach out to Dr. Wright and let her know --

6          MR. BURKE:  Yeah, I will do that, Judge.  You know,

7    where I am, it is -- I will pick it up, but I don't anticipate

8    that we'll get to her today, so we'll be doing her tomorrow.

9          THE COURT:  Hang on.  You're talking about doing

10   five-plus hours of cross of this witness?  Is that really what

11   you're talking about doing?

12         MR. BURKE:  Your Honor, I will -- right now I'm on my

13   outline -- no, it's picking up.  I'm at -- I'm about halfway

14   through.

15         THE COURT:  So that's a yes to my question.

16         MR. BURKE:  That's a yes.

17         THE COURT:  It's your job.  You do it how you see

18   fit.  But you need to really evaluate whether it's necessary.

19   And again, we cannot pick it up on Friday.  If we don't finish

20   this by tomorrow, I don't know when we're going to be able to

21   finish this.

22         MR. BURKE:  With that understanding, Judge, I will --

23   let me speak to Dr. Wright.  I'll have her on standby.

24         THE COURT:  Okay.

25         MR. BURKE:  So at least maybe we can begin her today.

Klagsbrun - Cross -

1    But I don't know -- my hope is I can finish with this witness

2    today -- I will finish this witness today.  That's going to be

3    clear.  I just don't know how much we'll get of Dr. Wright.

4    That's all.

5              THE COURT:  Okay.  All right.  So let's take a break.

6    Why don't we come back at 1:00.

7              Doctor, you're still on cross, so I'd ask you not

8    talk to anybody about your testimony, okay?

9              THE WITNESS:  Sure.

10             THE COURT:  And we'll pick things back up at 1:00.

11             (A recess was taken)

12             THE COURT:  Mr. Burke, you've reached out to Dr.

13   Wright.  She's good in the waiting room, right?

14             MR. BURKE:  Yes, your Honor.

15             THE COURT:  Okay.  All right.

16             Then, Dr. Klagsbrun, I remind you, of course, you're

17   still under oath.

18             Mr. Burke, you may continue your cross.

19             MR. BURKE:  Thank you, your Honor.

20             Shannon, if we could just please pull up 927.  And

21   just go down to the progress section, 1.I2.

22   BY MR. BURKE:

23   Q    This is a report from January 11, so his final admission,

24   right?  And it's saying there, Patient compliant with unit

25   rules, medication, contact with staff, and attending groups.

Klagsbrun - Cross -

1       Right?

2   A   That is what the note says, yes.

3   Q   Is that indicating to the reader that he'd been compliant

4   with medication with his contact with staff, his unit rules,

5   and attending groups, correct?

6   A   Yes, that indicates that to the reader, yes.

7   Q   Okay.  So over the course of the first six admissions and

8   up to this point of this admission, the entries that I've shown

9   you indicate that Brendan is compliant with his medication and

10  treatment, correct?

11  A   The notes that you have shown me.  But there are other

12  notes that show differently.  But the notes that you have shown

13  me only show compliance.  Well, except for the cheeking -- the

14  15-minute mouth checks.  That implies that the treatment team

15  suggests medication noncompliance and so an additional order is

16  written.  So the answer is no.

17  Q   Okay.  So the entries, with the exception of that one

18  proviso with check his teeth -- no indication that any

19  medication was found cheeking, but at least check his cheek.

20  With the exception of that one entry, all of the entries that

21  I've shown you from his first admission in June through this

22  January 11 admission indicate that he's compliant with unit

23  rules, medication, and contact with staff and attending groups,

24  correct?

25  A   Yes.  The notes, except for that one that you have shown

Klagsbrun - Cross -

1  me, indicate medication compliant.  Not all the notes.

2  Q    Right.  But just the ones I've shown you throughout those

3  admissions, right?

4  A    Yes.  Except for that one.  Yes.

5  Q    And we also know that there was no indication -- because

6  you went through four things:  Lack of compliance, lack of

7  compliance with therapy, lack of compliance with ankle

8  bracelet, lack of compliance with unit rules.  Those are the

9  four things that you say were Brandon's lack of compliance,

10  right?

11  A    Yes.

12  Q    All right.  And we also know that there was no indication

13  of lack of compliance with the ankle bracelet in the November

14  admission, correct?

15  A    We don't know that, no, incorrect.

16  Q    Okay.  Well, based on what I showed you, there was nothing

17  that indicated any kind of lack of compliance with the ankle

18  bracelet or indication of elopement in the November admission?

19  A    Based on what you have shown me, no.

20  Q    Do you believe there was any indication of elopement in

21  the November admission?

22  A    There could have been.

23  Q    As you sit here today, you don't have any recollection if

24  there was any attempt of elopement in November of 2018, do you?

25  A    I do not.

Klagsbrun - Cross -

1              MR. BURKE:  Shannon, if we could just turn to 953.

2      And if we could just go down to the bottom.  Well, actually

3      right here where -- this is a -- I'm sorry.  Go back up to the

4      top.  I beg your pardon.  A little higher.  I just need the

5      date.

6              Thank you.

7      Q    This is an entry from January 16, 2019 at 2:22 p.m. where

8      it's referencing an interview that you had with patient Brendan

9      Vaughan, right?

10     A    Yes.

11     Q    Okay.  In that it says, Patient not acutely suicidal or

12     homicidal.  Awaiting results of psych testing.

13            Right?

14     A    That's what it says, correct.

15     Q    And so based on your observations, interviews, review of

16     medical records, you did not believe that Brendan at that time

17     was acutely suicidal or homicidal, correct?

18     A    Correct.

19     Q    And you're also awaiting Dr. Pogge's results of the psych

20     test, right?

21     A    Correct.

22     Q    We previously went over those before the break, right?

23     A    Yes.

24     Q    Dr. Klagsbrun, there's nothing in Dr. Pogge's report or in

25     this entry here -- well, let's just stay with this entry here,

Klagsbrun - Cross -

1  because this is you.  Nothing in here saying anything about the
2  grand rounds session that you attended and concerns that you
3  had about Brendan being an acute risk of being a school
4  shooter, right?
5  A    This does not say anything about that, correct.
6  Q    And it doesn't say anything about your concerns about
7  Brendan being an acute risk based on you attending that grand
8  rounds session in November of 2018 in Dr. Pogge's report,
9  right?
10 A    Correct.
11 Q    If you had concerns about that, you would expect, perhaps,
12 that you would include it in here, would you not?
13 A    Yes.
14 Q    So obviously on January 16, 2019 you didn't have those
15 concerns, at least as is reflected in this report, right?
16 A    Correct.
17        MR. BURKE:  Sorry, Judge.  I'm skipping over stuff.
18 You'll be glad to hear that.
19        THE COURT:  I'm doing cartwheels.
20        MR. BURKE:  1001, please.
21 Q    In this entry, Dr. Klagsbrun, it indicates that on January
22 24, 2019 Brendan was excited and anxious about pending
23 discharge tomorrow.  So some indication that he understood that
24 he'd be discharged on January 25; is that right?
25 A    No.  Because it's noted, 1/23 update.  So what that means

Klagsbrun - Cross -

1    is it was the progress note for January 23, even though it was

2    written January 24.  So the discharge was planned for January

3    24.

4    Q    Okay.  So that day.  All right.  I get it.

5         He wasn't discharged on January 24, though, right?

6    A    Correct, he was not.

7    Q    All right.  And the FBI reached out to Four Winds prior to

8    them coming in to meet with you, right?

9    A    Yes.

10   Q    And that was prior -- they reached out to you sometime

11   prior to January 30, 2019 to have that meeting, right?

12   A    Yes.

13   Q    Okay.  And they said to you that meeting was a duty to

14   warn meeting; is that right?

15   A    Yes.

16   Q    And in that duty to warn meeting, they went through

17   historically some of the information that they -- well, let me

18   start again.

19        The FBI spent a good deal of time with you that day, did

20   they not?

21   A    I think it might have been an hour, maybe two.

22   Q    Okay.  An hour or two, you took 13 pages of detailed notes

23   of that interview?

24   A    Yes.

25   Q    And in interview under a duty to warn -- so let me just

Klagsbrun - Cross -

1  ask you this:  You have a duty to warn as a psychiatrist,

2  right?

3  A    Yes.

4  Q    And what do you understand your duty to warn to be?

5  A    If I think somebody is at risk of hurting somebody else,

6  then it's my duty either to prevent that from happening or to

7  warn the other person.

8  Q    Okay.  So that's your understanding of your duty.  You

9  don't have an understanding of what the FBI's duty to warn is?

10 A    No.

11 Q    Okay.  So they came to you.  Did they in their duty to

12 warn ever tell you that you or anybody at Four Winds were in

13 danger with Brendan Vaughan?

14 A    Not in the -- not that I recall in the January 30 meeting.

15 Q    Okay.  So they never said, You guys are -- that's why

16 we're coming and -- they didn't see you as a potential victim,

17 right?

18          MR. ADELSBERG:  Objection.

19 A    That was not my understanding.

20 Q    Okay.  And in the duty to warn, the FBI went over searches

21 that they had conducted at Brendan's residence, right?

22 A    Yes.

23 Q    Okay.  And the search in Brendan's residence, did they

24 tell you they searched his residence some five or six times?

25 A    Yes.

Klagsbrun - Cross -

1   Q    Okay.  And that they found no weapons, correct?

2   A    I thought the last time they found some explosive devices,

3   but, you know...  Again, I -- yeah.

4   Q    Did they tell you they found an explosive device or that's

5   what you think they told you?

6   A    That's what I think that they told me.  It was a while ago

7   when we had the meeting.

8   Q    I'm representing that no explosive device was ever

9   recovered, and I'm sure Mr. Adelsberg can confirm that.

10       So did they tell you that?  As far as you sitting here

11  today based on your testimony, you believe they told you an

12  explosive device was recovered in Mr. Vaughan's house?

13  A    I don't recall the specifics.

14       MR. ADELSBERG:  Objection, your Honor.  I just want

15  to respond to counsel represented a position that I would take

16  in his question.

17       THE COURT:  Okay.  So is there a dispute as to

18  whether or not weapons were found?  Is that --

19       MR. ADELSBERG:  My understanding is that at that

20  point in time, I can't remember if it was that particular

21  search, but there were pipes that were found, and the FBI was

22  still trying to determine whether that was a weapon or not.

23       THE COURT:  Okay.  All right.

24       MR. BURKE:  And I'm representing to him that --

25  BY MR. BURKE:

Klagsbrun - Cross -

1   Q     Well, I'm representing to you, Dr. Klagsbrun, that there
2   was no indication of any kind of residue or bombs.  It was a
3   PVC pipe.
4            THE COURT:  Okay.  But that's -- what you're
5   representing to the doctor doesn't control what she might have
6   recalled the FBI saying to her at the time.
7   Q     Do you recall the FBI saying to you that they had a bomb?
8   A     I do not recall that specifically.
9   Q     Were you left with the impression based on these
10  discussions that you had with the FBI that they recovered an
11  explosive device?
12           THE COURT:
13           I recall at some point, and I don't remember if it
14  was the January 30 discussion, but that was the main
15  discussion, that there was something that had to do with IEDs.
16  I remember looking up what that stood for because I didn't know
17  it before the meeting.  So there was -- so I thought that there
18  was something that had to do with explosive devices.  I can't
19  recall if any were specifically found or what -- now what the
20  exact context of that was.  But I remember having concerns
21  about there being a connection between Brendan and explosive
22  devices.
23  Q     Okay.  And that concern that you had was based on what the
24  FBI was relaying to you about some kind of explosive device
25  that they uncovered; is that right?

Klagsbrun - Cross -

1   A    I don't know about that.  It was based on the entire

2   meeting all together, the posts, the comments, the journals.

3   It was the entire situation.  I wouldn't say it was one

4   statement or one comment.  It was the whole meeting and

5   everything that had me concerned after the meeting.

6   Q    Okay.  Other than this PVC pipe that the FBI told you they

7   recovered, they didn't tell you if any other weapons were

8   recovered during the five or six searches of Brendan's

9   residence, correct?

10  A    I thought I recalled something with an explosive device.

11  That's the best I can do.

12  Q    Okay.  Did they tell you when they recovered what they

13  believed to be an explosive device or a bomb?

14  A    Explosive device.  Like I said, I don't have any more

15  specifics.  I don't know if Brendan was researching this or

16  actually putting it together.  Like I said, I went Googling to

17  see what IED stood for, so there was something that was of

18  concern that had to do with explosive devices, and that's what

19  I recall.

20  Q    Okay.  So all I'm asking you is -- I'm not asking you

21  about research.  As you sit here today, do you have a

22  recollection that the FBI told you that they recovered an IED

23  or a pipe bomb?

24  A    That was my recollection.

25  Q    Okay.  If it turned out, Dr. Klagsbrun, that no IED or no

Klagsbrun - Cross -

1   pipe bomb was recovered in any of those searches, you would

2   agree with me that that representation wasn't true?

3   A    I'm not saying that they necessarily represented that they

4   found that.  In my mind I thought they had.  I'm not saying

5   that they said that they told me that they had.

6   Q    Okay.  Did you ever ask for clarification when they --

7   that you were left with the impression that they recovered a

8   pipe bomb to say, Wait a minute, you actually found a bomb?

9   When did you find it?  We had him here five times prior to this

10  admission?  You didn't say anything like that?

11  A    No.

12  Q    And as far as you know, Brendan was only charged with

13  making threats; he was never charged with possession of any

14  kind of explosive devices, correct?

15  A    Sure.  I was never focused on the charges and what --

16  which, and federal, and -- that just wasn't my focus.

17  Q    As far as you know, he was charged with making threats,

18  right?

19  A    Yes.

20  Q    Okay.  And as far as you know, he wasn't charged with

21  possession of a dangerous weapon or explosive device, correct?

22  A    Yes.

23  Q    During that duty to warn meeting, it was you, FBI agent

24  Melissa Zacharides, Thomas Smith -- do you know who Thomas

25  Smith is?

Klagsbrun - Cross -

1   A    I assumed an FBI agent.

2   Q    Okay.  Was there anybody else there?

3   A    Yes.  Eileen Scully, the program director.

4   Q    Did you have counsel there as well?

5   A    No.

6   Q    So it was you and Eileen and Melissa Zaccaridis and Thomas

7   Smith?

8   A    Correct.

9   Q    You said the meeting was one to two hours.  During this

10  meeting, Dr. Klagsbrun, the FBI told you about a plan that they

11  believe Brendan had to blow up four schools in Washingtonville

12  on the anniversary of Columbine and Hitler's birthday, April

13  20, 2019; isn't that correct?

14  A    Yes.

15  Q    And they told you that, and that caused you some concern,

16  did it not?

17  A    Sure.

18  Q    And as a result of him telling you that, that they

19  believed he was going to commit a bombing of a --

20  Washingtonville schools, four of them, on the anniversary of

21  Columbine and Hitler's birthday, April 20, 2019, you changed

22  certain things about Brendan's treatment, did you not?

23  A    No.

24  Q    After he got -- after that FBI meeting, that was the first

25  time you put him on one-on-one, wasn't it?

Klagsbrun - Cross -

1   A    Yes.

2   Q    So there was a -- and that's the SA, right?

3   A    He wasn't put on one-to-one based on the meeting with the

4   FBI.  So --

5   Q    It just happened be the next day.  So Dr. Klagsbrun, it

6   just happened to be the next day after the meeting with the FBI

7   that Brendan was placed on one-on-one?

8   A    No.  There was a reason why he was placed on one-to-one.

9   Q    And that reason, was it not, was the meeting with the FBI?

10  A    No.

11  Q    What was the reason that you placed him -- withdrawn.

12       So just so we can understand that we have the timeline...

13           MR. BURKE:  Shannon, if you could just please scroll

14  to 1413.

15  Q    That indicates the first day he was placed on observation,

16  right?

17  A    Yes.

18  Q    We can go to the day before.  You can see the chart.  That

19  shows the first day, right?  If you need me to scroll to the

20  prior page, you'll see that that's when it begins.

21  A    Sure.

22  Q    Okay.

23           MR. BURKE:  Now let's go to the next page.

24  Q    So 1/31/2019 at 1:10 p.m., is that -- isn't that the same

25  day that you actually saw the FBI?

Klagsbrun - Cross -

1   A    I can't remember if I saw the FBI on the 30th or the 31st.

2   Q    Okay.  So either the same day or the very next day --

3   A    Right.

4   Q    -- Brendan's placed on one-on-one status after you meet

5   with the FBI?

6   A    Correct.

7   Q    Right?

8   A    Yes.

9   Q    Okay.  And one-on-one status, or SA -- what does the SA

10  stand for?  Status there.

11  A    Yeah.  One-to-one observation.

12  Q    Okay.  Whatever S and the A means, that's what it stands

13  for?

14  A    Exactly.

15  Q    Okay.  And they also -- so does that mean he's got

16  somebody following him around the entire time, or he has --

17  A    Yes.  If SA status is for the full 24 hours, then yes.

18  Q    Okay.  Is there any way to tell whether this SA status was

19  full -- I guess if we scroll down.

20  A    Yeah.  We just see.  But it was.  So that I can say, it

21  was.

22  Q    So it's -- all right.  So then we don't need to do that

23  exercise.  You know he was on SA status for 24 hours a day?

24  A    Correct.

25  Q    And that began on January 31, 2019.

Klagsbrun - Cross -

1    You had also changed his medication to Clozaril, right?

2    A    I did that on January 24.

3    Q    Okay.  So I know you don't recall when the FBI reached out

4    to you to set up that meeting.  Do you believe it was prior to

5    January 24 where they called to set up the meeting on January

6    31, or you just don't recall?

7    A    I don't recall.

8    Q    Okay.  So it could have been prior to January 24, 2019

9    that the FBI reached out to you, right?

10   A    Yes.

11   Q    During that meeting with the FBI I wasn't there, right?

12   A    No.

13   Q    And as far as you know -- well, I wasn't invited, was I?

14   A    I don't know who else was invited.

15   Q    Okay.  Did the FBI agents ever tell you that I objected to

16   them going to meet with you because I feared that it would

17   interfere with Brendan's care?

18   A    It was a long time ago.  I don't recall -- I don't recall.

19   Q    Okay.  Now, back to the Columbine anniversary.  Doctor, as

20   Brendan continued to be kept at Four Winds, you indicated in

21   your notes that you wanted to keep him past that anniversary,

22   did you not?

23   A    I did.

24   Q    Okay.  And you actually took steps to go and have him

25   involuntarily committed on February 27, right?

Klagsbrun - Cross -

1  A    Well, he was already involuntarily committed, but it was
2  to continue that.
3  Q    He was involuntarily committed by White Plains, right?
4  A    Yes.
5  Q    Okay.  And he was going to be discharged the end of
6  January based on that involuntarily committal, correct?
7  A    No.  One thing doesn't have to do with the other.
8  Q    All right.  Wasn't he supposed to be discharged from the
9  end of January, beginning of February?
10 A    Well, we had scheduled discharge statements.
11 Q    And the scheduled discharge date was February 5, 2019,
12 right?
13 A    No.  It was January 24 or 25.
14 Q    Was there, then, a subsequent scheduled discharge date of
15 February 5, 2019?
16 A    No, there was no discharge date February 5 that I recall.
17 Q    Did there come a time, Dr. Klagsbrun, after the FBI
18 meeting that you had -- that Dr. Pogge and you performed a
19 HCL-20 [verbatim] and a Hare PCL?
20 A    I never performed those scales.  And Dr. Pogge did in his
21 psychiatric -- in his psychological assessment.  But I didn't
22 do any of those scales.
23 Q    Okay.  During his -- during that January 16, 2019
24 evaluation, it didn't have the HCL-20 and the Hare PCL as part
25 of it, did it?

Klagsbrun - Cross -

1   A    I don't recall.  I'd have to look.  But if it doesn't say

2   it, then it didn't have it.

3   Q    Okay.  I'm going to represent to you that it does say it.

4   And we'll get to the next entry and you'll see why.

5   A    Okay.

6              MR. BURKE:  So if we could go to February 7, 2019,

7   page 1099.  And at the bottom of page 1099, Shannon, please.

8        Thank you.

9   Q    It begins here at the bottom, it says, We also completed

10  an HCL-20 and then a Hare PCL to assess violence risk and any

11  evidence of psychopathy, right?

12  A    Yes, that's what it says.

13  Q    And according to these scales, He was a moderate risk of

14  violence -- and we can continue on to the next page -- and had

15  some characteristics of psychopathy, but not a psychopath

16  compared to the general population, right?

17  A    That's what it says.

18  Q    And there is a differential between antisocial and a

19  psychopath, right?

20  A    Yes.

21  Q    And a psychopath is someone who is considered to have a

22  severe form of antisocial personality disorder, right?

23  A    Yes.

24  Q    And someone who has an antisocial personality disorder,

25  they are on a spectrum, correct?

Klagsbrun - Cross -

1  A    All of these are on a spectrum.

2  Q    Right.  So you can have somebody that suffers from

3  antisocial personality disorder where it can range in severity

4  from occasional bad behavior to repeatedly breaking the law,

5  right?

6  A    Sure.

7  Q    All right.  So back to the you wanted to make sure that

8  you kept Brendan past April 20, 2019.  So you filed in the end

9  of February for the involuntary commit before Westchester

10  County Court, correct?

11  A    Yes.

12  Q    Okay.  In that filing --

13        MR. BURKE:  Shannon, I'm sorry to do this to you.

14  Are you able to pull up Defendant's Exhibit E, as in Edward?

15        MS. BECKER:  Give me one second.

16        Do you need to offer it first or is it okay if I

17  bring it up?

18        MR. BURKE:  Sam, was this offered already?

19        I think Sam offered it.

20        MR. ADELSBERG:  I have not offered this.  This is --

21        MR. BURKE:  Okay.  I beg your pardon, then.  This is

22  the involuntary filing, so I'm going to offer Defendant's

23  Exhibit E at this time.  In particular, if we could just go

24  to --

25        THE COURT:  Hang on.

Klagsbrun - Cross -

1          Any objection, government?

2          MR. ADELSBERG:  No, your Honor, no objection.

3          THE COURT:  All right.  Defendant's E is received.

4          (Defendant's Exhibit E was received)

5          MR. BURKE:  If we could turn to page 6 of the PDF.

6   BY MR. BURKE:

7   Q    Dr. Klagsbrun, that's your certificate as an examining

8   physician regarding Brendan Vaughan for an involuntary commit

9   on February 27, 2019, correct?

10  A    Yes.

11  Q    All right.  On page 2 -- beg your pardon.  Not page 2.

12  The next page.  Page 2 of the affidavit.  That's my fault.

13  Page 7.  You talk about his admission, and it says, While he

14  was admitted, FBI reached out to treatment team because they

15  felt they had a duty to warn, and it says they showed the team

16  evidence that Brendan had a plan to shoot up four schools on

17  April 20, the anniversary of Columbine.

18          Right?

19  A    Yes.

20  Q    That's what you were writing to the Court in this

21  affidavit?

22  A    Yes.

23  Q    And it says, They also showed us suicidal statements made

24  by Brendan.

25          Right?

Klagsbrun - Cross -

1    A    Yes.

2    Q    Okay.  Now, again, you don't know -- or do you have any

3    recollection of when the FBI said that Brendan made those

4    statements or drew up the plans?

5    A    No.

6    Q    Okay.  So there's nothing in this submission by you of

7    anything about threats that Brendan made to staff, right?

8    A    In this?  No.  No.

9    Q    And there's nothing in this about any concerns about

10   Brendan eloping, right?

11   A    No.

12   Q    And there's nothing in this admission about Brendan

13   tampering with his ankle monitor, correct?

14   A    Correct.

15   Q    Now, Dr. Klagsbrun, did the FBI -- well, withdrawn.

16        During that meeting with the FBI on January 30 or 31 of

17   2019, they never told you that it was impossible for Brendan to

18   blow up four schools in Washingtonville on April 20, 2019, did

19   they?

20   A    I don't recall them saying that.

21   Q    So they didn't tell you, Dr. Klagsbrun, that April 20,

22   2019 was a Saturday?

23   A    I don't recall them saying that.

24   Q    They didn't tell you that on April 20, 2019 the

25   Washingtonville schools were on Easter break?

Klagsbrun - Cross -

1    A      I do not recall them saying that.

2    Q      Okay.  And you would agree with me, Doctor, would you not,

3    that schools aren't in session during Easter break and schools

4    are not in session on Saturdays, correct?

5    A      Correct.

6    Q      Okay.  So would you agree with me that on April 20, 2019,

7    the anniversary of Columbine, it would have been impossible to

8    blow up four schools in Washingtonville with the students there

9    because no students were there?

10   A      Okay.

11   Q      You agree with that, right?

12   A      I agree that on Saturdays school is out of session, sure.

13   Q      Now, Doctor, throughout Brendan's admission there was

14   indications of symptoms of autism, correct?

15   A      Correct.

16   Q      From the very beginning, from the June 20 -- the June 8,

17   2018 admission, one of the first entries that we went through

18   earlier today, or I guess maybe even yesterday, showed that

19   Dr. Campbell believed he had features of autism, correct?

20   A      Yes.

21   Q      And you -- there was also an entry -- just to move this

22   along, and I'm not necessarily going to show you unless you

23   really feel compelled that I have to -- but on February 9,

24   2019, on page 1108 there's an entry about autistic features and

25   Brendan being on the autism spectrum.  February 16, 2019, 1160,

Klagsbrun - Cross -

1   same thing, autistic features, or Brendan being on the

2   spectrum.  And then on March 7, same thing, page 1313, Brendan

3   being on the -- suffering from the autism spectrum disorder.

4   March 8, additionally, same thing.

5        And when you spoke with the FBI after Brendan was

6   discharged the last time, you told them that he was diagnosed

7   both with autism and the personality disorder, right?

8   A    No.

9   Q    You did not tell them that?

10  A    No.  During the meeting they shared information with me.

11  I don't recall --

12       My screen just froze.

13       I don't recall what specifically I discussed.  The focus

14  was them sharing information with me.

15  Q    I'm sorry, but I think you're misunderstanding.  I'm

16  talking about after Brendan gets discharged the last time in

17  March of 2019.  You had subsequent meetings with the U.S.

18  Attorney where -- and in particular, it's the 3501T, you told

19  the U.S. Attorney's Office that you think Brendan has both

20  Asperger's but also ASPD, right?

21  A    Yes.

22  Q    And you also said that in your diagnosis when he was

23  discharged, that Brendan has ASD and antisocial personality

24  disorder, right?

25  A    Yes.

Klagsbrun - Cross -

1    Q    Okay.  When Brendan was discharged and signed the

2    discharge paperwork, isn't it a fact that on March 12 you said

3    he was still suffering from bipolar disorder and the diagnosis

4    hadn't changed?

5    A    I am unaware of that.  Could be that somebody didn't

6    change it in the chart.  Sometimes -- well, not sometimes.

7    Personality disorders can't be primary diagnoses, and typically

8    patients don't get diagnosed with personality disorders, so our

9    system doesn't allow it unless you ask IT to override it.  So

10   that might have been the issue, that his admission diagnosis

11   remained until we asked them to override it.  So that might be

12   why.

13   Q    Well, on the -- so the diagnosis did not -- when did the

14   diagnosis change in any of the paperwork that he had an actual

15   diagnosis of ASD and ASPD?

16   A    Sure.  Whenever it was changed in the progress notes.  I

17   can't recall the exact date.  But that's how the diagnosis gets

18   officially changed before it can get officially changed in the

19   discharge diagnosis.  So that's our protocol, that the doctor's

20   note says, Change the diagnosis to these diagnoses.

21             MR. BURKE:  One moment, your Honor.

22             If you could turn to page 1367, please.  And just go

23   to the bottom.

24   Q    Dr. Klagsbrun, that's Brendan signing the discharge.

25             (Discussion off the record).

Klagsbrun - Cross -

1   BY MR. BURKE:

2   Q    Dr. Klagsbrun, the 1367 shows Brendan signing the

3   discharge paperwork; is that right?

4   A    Yes.

5   Q    Okay.  And the preceding page, 1366, top portion where it

6   says Principal Diagnosis, bipolar DO unspecified, do you see

7   that?

8   A    Yes.

9   Q    Okay.  And this would have been prompted from whatever's

10  in the system as to what the principal diagnosis is to have

11  this discharge paperwork filled out, correct?

12  A    Right.  Well, it looks like it says discharge date 2/5.

13  Q    Right.  So was there a discharge date 2/5?

14  A    Not that I recall.

15  Q    So I guess back to my question, do you have -- let me

16  just...

17  A    I recall the discharge date January 24 or 25.  There might

18  have been another one scheduled.  It looks like -- it looks

19  like there was for February 5.

20  Q    Okay.  And that didn't happen either?

21  A    Correct.

22  Q    And the meeting with the FBI was on the 31st prior to that

23  potential discharge date of February 5?

24  A    For the February 5 one, yes.

25  Q    Doctor, did you ever speak to Brendan's family and Brendan

Klagsbrun - Cross -

1   about the possibility of shock therapy?

2   A    Yes.

3   Q    And that was in the meeting where you went over

4   Dr. Pogge's report; is that right?

5   A    I can't remember when it was brought up.  If it was in the

6   note, then --

7   Q    ECC therapy is shock therapy, is it not?

8   A    Yes.

9   Q    And you brought up that if medication doesn't work, you

10  were considering shock therapy; is that right?

11  A    Well, we weren't, but it's an option that's out there.  We

12  don't do that at Four Winds.

13  Q    During Brendan's stay at Four Winds, even the last stay

14  from January 24 through March 12, 2019, Brendan wasn't ever

15  placed in restraints, was he?

16  A    Not that I recall.

17  Q    Okay.  But that's an option, you could place him in

18  restraints, correct?

19  A    We don't have physical restraints, but patients can be

20  physically restrained by mental health workers.

21  Q    So you don't have physical restraints at all at Four

22  Winds?

23  A    Not at all.

24  Q    You mentioned that you put him on Clozaril and then also

25  Depakote, right?

Klagsbrun - Cross -

1   A    Correct.

2   Q    Did you ever do any blood levels to determine whether

3   Clozaril was in his system?

4   A    Not that I recall.  It can take weeks to get those

5   results, so they are often not so useful.

6   Q    Okay.  How about the Depakote, you did blood levels on

7   those, right?

8   A    Yes.

9   Q    So you chose not to do the blood levels on the Clozaril,

10  is that what I'm hearing, because it would take too long?

11  A    That's usually why we don't do Clozaril levels.  You

12  increase the dose by the time you get the Clozaril levels.  But

13  yes, you can get levels.

14  Q    And that wasn't done here for Brendan to determine whether

15  he had the therapeutic leveling of Clozaril in his system?

16  A    Just to clarify, there's clinical therapeutic levels when

17  you evaluate a patient clinically versus a blood level.

18  Q    Okay.  Perhaps I was imprecise in my question.

19       You didn't do any blood tests to determine whether he had

20  Clozaril in his system or not, correct?

21  A    Correct.

22  Q    But you did do it for Depakote, correct?

23  A    Correct.

24  Q    So is the Depakote test quicker, do you get that test back

25  quicker than you get the test on Clozaril?

Klagsbrun - Cross -

1    A    Yes.  You usually get it back within 24 hours, yes.

2    Q    During his stay there, you increased the Clozaril levels

3    from first -- well, 75 to 100 to 200 to 300 to 400 milligrams

4    per day of Clozaril; isn't that right?

5    A    Correct.

6    Q    Then you also increased his Depakote levels to 1,000

7    milligrams, right?

8    A    Correct.

9    Q    Do you have any recollection of when you did the blood

10   test to determine his levels of Depakote?

11   A    Not when, but I have recollection of the levels.

12   Q    Okay.  So depending on his prescribed medication could

13   also dictate what his levels would be, right?

14   A    Sure.  It depends on the dose and the amount that is in

15   the system in one --

16   Q    When you took Brendan off of the Depakote and the

17   Clozaril -- well, withdrawn.

18        You were increasing him to levels where you were

19   attempting to completely sedate him; isn't that right?

20   A    Not at all.

21   Q    So where there's indications in the note where you said

22   you were surprised that he wasn't sedated on those levels of

23   Clozaril, that it's biologically impossible not to be

24   sedated -- do you remember those entries?

25   A    Yes.

PAMELA GRIMALDI, CRR, CLR
914.390.4053

Klagsbrun - Cross -

1    Q    So isn't it a fact that you and Four Winds were trying to

2    sedate Brendan?

3            THE COURT:  Hang on.  Hang on.  I was uncomfortable

4    muting Mr. Vaughan, but it's really the source of the echoing,

5    so I have to mute him again.  Sorry.

6            MR. BURKE:  Your Honor, can we just -- can we unmute

7    him for a moment?  I just want to make sure -- well, he would

8    have said something when he was unmuted, I gather, so...

9            THE COURT:  Yeah.  He can also call you on the other

10   line, right?

11           MR. BURKE:  Yes, I believe he can if there's a real

12   issue.

13           THE COURT:  All right.

14   BY MR. BURKE:

15   Q    Dr. Klagsbrun, you didn't do anything to wean Brendan off

16   of the Clozaril, did you?

17   A    Can I answer the previous question about sedation?

18   Q    Yes, you can.

19   A    So certain medicines in most individuals cause sedation.

20   So -- but that's different than the goal of a doctor -- you

21   know, you said I was trying to completely sedate him.  My point

22   in the record was that this is a medicine that, for most, if

23   not all individuals, they get sedated.  That's why you go up

24   very, very slowly.  So it's unusual not to see any initial

25   sedation.  But that doesn't make that the goal of the

Klagsbrun - Cross -

1  medication.  Usually that then goes away as one's system gets
2  used to the medicine while you get to a therapeutic level.  So
3  you go slower if the person is --
4  Q    You said there was some indication -- you broke up there.
5  I think we lost that last part of it.  I didn't hear it.
6            MR. BURKE:  Judge, was that just on my end?
7            THE COURT REPORTER:  No.  Mine too.
8            THE COURT:  Mine too.
9            So, Doctor, if you could just restate that answer,
10 please.
11           THE WITNESS:  Sure.
12 A    So I was just saying that in a medicine that's very
13 sedating, you go up slowly.  You monitor for sedation.  And if
14 someone's becoming too sedated, since the goal is never to
15 sedate a patient, the goal is to treat a patient, you then slow
16 down the titration.  So it was unusual that during the course
17 of the entire titration, that there wasn't any indication of
18 sedation.  It's just highly, highly unusual in this medication.
19 Q    But you did say that there was some indication he was less
20 inhibited, right, while on it?
21 A    Well, when off it, he was more disinhibited.  So yes, it
22 was unclear whether the Clozaril or Depakote did that, but yes,
23 he was more disinhibited off the medications somewhat.
24 Q    Okay.  Which would indicate at least taking some of the
25 medication, at least from that observation, right?

Klagsbrun - Cross -

1    A    Yes.

2    Q    Okay.

3         MR. BURKE:  So, Shannon, if we could just go to page

4    1348.  And scroll down to Assessment.  There.

5    Q    You have the admitting diagnosis of bipolar, right?

6    A    Yes.

7    Q    Okay.  And if there was a change in his diagnosis, that

8    would be reflected there, right?

9    A    Yes.

10   Q    Okay.

11        MR. BURKE:  So if we could scroll down further.

12   Actually, I beg your pardon, if we could go to the top right

13   corner.

14   Q    This was March 12, 2019 at 6:20 a.m.  So at that point you

15   still hadn't changed his diagnosis from bipolar to autism

16   spectrum disorder and antisocial personality disorder; is that

17   right?  According to these records.

18   A    Just in this note can you scroll down so I can see the

19   assessment?  In this note, it looks like no, but I have to see

20   the assessment.

21        In this note, no.

22   Q    Okay.  And you'd agree with me, would you not, that he was

23   discharged on that date where his discharge said bipolar

24   unspecified, and then you issued a later discharge report where

25   it said autism spectrum disorder and the personality disorder?

Klagsbrun - Cross -

1  A    I don't think for his last discharge we did two

2  discharges; I think there was just one.  I think you were

3  referring back to the February 5 planned discharge with the

4  bipolar.

5  Q    Right.  But it was signed on March 12.  So you're saying

6  that that was just a misentry?

7  A    So that might have been due to IT not having overridden

8  the system to be able to complete the paperwork.  They had to

9  do something to allow us to put the antisocial personality

10  disorder as the primary diagnosis.  So that might have been

11  why.

12  Q    During his course of treatment at Four Winds, you did

13  not -- or none of the clinicians provided Brendan with any

14  treatment related to his developmental disability of autism,

15  correct?

16  A    I would say no.  No to your question.

17  Q    No, you did not provide any treatment related to the

18  autism spectrum disorder?

19  A    I would disagree with that statement.

20  Q    Doctor, you talked about -- on your direct examination

21  about Brendan's traumatic upbringing and that he suffered

22  trauma at the hands of his father with the one incident of

23  assault, correct?

24  A    I don't think I exactly phrased it that way.

25  Q    Well, you only knew of one incident where Brendan --

Klagsbrun - Cross -

1   Brendan's father supposedly assaulted him, right?

2   A    Brendan reported to me only one incident of his father

3   assaulting him.

4   Q    When you spoke to the father, was that ever anything you

5   spoke to him about?

6   A    Yeah.  I mean, it wasn't the main focus.

7   Q    You made a big point yesterday during your direct about

8   the traumatic effects of Brendan and issues that he experienced

9   as a young man before he reached 18 to support your

10   determination of antisocial disorder.  And that was one of the

11   things you talked about, was the assault that Brendan suffered

12   by his father, right?

13   A    Yes.

14   Q    Okay.  And as far as you know, making that assessment, it

15   was one incident, right?

16   A    My understanding, as I said yesterday, we don't know how

17   many incidents.  One incident was reported to me by Brendan,

18   along with the alcoholism and other things.  So it's not just

19   one --

20   Q    And the alcoholism.  He had been sober for over 10 years,

21   as the records reflect, right?

22   A    Record reflects at one point eight years, one point 10

23   years.  That's the record reflecting.

24   Q    Okay.  So eight to 10 years, based on your records, he had

25   been -- Mr. Vaughan had been sober?

Klagsbrun - Cross -

1    A    Well, based on the records.  That doesn't mean it's

2    factual, but based on the records, that's what was reported.

3    Q    And there was no records to report that Brendan had any

4    assaultive behavior where he ever hit anyone in school, right?

5    A    Not that I am aware of.

6    Q    And there was no record of Brendan ever assaulting anyone

7    in the home, right?

8    A    Not that I'm aware of.

9    Q    And there was never any indication of prior arrests

10   involving assaultive behavior or weapons, correct?

11   A    Not that I'm aware.

12   Q    Then you mentioned the one instance where Brendan wouldn't

13   see his mother when she came to visit him when she was sick,

14   right?  That's one of the evidence of lack of empathy.

15   Would you --

16   A    Yes.

17   Q    Did you ever speak to Mrs. Vaughan about her relationship

18   with Brendan?

19   A    I had interactions with her and we talked about Brendan.

20   Q    And did she tell you anything about her interactions with

21   him and their relationship and how good of a relationship they

22   had?

23   A    I don't recall her saying anything about their

24   relationship specifically.  It was more focused on concern

25   about his behaviors or her cutting down on her drinking.  That

Klagsbrun - Cross -

1    was what I recall.

2    Q    You recall her -- well, withdrawn.

3         It was never reflected in those interviews, because you

4    would have recorded it, right, that Brendan had a bad

5    relationship with his mother?

6    A    Sometimes things don't get recorded in the record that

7    are, in fact, what's going on.

8    Q    Okay.  Well, in your recollection of your meetings and

9    one-on-one interviews with Mrs. Vaughan, you have no

10   recollection of her ever telling you that she didn't have a

11   good relationship with Brendan, correct?

12   A    Correct.

13   Q    And I think the only instance you reference of any kind of

14   abuse of animals was a frog; is that right?

15   A    Yes.

16   Q    When you changed his diagnosis to antisocial personality

17   disorder and the autism spectrum disorder, did you indicate the

18   rationale behind -- well, withdrawn.

19        You didn't indicate in the determination, as to why you

20   were determining him to be antisocial, the frog, did you?

21   Specifically.  When you changed --

22   A    Right.  I did not reference the frog, no.  Not that I

23   recall.

24   Q    And you didn't specifically reference any kind of

25   perceived family trauma that he suffered prior to his

Klagsbrun - Cross -

1    hospitalization at Four Winds, did you?

2    A    I do not recall referencing that.

3            MR. BURKE:  Your Honor, I believe I'm nearing the

4    end.  I just want to check my notes and then I think we can...

5    Actually, I got one...

6    Q    Dr. Klagsbrun, you mentioned a reference to people --

7    staff members saying something about his -- that Brendan said,

8    You're on my list, right?

9    A    Yes.

10   Q    And you and others -- well, interpreted that to mean hit

11   list, did you not?

12   A    I did.

13   Q    But actually the reported notes never said anything about

14   a hit list.  He just said, You're on my list; isn't that right?

15   A    Yes, those are the words he used, You're on my list.

16   Q    Of people that he doesn't like, right?

17   A    Yes.

18   Q    And you then interpreted that to mean he must have a hit

19   list, so you went and looked in his journal and found some area

20   that was scratched out that you think might have contained a

21   hit list, but you have no idea, correct?

22   A    Yes.

23   Q    Okay.  So there was never any corroboration during this

24   examination that he ever even had a list or a hit list or

25   anything along those lines, correct?

Klagsbrun - Cross -

1    A    Well, no.  The corroboration would be his saying, You're
2    wondering if I have a hit list, in the context of everything
3    else.
4    Q    I'm asking that the examination of his diary or journal,
5    there was no indication of any kind of list; is that right?
6    A    Well, there was an indication of scratching out.
7    Q    Where you believe that could be, you didn't know?
8    A    Right.  Right.  But I didn't see because it was scratched
9    out.
10   Q    Right.  You -- in fact, when you reached out to the FBI,
11   you said, He's got a hit list.  I want him out of here.  Did
12   you not say that?
13   A    I don't remember my words, but I did -- I did say he needs
14   to go and that they need to figure out where, because staff
15   were incredibly frightened of him.
16   Q    You said "staff was incredibly frightened of him."  I
17   think you also mentioned during your direct that some staff
18   member had some kind of concern about liability that they
19   expressed to you.  Who was that staff member?
20   A    Dr. Campbell had concerns that if Brendan were to act on
21   his impulses, he would somehow be responsible, being his
22   treating psychologist, if she then discharged him and this
23   happened.
24   Q    And what happened?  He didn't do anything.
25   A    Right.  You asked me her concern.  That was her concern

Klagsbrun - Cross -

1  and, in part, why I took over the case.  She was very anxious

2  treating somebody she thought was dangerous and that she would

3  then have to discharge, so...

4  Q    So she treated him all along through the first six

5  admissions, discharged him where there was no acute suicidal or

6  homicidal risk, and then at that point expressed these concerns

7  of the liability, so you took it over?

8  A    The whole time there was concern, it just grew over time.

9  Q    There was never an expression in the discharge by

10  Dr. Campbell or the other doctors that were discharging him, a

11  concern of homicidal or suicidal ideation.  It said no acute

12  homicidal or suicidal ideation, correct?

13  A    Correct.

14  Q    At the end of your entry you said that Brendan should be

15  examined by a forensic -- to have a forensic evaluation done,

16  right?

17  A    Yes.

18  Q    And Brendan did have those forensic evaluations done by

19  Dr. Termini, to the Court, and Dr. Wright, correct?

20  A    Well, no.  I said forensic psychiatrist.  They are

21  forensic psychologists.

22  Q    But they did a forensic evaluation of Brendan to assess

23  him, correct?

24  A    Correct.

25  Q    And Brendan has also been accepted by OPWDD as having a

                        Klagsbrun - Cross -

1   developmental disability, correct?

2   A    I didn't see -- no.

3         MR. BURKE:  If we could, Shannon, please pull up

4   Defendant's Exhibit D, as in David.

5         MS. BECKER:  Again, do you want to offer that first?

6         MR. BURKE:  I was about to ask.

7         Yes, I'm going to offer it, your Honor.

8         THE COURT:  Any objection, government?

9         MR. ADELSBERG:  No objection.

10        THE COURT:  Received.

11        MR. BURKE:  Thank you.

12        (Defendant's Exhibit D was received)

13        MR. BURKE:  If we could scroll down a bit.  The part

14  that begins, An eligibility packet.  So it's on the top.

15  BY MR. BURKE:

16  Q    It says that, An eligibility packet was submitted to

17  support its determination of a developmental disability and

18  eligibility for OPWDD.

19        Now, OPWDD is Office of Persons With Developmental

20  Disabilities, correct?

21  A    Yes.

22  Q    And that was submitted, and it appears on the top of the

23  document on June 18, 2019, right?

24  A    Yes.

25  Q    And at the second page of this document -- keep going

                    PAMELA GRIMALDI, CRR, CLR
                         914.390.4053

Klagsbrun - Cross -

1  down.  Sorry.  Near the -- just above the signature.

2                    (Cell phone rang)

3            MR. BURKE:  Sorry about that.

4  Q    It says, Based on the information provided, results of

5  2nd-Step Review, we have determined that you have a

6  developmental disability and you are eligible to apply for

7  OPWDD services.  There's some additional services eligibility

8  criteria that have not been reviewed through this process.

9        So they are indicating that he's got a developmental

10  disability and eligible to apply for services, right?

11 A    Yes.

12 Q    And that's Brendan, correct?

13 A    Yes.

14 Q    OPWDD treats people on the autism spectrum, correct?

15 A    Yes.

16            MR. BURKE:  Your Honor, now I'm done.

17            Thank you, Dr. Klagsbrun.

18            THE COURT:  All right.  So redirect?

19            MR. ADELSBERG:  Your Honor, is it possible to take a

20  five-minute break just to confer with Ms. Feinzig?

21            THE COURT:  It's always possible.  But yes, we can

22  take a five-minute break.

23            MR. ADELSBERG:  Thank you, Judge.

24            (A recess was taken).

25            MR. BURKE:  Sam, what should I tell the next witness?

Klagsbrun - Redirect -

1    You're not going to be long, are you?  Or you don't know?

2              MR. ADELSBERG:  This shouldn't take long.

3              THE COURT:  Hang on.  We just need the doctor.

4              THE WITNESS:  I'm here.

5              THE COURT:  There you are.  Hi, Doctor.  Sorry.  I

6    was looking in the wrong direction.

7              She's like, I'm here.  I really want to get this

8    done.  Let's go.

9              All right.  Let's wait for Mr. Burke to resume his

10   chair in his fancy law conference room there.

11             MR. BURKE:  Those books are fake, Judge.

12             THE COURT:  That doesn't matter.  As long as they

13   look good.

14             MR. BURKE:  They are more ornamental.  No one uses

15   them.  You just go online now.

16             THE COURT:  That's been true of books for a long

17   time.

18             MR. BURKE:  Absolutely.

19             THE COURT:  All right.  So government, redirect.  Go

20   ahead.

21             MR. ADELSBERG:  I'm going to start with a screen

22   share, if that's okay.

23   REDIRECT EXAMINATION

24   BY MR. ADELSBERG:

25   Q    Dr. Klagsbrun, do you recall that defense counsel asked

Klagsbrun - Redirect -

1   you about the record currently on the screen which is dated

2   August 20 and specifically highlighted as part of the record?

3   A    Yes.

4   Q    And do you recall that defense counsel also stated that

5   there was no indication that the defendant was actually

6   cheeking his medication?

7   A    Yes.

8   Q    I'm going to direct you to another record, which is dated

9   the exact same date.

10          MR. BURKE:  Your Honor, I just object as to my

11   characterization on that document.  But --

12          THE COURT:  You want to clarify, then, government?

13   Because otherwise he's going to have recross.

14          MR. BURKE:  I don't think when we got to that

15   document I was saying anything about cheeking.

16          MR. ADELSBERG:  It was actually -- I clarify it was

17   later on in the -- in your cross-examination that you said that

18   there was no indication that he was actually cheeking.  It was

19   a statement that was made.  And I don't think it's incredibly

20   relevant.  I think that the point will become clear when I ask

21   the witness some questions.

22          THE COURT:  All right.  Go ahead.

23   BY MR. ADELSBERG:

24   Q    Dr. Klagsbrun, can you read -- and you know what, the

25   handwriting is a little hard to read, so --

Klagsbrun - Redirect -

1    A    I can read it.

2    Q    In our chart I typed it out.  Will you read the August 20,

3    2018 entry on the same day.

4    A    Patient appears to spit sublingual medication into water

5    cup after administration.  When inspected further, the water

6    clearly contained pieces of medication.  Patient states it's

7    what he always does and is only little because it tastes bad.

8    Q    What does this record suggest to you?

9    A    That Brendan is not compliant with taking his medications,

10   and he even said so himself.

11   Q    Okay.  Now, further down in Exhibit 1, which is already in

12   evidence, there are a number of parts of this chart that are

13   highlighted.  Do you see those?

14   A    Yes.

15   Q    And were all of these entries from before the FBI went and

16   performed a duty to warn?

17            MR. BURKE:  Objection.

18            MR. ADELSBERG:  Can you give us -- it's over two

19   pages, so I'm going to -- look at the dates on this page, and

20   then I'm going to go to the next page.  If you could just give

21   me a date range for all of these -- all of the highlighted

22   entries.

23            THE COURT:  Isn't the document in evidence?

24            MR. BURKE:  It is, Judge, but I think the way the

25   question was worded, it said prior to the FBI.  The FBI came

Klagsbrun - Redirect -

1   there in January.  So all the entries on this document are not

2   prior to when the FBI went there.

3            MR. ADELSBERG:  I wasn't saying --

4            THE COURT:  Rephrase it.

5            (The court reporter requested clarification.)

6            MR. ADELSBERG:  I was just asking the witness about

7   the entries that are highlighted, which are entries from -- as

8   you can see, from August 2018 until January 28, 2019.  And so

9   my question to the witness is...

10  BY MR. ADELSBERG:

11  Q    Were all of these entries from before the FBI came to --

12  to speak with you?

13  A    They were.

14  Q    And this evidence is already in record, so I'm not going

15  to go through each one of these entries.  But during

16  cross-examination, when defense counsel asked you about why the

17  defendant was discharged in early December, you stated, in

18  substance, that it was complicated.  Is that correct?

19  A    Yes.

20  Q    Can you explain what you meant by that.

21  A    Sure.

22       So we were trying to discharge Brendan to continue seeing

23  Dr. Nakkab, his psychiatrist, and Elaine Zimmerman, his

24  therapist, and we were not able to get appointments with them

25  because both of them seemed too concerned about --

Klagsbrun - Redirect -

1              MR. BURKE:  Objection to the characterization.

2              THE COURT:  No, because she was asked on cross about

3    why it was complicated.  She said it was complicated.  And now

4    she's being asked why.

5              MR. BURKE:  Okay.  That's fine.  I'll withdraw my

6    objection.

7              THE COURT:  Okay.  Go ahead.

8    A    They felt concerned treating him as an outpatient, so they

9    wouldn't give us appointments.  And then they gave us

10   appointments and then said, No, actually, we don't feel

11   comfortable.  So we had scheduled discharge.  I thought we had

12   an appointment with Dr. Nakkab and Elaine Zimmerman.  And then

13   last minute Dr. Nakkab canceled and we couldn't -- we couldn't

14   get those appointments.  So that was part of why we didn't do

15   the discharge.

16       Then I had a conversation with Brendan's parents, and his

17   mother said, Is there anything you can do to help with his

18   obsession?  And I then brought up Clozaril and explained why

19   and how it can sometimes help if someone is just obsessed, and

20   it covers all the psychiatric illnesses.  And so his parents

21   were in favor of that.  So then we decided at that point to

22   start it.  And that was the week before I had met with the FBI.

23       But after I canceled the discharge was when Brendan had

24   then broken the Kindle and slammed the door and then started

25   more so breaking rules, being noncompliant, threatening to

Klagsbrun - Redirect -

1    elope.  It was much more outward.  And that was all before the

2    meeting with the FBI.

3    Q    Right.  So why was Bren -- why was the defendant placed on

4    one-on-one status at the end of January?

5    A    Right.

6         So then after the meeting with the FBI, it became clearer

7    to myself and the treatment team about Brendan breaking rules

8    and not following -- following rules.  And so in my meeting

9    that Eileen and I had, Eileen Scully, the program director, who

10   also had met with the two FBI agents, when she and I were

11   meeting with Brendan, it was actually Eileen Scully who said to

12   him, Actually, can we see your ankle monitor, and is the

13   battery still on?  And he hadn't charged it.  And he took it

14   out, and there was some excuse why.

15        And so in part we put him on one-to-one status to monitor

16   the ankle monitor bracelet, because there was concern that he

17   wasn't charging it, he wasn't using it.  It was there for a

18   reason.  So that was a big part of why we put him on status.

19        And in addition, we then found out he was getting people's

20   phone numbers, and so also to try to stop that as well and

21   protect the other patients from that as well.

22        So there were many reasons why.  But specifically with the

23   ankle bracelet was a huge -- a huge deal.  And like I said, I

24   didn't even realize that you could take out the battery and how

25   it worked until that meeting.  And so then we put him on

Klagsbrun - Redirect -

1   one-to-one status.

2   Q    During the defendant's time at Four Winds, did you always

3   have the same level of involvement in his treatment?

4   A    No.

5   Q    So was there a time you became more involved in his

6   treatment?

7   A    Absolutely.  In the last admission.

8   Q    And was it during that period when you became more

9   involved in his -- in his treatment that you reached the

10  conclusion or the diagnosis of antisocial personality disorder?

11  A    Yes, absolutely.  There were a lot of things, but -- and

12  part of why I took over the case was, like I said earlier,

13  staff were feeling worried, there were legal issues going on.

14  Then came the meeting with the FBI.  There were a lot of

15  pieces.

16       But then, yes, due to the fact that I was seeing Brendan

17  day to day, observing, hearing directly, in addition to my

18  meeting with the FBI, all of that together, and having known

19  Brendan over the course of nine months, and then starting to

20  put all the pieces together that weren't so straightforward in

21  the first six admissions, yes, that then contributed to my

22  diagnosis of antisocial personality disorder.

23  Q    Final question here.  You had mentioned in response to

24  cross-examination that the defendant appeared to experience a

25  lack of sedation from a high dose of medication.  What, if

Klagsbrun - Recross

1   anything, does that suggest to you?

2   A   Sure.  So it's unusual when you keep increasing a medicine

3   that typically is sedating to have no sedative effect in a

4   person's response.  And so that, then, is another -- another

5   way to signify that a patient is potentially not taking the

6   medication.

7           MR. ADELSBERG:  Thank you, Dr. Klagsbrun.

8           No further questions, your Honor.

9           THE COURT:  Recross?

10          MR. BURKE:  Yes, your Honor.  Just briefly.

11  RECROSS EXAMINATION

12  BY MR. BURKE:

13  Q   Dr. Klagsbrun, you just said on redirect that you saw

14  Brendan every day during the last admission, Monday through

15  Friday; isn't that right?

16  A   Unless I was out.

17  Q   And so by saying every day, that may not be accurate,

18  correct?

19  A   Yes.  Not every day because I don't work on the weekends,

20  and after I took over the case formally.

21  Q   Okay.  And you took --

22  A   To clarify.

23  Q   You took over the case formally not right at the beginning

24  of his admission, but sometime around when the FBI came; is

25  that fair to say?

PAMELA GRIMALDI, CRR, CLR
914.390.4053

Klagsbrun - Recross

1    A    No.  I think it was before.  It's stated in the progress
2    notes what specific date that was.
3    Q    Okay.  If I represent to you it was around the 24th, does
4    that sound about right, January 24, when you --
5    A    If I see a note, but I was -- just to clarify, I was
6    heavily involved from the beginning.  I was the one talking
7    with Dr. Nakkab trying to schedule that appointment the morning
8    of Brendan's discharge.  So even though the record doesn't say
9    the level of my involvement --
10   Q    And "heavily involved," you're not -- you're not seeing
11   Brendan one-on-one, and you're not reflecting in any of the
12   evaluations that you're evaluating Brendan.  Your treatment
13   team is doing that, other doctors are doing that, correct?
14   A    It doesn't mean I'm not seeing him.  But prior to that, I
15   wasn't seeing him five days a week.
16   Q    And, in fact, from February 27 through March 5 you weren't
17   in the hospital, you were out of the hospital for whatever
18   reason for that period of time, and Dr. Riccardelli covered for
19   you; isn't that right?
20   A    Yes.
21   Q    So during that period, from February 27 to March 5, you
22   weren't there?
23   A    Correct.
24   Q    So you weren't physically seeing Brendan or observing him.
25   So when you said earlier you were there every day, you saw him

Klagsbrun - Recross

1  every day, that wasn't accurate, was it?

2  A    Not every single day of his last visit.  That was

3  inaccurate, correct.

4  Q    The --

5          MR. BURKE:  Your Honor, this is perhaps more taking

6  judicial notice that April 20, 2019 is a Saturday on the

7  calendar.

8          THE COURT:  I actually have a vivid memory that, in

9  fact, it was a Saturday.  So done.

10          MR. BURKE:  All right.  We can talk about that off

11  the record.  Unless you want to share now.  But anyhow.

12          THE COURT:  No.  Keep it for later.

13          MR. BURKE:  That sounds good.

14          I have no further redirect.  Thank you,

15  Dr. Klagsbrun.

16          THE COURT:  Any re-redirect?

17          MR. ADELSBERG:  No, your Honor.

18          THE COURT:  Doctor, I can finally say you are

19  excused.  Enjoy the rest of the day.  Please stay healthy.

20          THE WITNESS:  Thank you.

21          THE COURT:  Government, any other witnesses?

22          MR. ADELSBERG:  No, your Honor.

23          THE COURT:  All right.  So the government rests.

24          Mr. Burke, do you want me to bring in Dr. Wright

25  here?

Proceedings

1          MR. BURKE:  Yeah.  I just need to kind of clear my

2     area, if that's okay.

3          THE COURT:  That's fine.  Why don't I go ahead and

4     admit her into the Zoom party here, and then we can swear her

5     in and what not.

6          Dr. Wright, can you hear me?

7          DR. WRIGHT:  I can.

8          THE COURT:  So if you would switch on the video,

9     since you're about to testify.  Good afternoon.

10          DR. WRIGHT:  Good afternoon.

11          THE COURT:  Sorry to keep you waiting.  These things

12     sometimes take longer than we expect, in spite of everybody's

13     good faith estimates.

14          So Mr. Burke is collecting his notes so he can begin

15     the direct examination.  And just so you know, Doctor, we're

16     going to have to stop at 3:00 because we have some limitations

17     imposed by, you know, things outside our control.

18          So Mr. Burke, you just let me know when you're ready,

19     and then we can swear the doctor in.

20          MR. BURKE:  I'm ready, Judge.

21          THE COURT:  Antoinette, do you want to do the honors?

22     You've got to unmute.

23     MEGAN WRIGHT, PsyD, having been duly sworn, testified as

24     follows:

25          THE COURT:  Do you want to state and spell your name

PAMELA GRIMALDI, CRR, CLR
914.390.4053

Wright - Direct -

1    for the record, Doctor?

2              THE WITNESS:  Megan Wright, W-R-I-G-H-T, first name

3    M-E-G-A-N.

4              THE COURT:  Mr. Burke, you may proceed.

5    DIRECT EXAMINATION

6    BY MR. BURKE:

7    Q     Good afternoon, Dr. Wright.

8    A     Good afternoon.

9    Q     Dr. Wright, what's your occupation?

10   A     I'm a clinical psychologist.

11   Q     How long have you been a clinical psychologist?

12   A     Since 2009.

13   Q     What's your -- where do you work?

14   A     I work at Forensic Psych Eval, Inc., which is my own

15   practice.

16   Q     Prior to 2009, what's your educational background?

17   A     So I completed my master's in clinical psychology in 2009.

18   I then completed my doctorate in clinical psychology in 2011.

19   Q     Since then, what have you been doing since you completed

20   your doctorate?

21   A     Since my doctorate, I've been employed as a forensic

22   psychologist in a few different agencies, mainly the New York

23   State Office of Mental Health where I was employed as a

24   forensic psychologist.  And that position split me between

25   Greenhaven and Downstate Correctional Facility.  And then I

Wright - Direct -

1  also worked as a consultant for Astor doing Family Court

2  evaluations for child abuse and risk factors.

3      And then for my own practice, which started in 2016, I'm a

4  forensic psychologist doing risk assessment and forensic

5  evaluation.  And I have other clinicians who do treatment here

6  as well.

7  Q    During your educational work, did you ever work with

8  Bureau of Prisons?

9  A    I did.  After my master's, I did.

10 Q    Is that the federal Bureau of Prisons --

11          MS. BECKER:  Should we have Dr. Klagsbrun still on

12 the call or should she leave the Zoom?

13          THE COURT:  Yeah, I think that Dr. Klagsbrun should

14 leave.  I assume you want that, Mr. Burke, right?

15          MR. BURKE:  I do.

16          THE COURT:  Nothing personal, Doctor.

17          MS. BECKER:  Margery and Sam lost their connection.

18          THE COURT:  All right.  So Dr. Klagsbrun needs to --

19          MR. BURKE:  How did we lose both of them at the same

20 time?

21          THE COURT:  Because we're on the government feed.

22          MS. FEINZIG:  Yeah.  Probably, your Honor.

23          MR. BURKE:  I just got an alert that mine's unstable

24 too.  But that's okay.

25          THE COURT:  All right.  So Dr. Klagsbrun, if you

Wright - Direct -

1   could exit the Zoom, because in theory you could be recalled as
2   a witness, and so witnesses shouldn't be listening to other
3   witnesses's testimony.
4           I don't know, maybe she's not even there.
5           MR. ADELSBERG:  It might be --
6           THE COURT:  I can remove her.  These hosting powers
7   can make you kind of crazy here, you know.  You can remove
8   people.  It's a little scary.
9           All right.  So this may be reversible error, but I'm
10  going to remove the doctor from the Zoom.
11          It asks if I want to report her.  No, I don't.
12          MR. BURKE:  Is that for Zoom bombing?
13          THE COURT:  I guess so.  I don't know.
14          All right.  Thank you, Pam [verbatim], for that
15  suggestion.
16          You may continue, Mr. Burke.
17          MR. BURKE:  Thank you, your Honor.
18  BY MR. BURKE:
19  Q    Dr. Wright, my last question -- and I'll repeat it,
20  because I think the government dropped off.  Have you ever
21  worked for the Federal Bureau of Prisons?
22  A    Yes, I have.  After I completed my master's during my
23  doctoral program I did.
24  Q    Okay.  And according to your CV, you worked there for
25  about a year; is that right?

Wright - Direct -

1   A    Yes.

2   Q    Where did you work for the Department of -- the Bureau of

3   Prisons?

4   A    FMC Devens outside of Boston.

5           (The court reporter requested clarification.)

6   Q    And at the Bureau of Prisons when you worked there, you

7   worked for the forensic psychology department at FMC Devens,

8   right?

9   A    I did, on the risk assessment team.

10  Q    That's where you would be doing the HAR -- the Hare

11  assessment, the PCL-5 assessment, the HCR-20 assessment, right?

12  A    Yes.  That was also -- yes, we did.  That was also civil

13  confinements.

14  Q    Did you in your -- over the course of your career, have

15  you ever been declared an expert?

16  A    I have.

17  Q    I'm sorry, I didn't hear you.

18  A    Yes, I've been declared.

19  Q    Have you ever been found to be an expert by a court of

20  law?

21  A    Yes, I have.

22  Q    Approximately how many times?

23  A    Approximately 84 times.

24  Q    And 84 times that you've been deemed to be an expert by a

25  court of law, was that in forensic psychology?

Wright - Direct -

1  A    It's always in forensic psychology, but it sometimes

2  differs in the specificity of the case, so it's normally in

3  risk factors, sexual offending, child abuse, and general

4  violence assessment, general violence risk.

5  Q    And have you ever been denied expert treatment by a Court?

6  A    No, sir.

7  Q    The 84 times, was it mostly state court or was there

8  federal court also where you were deemed an expert?

9  A    Mostly state court.  There were times at Devens where I

10 would testify via closed video feed for the Bureau of Prisons,

11 but normally those were in civil confinement trials, so they

12 were internal trials.

13          MR. BURKE:  Your Honor, at this time I'd like to

14 offer Dr. Wright as an expert in forensic psychology.  I don't

15 know if I need to be that formal.

16          THE COURT:  Any objection?

17          I don't think we need to be.

18          But any objection, government?

19          MR. ADELSBERG:  No, your Honor.

20          THE COURT:  Okay.  Done.

21          MR. BURKE:  Thank you.

22 BY MR. BURKE:

23 Q    Dr. Wright, did there come a time when you were contacted

24 to perform a mental health violence risk assessment on Brendan

25 Vaughan?

Wright - Direct -

1  A    There was, in the summer of 2020.

2  Q    I'm just going to ask if you could keep your voice up,

3  Doctor.

4  A    Sorry.

5  Q    No worries.

6       Dr. Wright, you said you were contacted in the summer of

7  2020 to perform a report -- to perform an evaluation on Brendan

8  Vaughan.  Did there come a time that you performed the

9  evaluation on Brendan Vaughan?

10 A    Yes.  In August of 2020.

11 Q    And that evaluation, what were you tasked to do?

12 A    I was asked to --

13 Q    Well, let me ask it a different way:  What were you

14 looking to do by way of evaluating Brendan?

15 A    Risk of violence, overall dangerousness, overall

16 psychological functioning.

17 Q    And does it indicate -- you have a copy of your report in

18 front of you?

19 A    Yes, I do.

20       MR. BURKE:  Sam, have you already moved in Exhibit 6?

21 I think you have.

22       MR. ADELSBERG:  I think I moved in both of your

23 experts' reports.

24       THE COURT:  Yeah, I think that's right, I think you

25 did.

Wright - Direct -

1          MR. BURKE:  Okay.  If he hasn't, I'll move it in now
2    just in the abundance of caution.

3          But I believe you have.
4    BY MR. BURKE:

5    Q    So Dr. Wright, you performed an evaluation of Brendan.
6    What did you do to perform that evaluation?

7    A    I interviewed him at -- he was an inmate at the time at
8    Orange County Jail, where I believe he still is, interviewed
9    him over the course of a day, did assessments, and reviewed a
10   large amount of records, and also spoke with his mother.

11   Q    You say you also spoke with his mother?

12   A    I did.

13   Q    And did you do a battery of tests on Brendan?

14   A    I did.

15   Q    Okay.  The evaluation of Brendan where you said you spent
16   the day there, that was on August 17 of 2020; is that right?

17   A    It was.

18   Q    Did you have to go back and see him again for the battery
19   of tests?

20   A    No.

21   Q    Was it over a two-day period?  Go ahead.  I'm sorry.

22   A    I spent the day there.  And I had to leave some paperwork
23   there with the captain because the day just ran out, and so
24   then I was given the paperwork afterwards.

25   Q    When did you get the paperwork afterwards?

Wright - Direct -

1   A     It was mailed to me almost immediately.  He just had to

2   complete -- he was just completing -- he was completing one

3   assessment.

4   Q     Okay.  So the jail mailed you that final assessment; is

5   that right?

6   A     Uh-huh.  Yes.

7   Q     Your evaluation report, it goes through a number of the

8   tests that you performed and the opinion that you rendered,

9   right?

10  A     Yes.

11  Q     And did you make a determination as to, based on your

12  interview, evaluation of records, and review of other items,

13  Brendan's risk level?

14  A     At the time, when I evaluated him, I found him to not be a

15  current risk for danger to self or others.  But, you know, it

16  encompasses that, that time.

17  Q     And that's the time where you had interviewed him and went

18  through, as I said, a host of questionnaires, your observation,

19  your review of records, correct?

20  A     Yes.

21  Q     What was the first test that you performed?  I think it's

22  on page 5.

23  A     The MMPI-RF, which is the Restructured Form of the MMPI-2.

24  At that time was the most current version of the MMPI.

25  Q     And previously Dr. Termini wasn't able to perform the MMPI

Wright - Direct -

1    because her evaluation of Brendan was within a six-month period

2    of a MMPI being performed; is that right?

3    A    It was too close, the time period was too close.

4    Q    So the -- you had -- well, withdrawn.

5         The 12-month period allowed you then to perform this test,

6    right?

7    A    Yes.

8    Q    What does the test look to measure?

9    A    The MMPI measures a variety of things:  Basically all

10   mental health symptomology in sort of the four main domains

11   that we have, which are depressive symptoms, anxiety symptoms,

12   psychotic symptoms, mood disorder symptoms.  And then in

13   addition to that, it's measuring one's approach to the test.

14   So it can detect whether someone is overreporting,

15   underreporting, attempting to get a specific result.

16   Q    I'm just going to jump back.  Prior to your evaluation of

17   Brendan Vaughan, have you rendered opinions in your expert

18   capacity that individuals suffer from autism?

19   A    Yes.

20   Q    Have you also rendered opinions that individuals have

21   suffered from antisocial personality disorder?

22   A    Yes, absolutely.

23   Q    What does the MMPI show as far as Brendan and the results

24   that you evaluated?

25   A    So it's a current snapshot.  So it's, you know, someone

Wright - Direct -

1   sort of reporting presently what's going on with them.  And

2   what he reported at the time was a huge amount of depression.

3   And, of course, I did interview him in jail, so a huge amount

4   of depression.  A lot of -- a lot of anxiety, a lot of

5   self-deprecation, a lot of independent personal difficulties.

6   Very, very cynical towards himself and his own behaviors.  And

7   then he also reported a lot of memory problems.  And coping

8   issues with stress.

9   Q    And based on that finding, you recommend continued ongoing

10  psychiatric treatment, right?

11  A    Very strong need for ongoing psychiatric treatment was

12  indicated.  He presented as unwell.

13  Q    And do you know if he's been accepted to continue

14  treatment at OPWDD or with OPWDD?

15  A    At the time, he had been accepted.  There are instances

16  where things change.  So from what I knew at that time, he had

17  been accepted.

18  Q    And accepted to continue to treat his developmental

19  disability of autism; is that right?

20  A    Accepted to receive treatment through OPWDD, is sort of --

21  so in New York State, if you're accepted as being eligible,

22  they then will take over your care.

23  Q    In order for that process to happen, they have to make a

24  determination that an individual is disabled and suffers from a

25  developmental disability, right?

Wright - Direct -

1    A    I've never worked for them, but from what I know, yes, you

2    sent in -- usually a family member sends in records, and all of

3    those records are reviewed, and normally they contact you back

4    and ask for more and, you know, it becomes -- it's almost as if

5    one applies for Medicare or Medicaid.  You basically send them

6    all of your medical records.

7    Q    And as far as you understand it, they -- when you were

8    interviewing him in August 2020, he had been accepted as

9    eligible for this -- for these services, right?

10   A    Yes.  Yes, I believe it was in June, he had gotten an

11   eligibility letter.

12   Q    The next test that I think in your report you indicated

13   that you performed is on page 6 where you reference the Hopkins

14   Psychiatric Rating Scale?

15   A    Yes.

16   Q    And what is that test and what does it show?

17   A    So that is a scale that I chose based on it having been

18   used with him previously.  And it basically divides symptoms in

19   relatively large clusters, and it's looking for where are the

20   greatest concentrations of endorsements with regard to

21   symptomology.  You know, those clusters can be applied to a lot

22   of different diagnoses, so they are divided up sort of in

23   general categories.  So there's an obsessive compulsive cluster

24   of symptomology, there's depressive and psychotic.  And so it

25   basically gives a very rough delineation as to what the

Wright - Direct -

1   person's identifying primarily.

2       I'm sorry about my voice.

3   Q   That's okay.

4       What does it show -- what do the results show for the

5   Hopkins Psychiatric Rating Scale as to Brendan in your

6   evaluation?

7   A   So he endorsed overall depressive and anxiety symptoms.

8   But the anxiety symptoms can be translated to varying

9   diagnoses.  So OCD is an anxiety disorder.  PTSD is an anxiety

10  disorder.  So when someone is endorsing the symptoms, it's very

11  widespread.  It narrows down slightly where their most current

12  symptomology that they are reporting lies.

13  Q   All of these tests, do they have validation built within

14  them, or validity checks as they are called?

15  A   They do.  They do.  I mean, ultimately it's best to give

16  multiple tests and to not rely completely on them, just because

17  it's not good practice to rely on one test or completely rely

18  on another test.  In general you want to look at all the

19  information that you are able to get.  So they all have

20  validity built into them, just in different ways.

21  Q   And you'd also build into your assessment your

22  observations and review of certain records; is that fair to

23  say?

24  A   Yes, it is.

25  Q   And based on your observations of Brendan and the review

Wright - Direct -

1  of the reports, do you believe that he was on the autism

2  spectrum?

3  A    I did.  I did.  I believe he met the criteria for that at

4  that time.

5  Q    What was the criteria you believe he met at that time?

6  A    The hallmark criteria of autism is persistent social

7  disturbance and a persistent difficulty connecting with other

8  people beginning at a young age, usually before the age of 11.

9  So it really -- all of his records seem to resonate that he had

10  had social -- social issues and difficulty connecting with

11  others, difficulty communicating from a young age.

12  Q    You told me what the Hopkins Psychiatric Rating Scale

13  showed, and I believe -- what was your findings?

14  A    He mainly indicated depression and anxiety at that time.

15  Q    Was that consistent with any prior evaluation?

16  A    It was.  He -- when I looked at the records from Four

17  Winds, he had endorsed -- it differed slightly, but he endorsed

18  a lot of depressive and anxiety symptoms there as well.  He did

19  not endorse hostility with me, and I remember that he had with

20  them.  So I'm not sure if that was environmental or just

21  different with me.  But I did not find him hostile, at least at

22  that time.

23  Q    So Dr. Wright, how many tests did you perform on Brendan?

24  A    In total, nine.

25  Q    You did the MMPI, I think -- we have it on your report,

Wright - Direct -

1  right?

2  A    Yes.

3  Q    We've got the MMPI, the Historical Clinical Risk

4  Management -- that's the HCR-20?

5  A    Yes.

6  Q    The Hare Psychopathy Checklist:  Revised Version, PCL:R.

7  The State-Trait Anger Expression Inventory.  That's the

8  STAXI-2?

9  A    Uh-huh.

10 Q    Firestone Assessment of Violent Thoughts, that's the FAVT,

11 and then also Classification of Violent Risk, COVR?

12 A    Yes.

13 Q    The Trauma Symptom Inventory, right?

14 A    Uh-huh, yes.

15 Q    And then Hopkins Psychiatric Rating Scale.  We talked

16 about that one.  Structured Interview of Reported Symptoms,

17 SIRS, right?

18 A    Yes.

19 Q    So we've gone through the Minnesota and the Hopkins

20 psychiatric tests.  What was the next test that you performed?

21       THE COURT:  I think you're going to have to keep us

22 in suspense, Mr. Burke, because we're coming up on the 3:00

23 hour.

24       MR. BURKE:  This is a good time, because I did want

25 to send over to the government and the Court the 20 questions.

Wright - Direct -

1    And that way -- it would take a little bit of time to get it to

2    everybody now because I put a sticker on it.  So this is as

3    good a time as any.

4              THE COURT:  Okay.  All right.  So then we will break

5    for the day and pick up again tomorrow 10:00.

6              Dr. Wright, I very much appreciate your patience.  I

7    know we did keep you waiting today.  I can assure you it was

8    nobody's fault except maybe technology's.

9              All right.  So Doctor, you are excused.  You are on

10   cross-examination, so don't talk to anybody about your

11   testimony, all right?  You're not on cross.  I take that back.

12   You will be on cross.  Talk to whoever you want.  But just be

13   available tomorrow morning at 10:00.  So you can go, Doctor,

14   because I just want to ask the lawyers some questions.

15             THE WITNESS:  Yes, sir.

16             THE COURT:  Thank you.

17             So I'm trying to unmute your client.

18             THE DEFENDANT:  Hello?

19             THE COURT:  We're going to have to fix that.

20             Somehow.

21             So how long do you think you're going to be on direct

22   with Dr. Wright, Mr. Burke?

23             MR. BURKE:  I don't think -- maybe an hour, probably

24   less.

25             THE COURT:  Okay.

Proceedings

1          MR. BURKE:  So I don't think it's going to be much

2     more.  And I think Dr. Termini, same thing, maybe an hour.  My

3     hope is that we get everything done and move to sentencing

4     tomorrow.  I think we can.  So long as Sam doesn't have a

5     lengthy cross, which I don't anticipate.  But I'll leave that

6     to him.

7          THE COURT:  Okay.  So from the person who just spent

8     five hours cross-examining somebody, government, don't be too

9     long cross-examining the defense witnesses, I guess is the

10    moral of the story.  Do you think your cross will last more

11    than a half an hour for either witness?

12         MR. ADELSBERG:  I don't anticipate it lasting more

13    than a half hour, your Honor.

14         THE COURT:  Okay.  All right.  So I think if you

15    could both just really synthesize your notes to try to be as

16    efficient and crisp as you can tomorrow, then we can get this

17    done.  Because as I said, I'm very concerned about if we don't

18    finish this tomorrow, then when will we be able to resume?

19         And I know, for one, that having all the doctor

20    testimony fresh in my head would be very helpful to then go

21    into sentencing tomorrow.

22         So do whatever you can.  I'm not trying to tell you

23    how to do your job, but whatever you can do so we can finish

24    tomorrow would be great.

25         MR. BURKE:  Yes, your Honor.  I'm hoping -- I believe

Proceedings

1  we will be done probably lunch break, and then move to

2  sentencing after is what I'd like to see.

3            THE COURT:  Okay.

4            MR. BURKE:  Anyhow.

5            THE COURT:  All right.  Okay.  Anything else that we

6  need to take up?

7            MR. ADELSBERG:  Your Honor, one quick thing.  Defense

8  counsel sent to chambers and to the government an exhibit,

9  Exhibit F.

10           THE COURT:  Yeah.

11           MR. ADELSBERG:  Which defense hadn't put or sought to

12 put into evidence.  I just want to put on the record that the

13 government doesn't think it's a -- there's an accurate -- well,

14 to the extent that the judge has looked at it, because it was

15 submitted to chambers, it represents itself as a compilation of

16 excerpts.  And distinct from our Exhibit 1, which is actually

17 quoted excerpts, there appears to be some commentary baked in,

18 or at least -- it's not quotations and it's not direct

19 excerpts.  And we just want to put on the record that we would

20 object to that being considered as a direct reflection of the

21 records.

22           THE COURT:  Why don't we -- why don't you two talk,

23 all right, and see if you can come to an agreement.  If you

24 can, great.  If you can't, then I'll referee the disagreement

25 tomorrow.

PAMELA GRIMALDI, CRR, CLR
914.390.4053

Proceedings

1          MR. BURKE:  That's fine.  And you have my cell.

2          MR. ADELSBERG:  Yep.

3          MR. BURKE:  Okay.

4          THE COURT:  All right.  Anything else?

5          (Discussion off the record).

6          MR. ADELSBERG:  Thank you, Pam.  Really appreciate

7    it.

8          And if there's nothing else from anybody else, then

9    we will adjourn and bid you all a pleasant afternoon.  See you

10   tomorrow at 10:00.

11   CERTIFICATE:  I hereby certify that the foregoing is a true and
     accurate transcript, to the best of my skill and ability, from
12   my stenographic notes of this proceeding.

13

14          Pamela L. Grimaldi, RPR, CRR, CLR
            Official Court Reporter, USDC, SDNY
15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3   SARAH KLAGSBRUN, M.D.                                    Page

4     Continued Cross Examination by Mr. Burke              140
      Redirect Examination by Mr. Adelsberg                 248
5     Recross Examination by Mr. Burke                      255

6   MEGAN WRIGHT, PsyD

7     Direct Examination by Mr. Burke                       259

8

9                        EXHIBITS

10

    Defendant's Exhibit D                                   246
11  Defendant's Exhibit E                                   227

12

13

14

15

16

17

18

19

20

21

22

23

24

25